STERN KILCULLEN & RUFOLO, LLC
Herbert J. Stern
    hstern@sgklaw.com
Joel M. Silverstein
    jsilverstein@sgklaw.com
325 Columbia Turnpike, Suite 110
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

GIBSON, DUNN & CRUTCHER LLP
Theodore J. Boutrous, Jr., *pro hac vice forthcoming*
    tboutrous@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

*Attorneys for Defendants*
*Chevron Corp. and Chevron U.S.A. Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF HOBOKEN<br><br>Plaintiff,<br><br>v.<br><br>EXXON MOBIL CORP., EXXONMOBIL OIL CORP., ROYAL DUTCH SHELL PLC, SHELL OIL COMPANY, BP P.L.C., BP AMERICA INC., CHEVRON CORP., CHEVRON U.S.A. INC., CONOCOPHILLIPS, CONOCOPHILLIPS COMPANY, PHILLIPS 66, PHILLIPS 66 | Civil Action No. 2:20-cv-14243<br><br>**NOTICE OF REMOVAL** |

COMPANY, AMERICAN
PETROLEUM INSTITUTE,

Defendants.

**TO THE CLERK OF THE ABOVE-TITLED COURT AND TO PLAINTIFF THE CITY OF HOBOKEN AND ITS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT Defendants Chevron Corp. and Chevron U.S.A. Inc. (collectively, "the Chevron Parties") remove this action—with reservation of all defenses and rights—from the Superior Court of New Jersey, Law Division: Hudson County, No. HUD-L-003179-20, to the United States District Court for the District of New Jersey, pursuant to 28 U.S.C. §§ 1331, 1332(d), 1367(a), 1441(a), 1442, 1446, and 1367(a), and 43 U.S.C. § 1349(b). All other defendants that have been joined and served (collectively, "Defendants") have consented to this Notice of Removal.

This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because the Complaint necessarily arises under federal laws and treaties and presents substantial federal questions as well as claims that are completely preempted by federal law. Removal is also proper pursuant to the federal officer removal statute, 28 U.S.C. § 1442, as well as 28 U.S.C. §§ 1332(d), 1441(a), and 1446, and 43 U.S.C. § 1349(b). This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claims for which it does not have original federal question jurisdiction because

they form part of the same case or controversy as those claims over which the Court

has original jurisdiction.

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................... 1

II.    TIMELINESS OF REMOVAL ................................................. 34

III.    SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL ..... 35

IV.    THIS COURT HAS FEDERAL-QUESTION JURISDICTION BECAUSE PLAINTIFF'S CLAIMS NECESSARILY ARISE UNDER FEDERAL LAW ...................................................................................... 40

V.    THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL SHELF LANDS ACT ................................................................ 52

VI.    THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE ............................................................ 60

VII.    THE ACTION IS REMOVABLE BECAUSE IT NECESSARILY RAISES DISPUTED AND SUBSTANTIAL FEDERAL ISSUES ........................... 117

VIII.    THE ACTION IS REMOVABLE BECAUSE IT IS COMPLETELY PREEMPTED BY FEDERAL LAW ............................................... 142

IX.    THIS ACTION IS REMOVABLE BECAUSE THIS CASE ARISES FROM ACTS ON MULTIPLE FEDERAL ENCLAVES ................................... 150

X.    THE ACTION IS REMOVABLE UNDER THE CLASS ACTION FAIRNESS ACT ....................................................................... 154

XI.    THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER ...... 162

## I.    **INTRODUCTION**

For many decades, United States policy has expressly recognized the fundamental strategic importance of oil and gas to the Nation's economic well-being and national security.  It is not an accident that the United States Department of Defense is the single largest consumer of energy in the United States and one of the world's largest users of petroleum fuels.   And when certain OPEC countries embargoed oil sales to the United States in 1973-74, the U.S. Congress responded by, among other things, creating the Strategic Petroleum Reserve to blunt the use of petroleum as a weapon.  *See* Energy Policy and Conservation Act of 1975, Pub. L. No. 94-163, 89 Stat. 871 (1975).  For similar reasons, Congress enacted the Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258, 90 Stat. 303, 307-08 (1976), which "authorized and directed" that petroleum from the federal petroleum reserve at Elk Hills, California—which Defendant Chevron Corp. had operated for thirty-one years, developing and exploiting this capacity—"be produced at the maximum efficient rate for up to 6 years."[1]

In fact, for vital security and economic reasons, every Administration since that of Franklin D. Roosevelt has taken active steps to increase U.S. oil production. While the alleged risks of global climate change have increased focus on alternative

---

[1] *See also* Declaration of Joshua D. Dick ("Dick Decl."), Ex. 2 (Steven Rattner, *Long-Inactive Oilfield is Open—for Now*, N.Y. Times (Oct. 31, 1977)); *id.* Ex. 3 (Robert Lindsey, *Elk Hills Reserve Oil Will Flow Again*, N.Y. Times (July 3, 1976)).

sources of energy, petroleum remains the ineluctable backbone of United States energy policy.   For this reason, in 2010, President Obama "announc[ed] the expansion of offshore oil and gas exploration—but in ways that balance the need to harness domestic energy resources and the need to protect America's natural resources."[2]  President Obama explained that it was "not a decision that I've made lightly. . . . But the bottom line is this: given our energy needs, in order to sustain economic growth, produce jobs, and keep our businesses competitive, we're going to need to harness traditional sources of fuel even as we ramp up production of new sources of renewable, homegrown energy."[3]

Now, however, Plaintiff asks the court to find that this same petroleum production contributes to, among other things, an unlawful "public nuisance" and "trespass" under New Jersey state law.  Under various theories, the Complaint seeks to hold Defendants liable for "extracting, producing, and selling more than 12% of the world's fossil fuels since 1965."  Compl. ¶ 335; *see also id.* ¶¶ 291(e), 309(e), 339, 347, 350, 357, 362.   Plaintiff asserts that this subjects Defendants to "compensatory, consequential and punitive damages," as well as orders "compelling Defendants to abate the nuisance" and "preliminarily and permanently enjoining" them from conducting their lawful activities.  Compl. at 144–45, Prayer for Relief.

---

[2]  Remarks on Energy at Andrews Air Force Base, Maryland, 2009 Daily Comp. Pres. Doc. 2 (Mar. 31, 2010), https://www.govinfo.gov/content/pkg/DCPD.

[3]  *Id.*

Plaintiff's claims depend on Defendants' production, distribution and/or sale of oil and gas that create greenhouse gas emissions if and only if combusted by end users.  Plaintiff does not—and cannot—limit its claims to harms allegedly caused by oil and gas extracted, produced, distributed, sold, marketed, or used in New Jersey. Instead, Plaintiff's claims expressly target Defendants' nationwide and *global* activities.  In fact, Plaintiff's claims sweep even more broadly, depending necessarily on the activities of billions of oil and gas consumers, including not only entities like the U.S. government and military, but also countless hospitals, schools, manufacturing facilities, and individual households around the world.  Indeed, Plaintiff *itself* is a prodigious consumer and user of fossil fuels, emitting thousands of tons of $CO_2$ through its own consumption alone.[4]  Yet, Plaintiff asks this Court to halt Defendants' production of oil and gas by assessing massive monetary damages and entering an injunction.

The scope of this theory is breathtaking—it would reach the sale of oil and gas anywhere in the world, including all past and otherwise lawful sales, including sales to the federal government.  *See, e.g.*, Compl. ¶ 32 ("*Global* production and combustion of fossil fuels is the central reason why the atmospheric concentration of

---

[4] First Environment, Inc., *Greenhouse Gas Emissions Inventory Government Operations City of Hoboken, New Jersey Activities Year 2017*, 16–19, Apr. 2019, https://assets-global.website-files.com/58407e2ebca0e34c30a2d39c/5cbdc8711782057ff8e06626_FINAL_Municipal%20GHG%20Report.pdf.

greenhouse gasses, prominently carbon dioxide ('$CO_2$'), has dramatically increased over the last fifty years. . . ." (emphasis added)).[5]  And because Plaintiff challenges "production and combustion" over the past several decades, the Complaint necessarily calls into question longstanding decisions by the federal government regarding, among other things, national security, national energy policy, environmental protection, the maintenance of a national strategic petroleum reserve program, development of energy resources on the United States' outer continental shelf lands, mineral extraction on federal lands (which have produced billions of dollars in revenue for the federal government), and the negotiation of international agreements bearing on the development and use of fossil fuels.

The federal issues and implications of Plaintiff's Complaint and requests for relief demand resolution by a federal court under federal law.  The determination of how best to address *global* climate change, and the balancing of the costs and benefits of the use of fossil fuels that goes into that equation, has been and should continue to be made by the federal government through federal policies and international cooperation.  As the Ninth Circuit recently explained, "any effective plan [to reduce greenhouse gas emissions] would necessarily require a host of complex policy

---

[5]  *See also, e.g., id.* ¶ 32 ("Global production and combustion of fossil fuels is the central reason why the atmospheric concentration of greenhouse gasses, prominently carbon dioxide ("CO2"), has dramatically increased over the last fifty years."); ¶ 33 ("[G]reenhouse gas emissions from fossil fuels are the main driver of global warming.").

decisions entrusted . . . to the wisdom and discretion of the executive and legislative branches." *Juliana v. United States*, 947 F.3d 1159, 1171 (9th Cir. 2020).   A patchwork of fifty different state-law answers to this necessarily global issue would be unworkable and precluded under our federal constitutional system.  *See North Carolina ex. rel. Cooper v. TVA*, 615 F.3d 291, 298 (4th Cir. 2010) ("If courts across the nation were to use the vagaries" of state "public nuisance doctrine to overturn the carefully enacted rules governing air-borne emissions, it would be increasingly difficult for anyone to determine what standards govern.").

As a consequence, the Complaint is removable to federal court on multiple grounds including, without limitation: (1) federal question jurisdiction (28 U.S.C. §§ 1331, 1441(a)) because Plaintiff's claims "arise under" federal law; (2) jurisdiction under the Outer Continental Shelf Lands Act (43 U.S.C. § 1349(b)); and (3) jurisdiction under the Federal Officer Removal Statute (28 U.S.C. § 1442).

***Plaintiff's claims arise under federal law*.**  Plaintiff's Complaint seeks to use state tort law to impose liability on the energy industry for all of the future harms that Plaintiff alleges will be caused by global warming.  In the process, Plaintiff would effectively levy an unprecedented worldwide tax on lawful productive conduct that has long been encouraged by Congress and foreign governments alike, and that remains essential to the health of the economy and the security, stability, and economic interests of the United States.  Though Plaintiff purports to assert its claims

under state law, the face of the Complaint reveals that the substance of those claims turns on long-established federal policy, statutory, regulatory, and constitutional standards, issues, and frameworks.  The well-pleaded complaint rule makes clear that it is the substance of the claims, not the plaintiff's characterization of them as state or federal claims, that is controlling.

Supreme Court precedent dictates that claims based on alleged interstate or international pollution fall into the narrow category of claims for which the structure of the U.S. Constitution demands that "a federal rule of decision is 'necessary to protect uniquely federal interests.'" *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (citation omitted).  State law, by its very nature, cannot apply, and the Supreme Court has held on at least three separate occasions that an action for interstate air or water pollution necessarily arises under federal law and warrants a federal court's exercise of federal question jurisdiction under 28 U.S.C. § 1331.  *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410 (2011) ("*AEP*") (interstate and international effects of greenhouse gas emissions); *City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) ("*Milwaukee II*") (interstate water pollution); *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972) ("*Milwaukee I*") (same).  In the context of interstate pollution disputes, the Court has explained that "only a federal common law basis can provide an adequate means for dealing with such claims."  *Milwaukee I*, 406 U.S. at 107 n.9 (citation omitted); *see also International Paper Co. v. Ouellette*, 479 U.S.

481, 488 (1987) ("[T]he regulation of interstate water pollution is a matter of federal, not state, law."). Thus, Plaintiff's claims seeking relief for interstate greenhouse gas emissions necessarily "arise under" federal law. *Cf.* 28 U.S.C. § 1441(c)(1)(A). The Complaint's dependence on the navigable waters of the United States reinforces that conclusion. Following these precedents, the Southern District of New York held that a lawsuit legally indistinguishable from this to be one "arising under" federal law. *See City of New York v. B.P. p.l.c.*, 325 F. Supp. 3d 466, 472 (S.D.N.Y. 2018) ("*City of New York*").

Plaintiff's claims also necessarily arise under federal law because they seek to regulate the production and sale of oil and gas abroad (where much of the alleged conduct underlying Plaintiff's claims necessarily occurred), and, therefore, implicate the federal government's foreign affairs power and the Constitution's Foreign Commerce Clause. The federal government has *exclusive* authority over the nation's international policy on climate change and relations with foreign nations. "Power over external affairs is not shared by the States; it is vested in the national government exclusively." *United States v. Pink*, 315 U.S. 203, 233 (1942). In the context of Plaintiff's interstate and international claims, therefore, "our federal system does not permit the controversy to be resolved under state law," "because the authority and duties of the United States as sovereign are intimately involved" and "because the interstate [and] international nature of the controversy makes it inappropriate for state

law to control." *Texas Indus.*, 451 U.S. at 641.   Because climate change is an inherently global phenomenon—and is alleged to be so in the Complaint—any liability imposed by state courts under state law would have global effects, undermining the federal government's foreign-policy prerogatives in an area where comprehensive international solutions are paramount.   Moreover, conflicts would inevitably arise were the courts of different states, each applying its own state's law, to impose conflicting standards on the same global conduct.

At bottom, this lawsuit implicates bedrock divisions of federal-state responsibility.   Plaintiff seeks to usurp, through what is styled as a set of state-law claims, the direction of federal policy in core spheres of national security, nationwide economic development, and international relations.   Given the substantial and uniquely federal interests posed by climate change claims like these, causes of action of the type asserted here arise *only* by federal law or statute.

***Outer Continental Shelf Lands Act***.   In recent decades and continuing through the present, a substantial portion of domestic exploration and production of oil and gas has occurred on the Outer Continental Shelf ("OCS").   Defendants and their affiliates operate a large share of the more than 5,000 active oil and gas leases on nearly 27 million OCS acres administered by the U.S. Department of the Interior

under the Outer Continental Shelf Lands Act ("OCSLA").[6]  Oil produced from the OCS has accounted for approximately 30% of all domestic production, and the U.S. Treasury takes in more than $10 billion in average annual revenues from OCS lease bonuses, rental payments, and royalties.[7]  Many of the Defendants in this lawsuit and their alleged predecessors, successors, or subsidiaries worked to develop the oil and gas resources on the OCS under federal government supervision.  As such, Plaintiff's claims "aris[e] out of, or in connection with . . . any operation conducted on the" OCS, and therefore provide this Court with jurisdiction.  43 U.S.C. § 1349(b).

In 1953, Congress passed OCSLA to make these vital national oil and gas resources available for "expeditious and orderly development."  43 U.S.C. §1332(3). Responding to President Nixon's direction to "increase the acreage leased on the Outer Continental Shelf" to meet the federal government's goal for energy independence from foreign oil by 1980,[8] Congress amended OCSLA to *further encourage* the leasing of the OCS to meet national energy and security needs, while increasing federal control over lessees, to promote the national energy agenda and

---

[6]  Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Management, Before the House Committee on Natural Resources (Mar. 2, 2016), https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.

[7]  U.S. Dep't of Interior, Bureau of Ocean Energy Management, *OCS Oil and Gas Leasing Program:  2012-2017 Final Programmatic Environmental Impact Statement ("2012-2017 EIS")*, OCS EIS/EA BOEM 2012-030, 1-4 (2012).

[8]  *See* Special Message to the Congress on the Energy Crisis, 1 Pub. Papers 29 (Jan. 23, 1974), https://quod.lib.umich.edu/p/ppotpus/4731948.1974.001?rgn=main;view=fulltext.

protect the environment.  The amendments were "intended to result in expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." *California ex rel. Brown v. Watt*, 668 F.2d 1290, 1296 (D.C. Cir. 1981) (quoting 43 U.S.C. § 1802).

Recognizing the substantial federal interests in the OCS leasing program, Congress granted federal courts original jurisdiction "to the *entire range of legal disputes* that it knew would arise relating to resource development on the Outer Continental Shelf." *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985) (emphasis added).  There can be no doubt that Plaintiff's alleged injuries, which the Complaint asserts are a result of Defendants' "production and combustion of fossil fuels," are directly connected to Defendants' substantial operations on the OCS.  Compl. ¶ 32; *see also id.* ¶ 301.  In any event, the Court need only "'credit [Defendants'] theory of the case for purposes' . . . of the removal inquiry." *K&D LLC v. Trump Old Post Office LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020) (quoting *Jefferson Cnty. v. Acker*, 527 U.S. 423 (1999)), and interpret OCSLA broadly in favor of removal.  *See, e.g.*, *The Taxpayer Citizens Grp. v. Cape Wind Assocs., LLC*, 373 F.3d 183, 188 (1st Cir. 2004) (OCSLA is "a sweeping assertion of federal supremacy over the submerged lands outside of the three-mile SLA

boundary").

***Federal Officer Removal***.  Defendants' exploration and production of oil and gas, including production on the OCS and on federal lands, has been conducted substantially under the direction, supervision, and control of officers of the federal government, and therefore this action is also removable under the Federal Officer Removal Statute.  28 U.S.C. § 1442.  Indeed, the leases the government required Defendants to sign in order to produce oil and gas on the OCS include terms and conditions that provide for continued federal oversight and that mandate that Defendants develop the leaseholds to achieve national energy objectives.  These terms require Defendants to produce oil and gas, control the methods of production, and direct how oil and gas are sold to benefit the national economy.  For example, the leases require Defendants to "maximize the ultimate recovery of the hydrocarbons from the leased area"; require that drilling take place "in accordance with an approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD) [as well as] approval conditions"; and specify that the federal government retains the right to oversee the lessee's rate of production from its leases.[9]

By producing oil and gas from the OCS, Defendants help the government meet

---

[9] *See generally* Dick Decl.. Exs. 5–8; Adam Vann, Congressional Research Service, RL33404, Offshore Oil and Gas Development: Legal Framework (2018), https://fas.org/sgp/crs/misc/RL33404.pdf (describing the multi-step process for approval of development plans and BOEM oversight procedures).

11

national interests, and—as President Obama emphasized in 2010—do so in the way that the federal government has concluded best addresses national climate change objectives by balancing national security, economic and environmental concerns. *See supra* n.2. Indeed, one of the first undertakings of the newly created Federal Energy Administration in 1974 was to propose expanding the OCS leasing program significantly: "Recent world events have spotlighted the growing dependence of the United States on imported crude oil and petroleum products. Interruptions in oil imports impose severe costs on the United States due to the pervasive economic role of petroleum in almost every sector of the economy. . . . [T]he Outer Continental Shelf represents one of the most important potential sources of increased domestic energy production, [and so] the President has called for an accelerated leasing program as a mechanism to insure that the most favorable OCS exploration prospects become available for near-term development."[10]

It is significant that, to implement this direction, Congress considered creating a national oil corporation to facilitate the development of oil and gas on the OCS, but ultimately decided that it would be more efficient to contract with private energy companies, including many of the Defendants here, to extract and produce oil and gas from these federal lands through a closely monitored leasing program that would be supervised by the Department of the Interior and provide the federal government

---

[10]  Dick Decl., Ex. 10 (H.R. Doc. No. 93-406, at App'x 2 (1974)).

with sufficient control over the production to protect national interests. *See* Cong. Rec. S903-11 (Jan. 27, 1975). As the Supreme Court has explained, removal is appropriate where, as here, private companies have "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 154 (2007).

As noted above, the United States military needs oil and gas to be produced by Defendants and other industry members to carry out its military purpose. For more than a century, "these products [have been] used for the war effort . . . [as] many 'ordinary' products [are] *crucial* to the national defense, such as . . . fuel and diesel oil used in the Navy's ships; and lubricating oils used for various military machines." *Exxon Mobil Corp. v. United States*, 2020 WL 5573048, at *31 (S.D. Tex. Sept. 16, 2020) (emphasis added); *see also id.* at *47 (noting the "value of [the] petroleum industry's contribution to the nation's military success."). The United States Department of Defense is the country's—and one of the world's—single biggest user of petroleum fuels. In fiscal year 2019 alone, the Department of Defense purchased 94.2 million barrels of petroleum in compliance with military specifications, totaling $12.1 billion in procurement actions.[11]

---

[11] Def. Logistics Agency Energy, Fiscal Year 2019 Fact Book (2019), https://www.dla.mil/Portals/104/Documents/Energy/Publications/FactBookFiscalYear2019_highres.pdf?ver=2020-01-21-103755-473. This Fact Book also provides details of the types of fuels purchased by the military, the military standards governing the fuels purchased from Defendants, and the military's research efforts related to petroleum fuels.

Starting at least as early as World War II, officers of the federal government directed and controlled Defendants' production, extraction, and development of fossil fuel products as required to meet the unprecedented demands generated by the nation's military. The court in *Exxon Mobil v. United States* acknowledged the long history of federal government control over Defendants' lawful activities in finding that the government was responsible for certain environmental response costs under CERCLA: "By controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry." *Exxon Mobil*, 2020 WL 5573048, at *11 (S.D. Tex. Sept. 16, 2020). Federal agencies that were formed for the war effort, including the War Production Board ("WPB") and the Petroleum Administration for War ("PAW"), had the power to order the oil and gas industry to identify scarce goods, prioritize their use, and facilitate gas production for the military. *See United States v. Shell Oil Co*., 294 F.3d 1045, 1049 (9th Cir. 2002) ("*Shell I*"). "The government exerted substantial control and direction over the refineries' actions, including decisions on how to use raw materials and labor." *Exxon Mobil*, 2020 WL 5573048, at *1. The *Exxon Mobil* court rejected the argument that private refiners "voluntarily cooperated" and instead found that they had "no choice" but to comply with federal officer's direction. *Id.* at *11. In fact, the federal government "insiste[d] on having the plants operate 24 hours a day, 7 days a week, year round." *Id*. at *8. Put simply, the federal government "exerted significant control over the operations

of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials." *Id*. at *14.

In the decades after World War II, and continuing up to the present, the federal government has repeatedly relied on energy companies, including Defendants, to increase domestic oil production to bolster the nation's military and economic security. For instance, in the 1970s, in the midst of a series of national energy crises, Congress passed the Trans-Alaska Pipeline Authorization Act of 1973, explaining that it was in the "national interest" to deliver oil and gas from Alaska's North Slope "to domestic markets . . . because of growing domestic shortages and increasing dependence upon insecure foreign sources." Trans-Alaska Pipeline Authorization Act, Pub. L. No. 93-153, § 202(a), 87 Stat. 576, 584 (1973). Defendants in this lawsuit, as well as their alleged predecessors and subsidiaries, have been contributors to the approximately 18.4 billion barrels of oil produced in Alaska since November 1973—the month in which the Trans-Alaska Pipeline Authorization Act was signed into law—to the present.[12] In the 1990s, the Clinton administration amended OCSLA to permit the Secretary of the Interior to grant certain royalty relief payments aimed at "reduc[ing] America's dependence on unreliable sources of imported oil by helping unlock an estimated 15 billion barrels of oil in the central and western Gulf

---

[12] *See* Alaska Oil and Gas Conservation Commission, Data Miner 3: Production, http://aogweb.state.ak.us/DataMiner3/Forms/Production.aspx.

of Mexico" for energy companies' exploration and production.[13]   In the 2000s, the Bush administration opened up approximately 8 million additional acres of OCS lands for leasing in the Gulf of Mexico, stating: "By developing these domestic resources in a way that protects the environment, we will help address high energy prices, protect American jobs, and reduce our dependence on foreign oil."[14]   Through these actions and others too numerous to list here, the United States government has repeatedly pushed for energy companies, including Defendants, to develop the nation's domestic oil resources, both for its own use and the use of billions of consumers, including Plaintiff here.

Without question, Plaintiff's Complaint asserts claims "for or relating to" acts taken by Defendants under color of federal office.  Plaintiff seeks to hold Defendants liable—in the form of compensatory, punitive, and profit disgorgement damages— for actions taken under the direction of federal officers to fulfill the needs of the federal government and in pursuit of federal government policies to develop fossil fuel resources and secure the national defense.  This is more than sufficient for removal under the Federal Officer Removal Statute, which requires only "a 'connection' or 'association' between the act in question and the federal office."  *In*

---

[13]  Press Secretary, White House Office of Communications, Statement on North Slope Oil Bill Signing (Nov. 28, 1995), 1995 WL 699656, at *1.

[14]  Statement on Signing [H.R. 6111], 2 Pub. Papers 2218 (Dec. 20, 2006), https://books.google.com/books?id=o2ei8yOphboC&printsec=frontcover#v=one page&q&f=false.

*re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia*, 790 F.3d 457, 474 (3d Cir. 2015) ("*Def. Ass'n of Philadelphia*"); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (holding same); *Latiolais v. Huntington Ingals, Inc.*, 951 F.3d 286, 292 (5th Cir. Feb. 24, 2020) (en banc) (same).

Defendants' allegations in support of federal officer removal are more than "facially plausible," which is all that is required for "removal under the federal pleading standards." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 941 (7th Cir. 2020); *id.* at 945 (a defendant receives "the benefit of all reasonable inferences from the facts alleged" in the notice of removal). Defendants have asserted a reasonable basis for removal, and where both sides "have reasonable theories of th[e] case," the court "credit[s] only the [defendant's] theory." *Id.* at 947; *see also New Jersey Dep't of Envtl. Prot. v. E.I. Du Pont De Nemours & Co.*, 2020 WL 2611539, at *5 (D.N.J. May 22, 2020) ("[A] party is not required to 'win his case before he can have it removed.'") (quoting *Acker*, 527 U.S. at 431).

***The Complaint's allegations of "concealment" do not defeat removal***. Perhaps recognizing that its claims related to fossil fuel production and combustion are removable on multiple federal law grounds, Plaintiff's Complaint tries, at times, to recast the claims as being about "concealment" or "misinformation" rather than production. For example, the Complaint alleges that Defendants have "tried to

deceive the world for decades," Compl. ¶ 1, and "concealed the harms of fossil fuels … before climate change was widely understood," *id.* ¶ 5.  But these allegations are unfounded:  The scientific research relating to a potential link between fossil fuel consumption and global climate change has been voluminous and prominently in the public domain for decades, and no actions by Defendants could have possibly "concealed" this information.  And there is no dispute that, to this day, the federal government continues to encourage oil and gas production despite being well aware of the potential effects it may have on global climate change—for reasons that President Obama, among others, has explained.  *See Juliana*, 947 F.3d at 1164 ("A substantial evidentiary record documents that the federal government has long promoted fossil fuel use despite knowing that it can cause catastrophic climate change . . . .").

For these reasons, the Complaint is careful not to rely exclusively on allegations of "deception," but rather consistently lumps these claims together with production and sales.  *See, e.g.*, Compl. ¶ 42 ("Defendants' production, marketing, and sale of fossil fuels on a massive and unprecedented scale has been a substantial factor in causing these skyrocketing emissions."); ¶ 58 ("Defendants' extraction, production, and sale of fossil fuels, has therefore been a central force behind the accelerating pace of sea level rise today."); ¶ 74 ("Defendants' extraction, production, and sale of fossil fuels has substantially contributed to a range of devastating climate

impacts.").

The damages Plaintiff seeks confirm that this case is not—and cannot be—about alleged "concealment" or misrepresentations divorced from Defendants' productions activities. The Complaint seeks compensatory damages for all injuries suffered as a result of global climate change, an order compelling Defendants to abate the alleged nuisance, and a *permanent injunction* against Defendants' production of oil and gas—claimed remedies that do not, and cannot, flow from any misrepresentations or omissions. A misrepresentation cannot cause climate change, hurricanes, or a rise in sea level. Rather, according to the Complaint, those events and Plaintiff's alleged injuries are caused by the combustion of fossil fuels—and the numerous other recognized factors that have increased global $CO_2$ levels, like deforestation and other land use decisions, including ones by Plaintiff itself. If Plaintiff's claims were, in fact, based exclusively on alleged concealment and misrepresentations, its asserted damages would necessarily be limited to, at most, any harms attributable to the marginal increase in oil and gas consumption (if any) from the alleged concealment and misrepresentations. But that is not the relief demanded in the Complaint.

The reality is that the world has known for decades that the combustion of oil and gas releases greenhouse gases into the atmosphere, which may contribute to global warming and climate change. In fact, scientists have reported these effects

since the nineteenth century.  In 1896, Svante Arrenhius reported that "if the quantity of carbonic acid increases in geometric progression, the augmentation of the temperature will increase nearly in arithmetic progression."[15]  Similarly, in 1938, G.S. Callendar observed that "the increase in mean temperature, due to the artificial production of carbon dioxide, is estimated to be at the rate of 0.003°C per year at the present time."[16]

By the early 1950s, the potential link between oil and gas use and climate change had been widely reported.  For example, in 1953, popular media including the *New York Times*, *Washington Post*, *Time Magazine*, and *Popular Mechanics*, as well as New Jersey newspapers, reported research concluding that "Earth's ground temperature is rising 1½ degrees a century as a result of carbon dioxide discharged from the burning of about 2,000,000,000 tons of coal and oil yearly."[17]  A 1955 article in New Jersey's Herald-News newspaper was even more explicit, reporting that scientists think "air pollution may be warming up [the] climate . . . by running more

---

[15]  Svante Arrhenius, On the Influence of Carbonic Acid in the Air upon the Temperature of the Ground, 41 Philosophical Magazine and Journal of Science 237, 267 (1896).

[16]  Dick Decl., Ex. 11 (G.S. Callendar, The Artificial Production of Carbon Dioxide and Its Influence on Temperature, 64 Q.J. Royal Meteorological Soc'y 199, 223 (1938)).

[17]  Dick Decl., Ex. 65 (Popular Mechanics, *Growing Blanket of Carbon Dioxide Raises Earth's Temperature* (August 1953); *see also id.* Ex. 12 (W.K., *How Industry May Change Climate*, N.Y. Times (May 24, 1953);; *id.* Ex. 13 (Time Magazine, *Invisible Blanket* (May 25, 1953)); *id.* Ex. 14 (Washington Post, *Industrial Gases Warming Up Earth*, Physicist Notes Here (May 5, 1953)); *id.* Ex. 61 (The Morning Call (Paterson, N.J.), *Physicist Says Industrial Gases Makes World Climate Warmer* (May 5, 1953)).

automobiles, trucks, trains, planes and ships, by building more factories and refineries and in other ways pouring carbon dioxide and other contaminants into the atmosphere."[18]

National and New Jersey newspapers similarly reported the potential risks of sea level rise from global warming as early as the 1950s.  For example, in 1957 a front-page article in the *Washington Post* titled, "Teller Sees World-Flooding Peril Due to Industrial Overheating", reported that prominent nuclear physicist Edward Teller (two years *before* Teller's speech to API referenced in the complaint, Compl. ¶ 76) had noted that "increase[s] in carbon dioxide [are] the result of the ever mounting uses of fuel energy such as coal, oil and derivatives during the industrial age" and, as a result, "the ***ice caps on the poles will begin to melt*** and the amount of water on the earth will increase . . . [and] '[s]uch places as ***New York and Holland would be inundated***.'"[19]  Similarly, a 1956 article in the *Asbury Park Press* reported that "the danger, scientists say, lies in the enormously increasing output of the gas from man's smokestacks, engine exhausts and trash fires.  As a result, the ***world is getting warmer*** under its blanket of air [and] ***polar ice may melt and oceans may rise***."[20]

---

[18]  Dick Decl., Ex. 62 (Sam Dawson, *Scientist Thinks Air Pollution May Be Warming Up Climate*, The Herald-News (Sept. 23 1955), at 13).

[19]  Dick Decl., Ex. 15 (Wash. Post., at A1 (Dec. 8, 1957) (emphasis added) (internal quotation marks omitted)).

[20]  Dick Decl., Ex. 63 (The Asbury Park Press, 18 (July 22, 1956) (emphasis added)).

The potential impact of climate change was a frequent topic in newspaper articles in the decades that followed.  Searches for "greenhouse effect," "global warming" or "climate change" in the Newspapers.com archives for New Jersey papers between 1957 and 2000 alone identify more than 11,000 results.[21]  The same search in all U.S. newspapers covered by Newspapers.com between 1957 and 2000 yields more than 350,000 matches.[22]  Scientific journals also have published an exponentially growing volume of articles addressing climate change, with one researcher identifying more than 222,000 published scientific articles about climate change from 1980 to 2014 alone.[23]  Accordingly, Plaintiff's assertions that Defendants somehow deceived or concealed the relationship between greenhouse gas emissions and climate change are belied by this exceptionally long, substantial and robust public discussion for more than sixty years.

Plaintiff's allegations are further undermined by the undisputed fact that the U.S. government was well aware of the potential link between fossil fuel use and global climate since at least the 1950s and, in fact, actively encouraged and promoted production of domestic oil and gas despite such knowledge.  Testimony before Congress in 1956 revealed that "[b]ased on figures given out by the United Nations

---

[21]  Search last conducted Sep. 20, 2020.

[22]  *Id.*

[23]  Robin Haunschild, Lutz Bornmann & Werner Marx, Climate Change Research in View of Bibliometrics, PLOS ONE, July 2016.

. . . by the year 2010, we will have added something like 70 percent of the present atmospheric carbon dioxide to the atmosphere.  This is an enormous quantity . . . . [I]t may, in fact, ***cause a remarkable change in climate***."[24]  Also in 1956, a study funded by the Office of Naval Research found that "[t]he extra CO2 released into the atmosphere by industrial processes and other human activities may have caused the temperature rise during the present century" and predicted "that ***this warming trend will continue, at least for several centuries***."[25]

In 1965—more than 20 years before Plaintiffs allege Defendants began their purported campaign of deception—President Lyndon B. Johnson proclaimed to Congress that "[t]his generation has ***altered the composition of the atmosphere on a global scale*** through radioactive materials and a steady increase in carbon dioxide from the burning of fossil fuels"[26] and the President's Science Advisory Committee explained: "By the year 2000 the increase in atmospheric $CO_2$ will be close to 25%. This may be sufficient to ***produce measurable and perhaps marked changes in climate***, and ***will almost certainly cause significant changes in the temperature*** and

---

[24]  Dick Decl., Ex. 16 (*Second Supplemental Appropriation Bill: Hearing on H. Doc. 330 Before the Subcommittees of the Committee on Appropriations*, 84th Cong. 472–73 (1956)).

[25]  Gilbert N. Plass, *The Carbon Dioxide Theory of Climatic Change*, 8 Tellus 140 (1956), http://nsdl.library.cornell.edu/websites/wiki/index.php/PALE_ClassicArticles/archives/classic_articles/issue1_global_warming/n7._Plass__1956corrected.pdf.

[26]  Special Message to the Congress Transmitting Report on the National Wilderness Preservation System, 1 Pub. Papers 161 (Feb. 8, 1965), http://www.lbjlibrary.net/collections/selected-speeches/1965/02-08-1965.html.

other properties of the stratosphere."[27]

President Nixon's administration also recognized and understood the potential impacts of climate change. As former Harvard professor and future U.S. Senator Daniel Patrick Moynihan put it at the time: "It is now pretty clearly agreed that the CO2 content will rise 25% by 2000. This could increase the average temperature near the earth's surface by 7 degrees Fahrenheit. This in turn could *raise the level of the sea by 10 feet. Goodbye New York. Goodbye Washington*, for that matter."[28]

So too did the Carter Administration: A report requested by the Director of the Office of Science and Technology Policy concluded that "[w]e now have *incontrovertible evidence that the atmosphere is indeed changing* and that we ourselves contribute to that change. Atmospheric concentrations of carbon dioxide are steadily increasing, and *these changes are linked with man's use of fossil fuels* and exploitation of the land."[29] The report also found that as "[c]arbon dioxide continues to increase, the study group finds *no reason to doubt that climate change will result and no reason to believe that these changes will be negligible*."[30]

---

[27] Env't Pollution Panel, President's Sci. Advisory Comm., Restoring the Quality of Our Environment: Report of the Environmental Pollution Panel 9 (1965), https://hdl.handle.net/2027/uc1.b4315678.

[28] Dick Decl., Ex. 17 (Memorandum from Daniel P. Moynihan for John Ehrlichman, (Sept. 17, 1969)).

[29] Climate Research Board, *Carbon Dioxide and Climate: A Scientific Assessment* (July 23-27, 1979), https://www.bnl.gov/envsci/schwartz/charney_report1979.pdf.

[30] U.S. Env't Prot. Agency, *Can We Delay A Greenhouse Warming?* (1983), https://nepis.epa.gov/EPA/html/DLwait.htm?url=/Exe/ZyPDF.cgi/9101HEAX.PDF?Dockey=9101HEAX.PDF. Additionally, in 1980, The Global 2000 Report

The federal government's understanding of, and warnings about, the potential link between oil and gas use and global climate change continued into the Reagan Administration and beyond.  For example, a 1983 EPA report concluded that "[e]vidence continues to accumulate that *increases in atmospheric carbon dioxide (CO₂) and other 'greenhouse' gases will substantially raise global temperature*" and that its findings "support the conclusion that a global greenhouse warming is neither trivial nor just a long-term problem" and "*call for an expeditious response*."[31] A 1983 report from the Carbon Dioxide Assessment Committee concluded that the "increase [in atmospheric $CO_2$] is *primarily attributable to burning of coal, oil, and gas*."[32]  And in 1988, James Hansen of NASA testified before the Senate—which, according to the Complaint "received front-page coverage in *The New York Times*" (Compl. ¶ 109)—that "[g]lobal warming has reached a level such that we can ascribe with *a high degree of confidence a cause and effect relationship between the*

---

was published and a Congressional Hearing Before the Congressional Subcommittee on International Economics of the Joint Economic Committee was held to discuss the report.  The Report found that "[r]ising CO2 concentrations are of concern because of their potential for causing a warming of the earth. Scientific opinion differs on the possible consequences, but a widely held view was that highly disruptive effects on world agriculture could occur before the middle of the twenty-first century." *The Global 2000 Report: Hearing Before the Subcommittee on International Economics of the Joint Economic Committee*, 96th Cong. 36 (1980), https://www.jec.senate.gov/reports/96th%20Congress/The%20Global%202000%20Report%20(998).pdf.

[31] *Can We Delay A Greenhouse Warming?*, *supra* n. 30.

[32] Bd. on Atmospheric Scis. And Climate, Comm'n on Physical Scis., Mathematics, and Res., Nat'l Rsch. Council, Changing Climate 1 (1983), https://download.nap.edu/cart/download.cgi?record_id=18714.

*greenhouse effect and the observed warming*."[33]

Nor were these national warnings lost on New Jersey's governmental representatives, who were also aware of the potential risks of climate change since at least the 1980s. For example, in 1988, Robert A. Roe, then-Representative for New Jersey's 8th District, which includes Plaintiff Hoboken, co-sponsored a resolution proposing: "(1) The Congress and the President should implement a national energy and natural resource policy to mitigate global warming caused by the greenhouse effect; and (2) the President should encourage and participate in international agreements to implement international strategies compatible with such policy."[34] In 1989, Governor Thomas Kean issued an executive order for the state to "*recognize the 'scientific consensus' of climate change*" and acknowledge the potential for "*rising sea levels, intensifying storms, and other threats posed by a warming planet*."[35] And in 2008—more than 10 years ago—the City of Hoboken joined the Climate Protection Campaign and U.S. Mayors Climate Protection Agreement.[36]

In short, Plaintiff's claim that Defendants had exclusive, unique, early, or

---

[33] *Greenhouse Effect and Global Climate Change: Hearing Before the Committee on Energy and Natural Resources*, 134th Cong. 39 (1988) (testimony of Dr. James Hansen), https://www.sealevel.info/Hansen.0623-1988_oral.pdf.

[34] H. Cong. Rec., Oct. 12, 1988 (reflecting H.Con.Res. 389). In 1989, Representative Roe also co-sponsored the introduction of the Global Warming Prevention Act of 1989, H.R. 1078, 101st Cong. (1989).

[35] State of New Jersey, Executive Order #219 (1989), https://nj.gov/infobank/circular/eok219.htm

[36] City of Hoboken, "Meeting of January 2, 2008," http://www.hobokennj.org/docs/council/minutes/2008minutes.pdf.

superior knowledge about the potential link between fossil fuel use, greenhouse gas emissions, and climate change is demonstrably false.  The vast public record of media articles, scientific journals, and government reports over the course of the past fifty-plus years makes clear that any claim of "concealment"—actionable or otherwise—is absurd.

To be clear, this long history of public knowledge and discussion about the risk of global warming from carbon dioxide emissions does not mean, as Plaintiff suggests, that there was no scientific debate about the causes and potential impacts of climate change.  For example, the U.N. Intergovernmental Panel on Climate Change (IPCC), whose objective is "to provide governments at all levels with scientific information they can use to develop climate policies," (Compl. ¶ 27, n. 1) (quotation marks omitted) concluded in 1990 that there was insufficient data to determine that observed warming trends were due to human activities: "Thus, it is not possible at this time to attribute all or even a large part of the observed global warming to the enhanced greenhouse effect on the basis of observational data currently available."[37]  The IPCC further noted that "[t]here are many uncertainties in our predictions particularly with regard to the timing, magnitude and regional patterns of climate change due to our incomplete understanding" of various issues,

---

[37]  Dick Decl., Ex. 18 (IPCC (1990) at 254).

like the sources of greenhouse gases, clouds, oceans and polar ice sheets.[38]  By 1995, the IPCC still had not concluded with certainty that there was a human influence on climate: "Our ability to quantify the human influence on global climate is currently limited because the expected signal is still emerging from the noise of natural variability, and because there are uncertainties in key factors . . . ."[39]  Ultimately, the IPCC could only conclude that "the balance of evidence suggests" that there is a human influence on climate.[40]

It was not until 2001 that the IPCC was willing to state that new evidence indicated that human activity was "likely" (meaning 66-90% probability) responsible for "most" of the warming observed:  "There is new and stronger evidence that most of the warming observed over the last 50 years is attributable to human activities."[41] Even that caveated conclusion was questioned by the National Academies of Science, however, which cautioned that the conclusions in the IPCC's 2001 report should not be overstated: "Climate projections will always be far from perfect.  Confidence limits and probabilistic information, with their basis, should always be considered as an integral part of the information that climate scientists provide to policy and decision makers.  Without them, the IPCC [2001 report] could give an impression

---

[38]  Dick Decl., Ex. 18 (IPCC (1990) at xii).
[39]  Dick Decl., Ex. 19 (IPCC (1995) at 22).
[40]  *Id.*
[41]  Dick Decl., Ex. 20 (IPCC (2001) at 10).

that the science of global warming is 'settled,' even though many uncertainties still remain."[42]

In a report to Congress in 1991 titled "U.S. Efforts to Address Global Climate Change," the U.S. Department of State and U.S. EPA, like the IPCC, recognized the risk of climate change but noted that significant scientific uncertainties remained: "The possibility of global climate change has become an issue of great concern in the international community and within the United States.  Much is unknown, however, about whether or not such changes have been detected, when and how they might occur, or what can be done about it. . . .  [M]any scientific and economic uncertainties remain about possible climate change, its impacts, and societal responses. Much remains to be known about the magnitude and extent of a possible climate change."[43] In 2002, even after the IPCC's report noting the "likely" contribution of human activities to climate change, EPA's "Guide to Climate Change" noted: "The Earth's surface is becoming warmer, and evidence is mounting that human activities are likely contributing to the warming trend.  Still, uncertainties exist about exactly how much of the warming is due to human activities, whether recent temperature trends

---

[42] Comm. on the Sci. of Climate Change, Div. of Earth & Life Studies, Nat'l Rsch. Council, Climate Change Science: An Analysis of Some Key Questions 22 (2001), https://www.nap.edu/catalog/10139/climate-change-science-an-analysis-of-some-key-questions.

[43] U.S. Env't Prot. Agency, U.S. Efforts to Address Global Climate Change 1-2 (1991), https://nepis.epa.gov/Exe/ZyPDF.cgi/9101OZWK.PDF?Dockey=9101OZWK.PDF.

are truly outside the range of natural climate variability, and the effect that warming could have on our climate, lives, and habitat."[44]   In short, the scientific and policy debate about the causes, timing, impacts, and responses to climate change was occurring in thousands of newspaper articles, scientific publications, and government reports.  Plaintiff's assertions that Defendants concealed the truth and "orchestrated massive campaigns" to fabricate uncertainty ignore the vast public record and are plainly false.  Compl. ¶¶ 5, 6.

Yet, despite this public knowledge and the extensive public debate about the risks of climate change, the consumption of oil and gas, including by the federal government and Plaintiff itself, increased dramatically during this period.  From 1960 to 2018, consumption of both oil and gas in the United States more than doubled.[45]  Notably, even since 1990—the point in time when Plaintiff says "the public awareness of fossil fuels' potentially devastating climate consequences was on the rise,"[46]—domestic consumption of oil and gas has increased by 20% and 57%, respectively, through 2018.[47]  In 2018, the United States consumed more energy than

---

[44]   Dick Decl., Ex. 21 (U.S. Env't Prot. Agency, EPA's Guide to Climate Change 2 (2002)).

[45]   U.S. Energy Info. Admin., State Energy Data System (SEDS), All Consumption Estimates – US (2018), https://www.eia.gov/state/seds/sep_use/total/pdf/use_US.pdf.

[46]   Compl. ¶ 108

[47]   *Id.*; *see also* U.S. Energy Info. Admin., *Today in Energy: In 2018, the United States consumed more energy than ever before* (Apr. 16, 2019), https://www.eia.gov/todayinenergy/detail.php?id=39092.

ever before, with fossil fuels accounting for 80% of this record-breaking consumption.[48]

Given that the United States, and the world, have continued to rely on and use oil and gas at ever-increasing rates, with full knowledge and understanding that such usage may have adverse climate impacts, there can be no real doubt that increased production and consumption of oil and gas was not caused by Defendants' alleged "concealment," but by the country's fundamental and vital need for energy. In fact, the federal government has reported that world energy consumption is expected to grow by 50% by 2050 and will be focused in regions where strong economic growth is driving demand.[49]

For this reason, the federal government has continued to actively encourage domestic production of oil and gas, providing both incentives for and contracts with Defendants to obtain these products in the national interest. In particular, the federal government has continued to encourage domestic production on the OCS because, in part, it has concluded that even if this domestic source of oil and gas were cut off, consumers would simply obtain "oil and gas from other sources," including foreign sources, which would put our national security and economy at risk and "leave a void

---

[48] Hannah Ritchie & Max Roser, *Fossil Fuels*, Our World in Data, https://ourworldindata.org/fossil-fuels (last visited Oct. 7, 2020).

[49] *See* U.S. Energy Info. Admin., International Energy Outlook 2019 24–26 (2019), https://www.eia.gov/outlooks/ieo/pdf/ieo2019.pdf.

in planning for national energy needs."[50]  Indeed, the environmental analysis required to reauthorize the OCS leasing program recognized the existence of climate change but nonetheless concluded that relying on renewable energy sources at the current time would be neither possible nor advantageous.[51]  Similarly, in 2001 the federal government issued a report emphasizing the national interest in promoting domestic oil and gas development and explained that "we must continue meeting the nation's energy requirements by the means available to us."[52]  The report's findings led to the Energy Policy Act of 2005, which encouraged further exploration of the OCS and other onshore federal lands through contracts with Defendants.[53]  And, as noted above, in 2010 President Obama recognized the need to balance production with

---

[50]  U.S. Dep't of Interior , Bureau of Ocean Energy Mgmt., OCS EIS/EA BOEM 2012-030, OCS Oil and Gas Leasing Program: 2012-2017 Final Programmatic Environmental Impact Statement, 4-606, 4-643 (2012), https://www.boem.gov/sites/default/files/uploadedFiles/BOEM/Oil_and_Gas_Energy_Program/Leasing/Five_Year_Program/2012-2017_Five_Year_Program/2012-2017_Final_PEIS.pdf (projecting changes to domestic oil and gas supplies if OCS leases were halted); U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., Record of Decision and Approval of the 2017-2022 Outer Continental Shelf Oil and Gas Leasing Program, 82 Fed. Reg. 6643 (Jan. 17, 2017).

[51]  U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., OCS EIS/EA BOEM 2016-060, OCS Oil and Gas Leasing Program: 2017-2022 Final Programmatic Environmental Impact Statement, Vol. 1, at 1-11 (2016), https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2012-2017/BOEMOceanInfo/fpeis_volume1.pdf ("The development of renewable energy sources is strategically important, but the development of these resources in the foreseeable future does not fully or partially satisfy the purpose of and need for the Proposed Action [i.e., meeting the nation's current energy demand].").

[52]  U.S. Nat'l Energy Policy Dev. Grp., Reliable, Affordable, and Environmentally Sound Energy for America's Future, 1-13 (2001), https://www.nrc.gov/docs/ML0428/ML042800056.pdf.

[53]  Energy Policy Act of 2005, Pub. L. No. 109-58, § 357(a)(2)(B), 119 Stat. 594 (2005).

alternative sources of energy, and expanded the offshore leasing program.  *See supra* n.2.

* * * * *

In sum, this case is about the global production, sale, and consumption of vital products that are used daily by virtually every person on the planet.  Plaintiff attacks, and seeks to enjoin, Defendants' production and sale of these essential products—products that are critical to national security and that are at the backbone of the American (and global) economy.[54]  Oil and gas power our national defense and military; drive production and innovation; keep our homes, offices, hospitals and other essential facilities illuminated, powered, heated, and ventilated; transport workers and tourists into and across the nation; and form the materials from which innumerable consumer, technological, and medical devices are fashioned.  Plaintiff seeks to overturn decades of federal energy policy and threaten the dependable, affordable supply of fossil fuels on which this country, and the world, depends.

Policy decisions surrounding the use of fossil fuels and the threat of climate change "require consideration of competing social, political, and economic forces," as well as "economic [and] defense considerations."  *Juliana*, 947 F.3d at 1172 (internal quotation marks and citations omitted).  "[A]ny effective plan [to reduce

---

[54] Indeed, the State of New Jersey expressly recognized the provision of gasoline as an "essential" service during the coronavirus pandemic.  *See* N.J. Exec. Order. No. 104 (Mar. 16, 2020).

33

fossil fuel emissions] would necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and legislative branches" of the federal government.  *Id.* at 1171.  And federal law, rather than state law, *must* serve as the exclusive source of governing law for such inherently interstate and international policy matters, because "the basic scheme of the Constitution so demands."  *AEP*, 564 U.S. at 421.  Further, Plaintiff's Complaint relates to and seeks substantial relief from Defendants' production of oil and gas on federal lands and under the direction of the federal government, and it directly conflicts with attempts by both the legislative and executive branches of the federal government to address important issues of national and international policy.   Accordingly, Plaintiff's Complaint should be heard in this federal forum.

## II.   <u>TIMELINESS OF REMOVAL</u>

1.     Plaintiff, the City of Hoboken, filed a Complaint against the Chevron Parties and other named Defendants in the Superior Court of New Jersey, Law Division: Hudson County, No. HUD-L-003179-20, on September 2, 2020.  A copy of all process, pleadings, or orders in the possession of the Chevron Parties is attached as Exhibit A to the Declaration of Herbert J. Stern ("Stern Decl."), filed concurrently herewith.

2.     This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it is filed less than 30 days after service.  28 U.S.C. § 1446(b).  The Chevron Parties

were served on September 11, 2020.  Stern Decl. ¶ 2.  The consent of the other

Defendants is not required because removal does not proceed "solely under

section 1441(a)."  28 U.S.C. § 1446(b)(2)(A).  The Chevron Parties remove this

action to federal court on several bases, including, for example, 28 U.S.C.

§ 1442(a)(1).  Nevertheless, all purportedly served Defendants have consented to

removal.  Dick Decl. ¶ 2.  Consent is not required from any Defendant that has not

been served.  *See* 28 U.S.C. § 1446(b)(2)(A).[55]

### III.   SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL

3.   Plaintiff is the City of Hoboken.  Plaintiff brings claims against

Defendants for alleged injuries relating to global climate change, including damages

and injunctive relief from injuries suffered from "climate crisis-related impacts,"

such as sea level rise, extreme weather, and other natural phenomena.  *See, e.g.*,

Compl. ¶¶ 9, 254.  Plaintiff asserts the following claims:  public nuisance, private

nuisance, trespass, negligence, and violations of New Jersey's Consumer Fraud Act

("CFA").  In addition to compensatory and punitive damages, in its Prayer for Relief,

---

[55]   In filing this Notice of Removal, the Chevron Parties, and all other Defendants, do not waive, and expressly preserve, any right, defense, affirmative defense, or objection, including, without limitation, personal jurisdiction, insufficient process, and/or insufficient service of process.  A number of Defendants contend that personal jurisdiction in New Jersey is lacking over them, and these Defendants intend to preserve that defense and intend to move to dismiss for lack of personal jurisdiction at the appropriate time.  *See, e.g., Gordet v. Chryslergroup LLC*, 2015 WL 6407959, at *2 n.6 (D.N.J. Oct. 21, 2015) ("Removal does not, by itself, constitute a waiver of objection to personal jurisdiction."); *Morris & Co. v. Skandinavia Ins. Co.*, 279 U.S. 405, 409 (1929) (removal to federal court does not waive right to object to personal jurisdiction).

Plaintiff seeks "an Order compelling Defendants to abate the nuisance alleged . . . and to pay the costs of abatement," as well as "an Order preliminarily and permanently enjoining Defendants from engaging in future acts of trespass." *Id.* at 144–45, Prayer for Relief.  It is thus clear that Plaintiff brought this action to limit and ultimately end Defendants' production of fossil fuels because of their alleged connection to climate change.

4.    The Chevron Parties deny that any New Jersey court has personal jurisdiction over them and further deny any liability as to Plaintiff's claims.  The Chevron Parties expressly reserve all rights in this regard.  For purposes of meeting the jurisdictional requirements for removal only, however, the Chevron Parties submit that removal is proper on at least seven independent and alternative grounds.

5.    ***First***, the action is removable under 28 U.S.C. § 1441(a) and § 1331. Plaintiff's claims directly impact important federal interests and are interstate in nature such that they cannot be resolved by the law of any one state.  Under Supreme Court precedent, they must be governed exclusively by federal law.  *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 847, 850 (1985) ("*National Farmers*").  Federal law applies in those few areas of the law that so implicate uniquely federal interests—including, without limitation, interstate and ambient pollution, foreign affairs, navigable waters, and national security—that application of state law is inappropriate.  *AEP*, 564 U.S. at 422 ("[B]orrowing the law

of a particular State would be inappropriate."); *Milwaukee I*, 406 U.S. at 99 ("[P]ollution of interstate or navigable waters creates actions arising under the 'laws' of the United States within the meaning of [28 U.S.C. § 1331]."). Because Plaintiff's claims necessarily arise exclusively under federal law—no matter how Plaintiff characterizes them—they are properly removed to this Court under its federal question jurisdiction. *See, e.g., Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 928–29 (5th Cir. 1997).[56]

6.     ***Second***, this Court has original jurisdiction over this lawsuit and removal is proper pursuant to OCSLA. The Complaint makes clear that this action "aris[es] out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b); *see also Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

7.     ***Third***, Defendants are authorized to remove this action under the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1). Despite Plaintiff's purported disclaimer, *see* Compl. ¶ 222 n.202—multiple Defendants: (1) were "acting under" a federal officer; (2) assert colorable federal defenses; and (3) have claims against them which relate to acts under color of federal office. *See Papp v.*

---

[56] *See infra* n.57.

*Fore-Kast Sales Co.*, 842 F.3d 805, 813–14 (3d Cir. 2016); *Hammell v. Air & Liquid Sys. Corp.*, 2014 WL 4259206, at \*2 (D.N.J. Aug. 29, 2014).   The Complaint expressly alleges that the cumulative impact of Defendants' *global* extraction and production activities over the past several decades—which necessarily include Defendants' substantial operations on the OCS—contributed to the global greenhouse gas emissions that Plaintiff claims caused its alleged injuries.  *See, e.g.*, Compl. ¶ 3.

8.    ***Fourth***, removal is authorized under 28 U.S.C. § 1441(a) and § 1331 because this action necessarily raises embedded federal questions—that is, disputed and substantial federal questions that a federal forum may entertain without disturbing a congressionally approved balance of responsibilities between the federal and state judiciaries.  *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005) ("*Grable*").

9.    ***Fifth***, removal is authorized under 28 U.S.C. § 1441(a) and § 1331 on the further ground that Plaintiff's claims are completely preempted by the Clean Air Act and other federal statutes, treaties and international agreements, and the United States Constitution, which provide the exclusive federal remedy for addressing interstate greenhouse gas emissions that necessarily are the but-for cause of Plaintiff's alleged injuries.

10.     *Sixth*, removal is authorized under 28 U.S.C. § 1441(a) and § 1331 because—despite Plaintiff's purported disclaimer, *see* Compl. ¶ 222 n.202—the Complaint makes clear that Plaintiff's claims are based on alleged injuries and conduct occurring on federal enclaves.  As such, Plaintiff's claims are removable to this Court under federal-question jurisdiction.  *See* U.S. Const. art. I, § 8, cl. 17; *Jones v. John Crane-Houdaille, Inc.*, 2012 WL 1197391, at *1 (D. Md. Apr. 6, 2012) ("A suit based on events occurring in a federal enclave . . . must necessarily arise under federal law and implicates federal question jurisdiction under § 1331.").

11.     *Seventh*, this suit is effectively a class action, brought under New Jersey law, on behalf of New Jersey consumers, thereby creating removal jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

12.     The Chevron Parties will address each of these grounds in additional detail below.  Should Plaintiff challenge this Court's jurisdiction, Defendants reserve the right to further elaborate on these grounds and will not be limited to the specific articulations in this Notice.  *Cf., e.g.*, *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014–16 (7th Cir. 2018) (holding that district court erred by requiring evidentiary submissions by defendant to support removal in advance of ruling on jurisdiction).

## IV.   THIS COURT HAS FEDERAL-QUESTION JURISDICTION BECAUSE PLAINTIFF'S CLAIMS NECESSARILY ARISE UNDER FEDERAL LAW

13.    This action is removable because, as a matter of federal constitutional structure, Plaintiff's common law claims necessarily arise under *federal*, not state, law:  The issues presented are exclusively federal in nature; state law simply has no role to play.  Under 28 U.S.C. § 1331, federal courts have original jurisdiction over "claims founded upon federal common law as well as those of a statutory origin." *National Farmers*, 471 U.S. at 850 (quoting *Milwaukee I*, 406 U.S. at 100).  As the Supreme Court has repeatedly confirmed, "When we deal with air and water in their ambient or interstate aspects, there is a federal common law."  *AEP*, 564 U.S. at 421 (quoting *Milwaukee I*, 406 U.S. at 103).  Because Plaintiff's claims necessarily arise under federal law, this Court has federal-question jurisdiction and removal is proper.

14.    This ground for removal is separate and independent from the complete preemption ground for removal discussed below at section VIII.  *See, e.g.*, *Sam L. Majors Jewelers*, 117 F.3d at 924 ("There are three theories that might support federal question jurisdiction in a case such as this one. . . .  Second, jurisdiction will lie if an area of law is completely preempted by the federal regulatory regime.  Finally, if the cause of action arises under federal common law principles, jurisdiction may be asserted."); *id.* at 926 ("[B]ecause jurisdiction is not supported by complete

preemption, we must determine whether Jewelers' claim arises under federal common law.").

15.     The Court must determine at the outset whether Plaintiff's claims arise under federal or state law.  This analysis does not implicate preemption principles or standards because a claim that "arise[s] under federal common law . . . is a permissible basis for jurisdiction based on a federal question." *Treiber & Straub, Inc. v. U.P.S., Inc*., 474 F.3d 379, 383 (7th Cir. 2007); *see also Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 126 (2d Cir. 1999) ("[I]f federal common law governs a case, that case [is] within the subject matter jurisdiction of the federal courts.").

16.     Section 1331 extends the original jurisdiction of federal district courts to "all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  This jurisdictional grant encompasses actions that arise under federal common law, because "a cause of action . . . 'arises under' federal law if the dispositive issues stated in the complaint require the application of federal common law." *Milwaukee I*, 406 U.S. at 100.

17.     The contexts in which federal common law arises "fall into essentially two categories: those in which a federal rule of decision is 'necessary to protect uniquely federal interests,' . . . and those in which Congress has given the courts the power to develop substantive law." *Tex. Indus*, 451 U.S. at 640.  Claims for interstate

or international pollution fall into the former category, because they implicate unique federal interests and must of necessity be subject to uniform federal law as a matter of fundamental constitutional structure.  In our federal system, each State may make law within its own borders, but no State may "impos[e] its regulatory policies on the entire Nation," *see BMW of N. Am. v. Gore*, 517 U.S. 559, 585 (1996), or dictate our "relationships with other members of the international community," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964).  Federal law therefore must govern inherently interstate or international matters to the exclusion of state law, because "the basic scheme of the Constitution so demands," *AEP*, 564 U.S. at 421.

18.    Accordingly, as the Court explained in *Milwaukee I*, "[w]hen we deal with air and water in their ambient or interstate aspects, there is a federal common law." 406 U.S. at 103; *accord, e.g.*, *AEP*, 564 U.S. at 421 ("Environmental protection is undoubtedly an area 'within national legislative power,' one in which federal courts may fill in 'statutory interstices,' and, if necessary, even 'fashion federal law.'").  And because federal law governs in order to protect uniquely federal interests, state law *cannot* apply to such claims: "if federal common law exists, it is because state law cannot be used."  *Milwaukee II*, 451 U.S. at 313 n.7.  The Supreme Court put the point succinctly in *International Paper Co.* v. *Ouellette*, observing that "interstate water pollution is a matter of federal, *not state*, law."  479 U.S. 481, 488 (1987) (emphasis added).

19.     As the Third Circuit explained, "the power of federal courts to craft federal rules of decision is established in cases in which a federal common law rule is 'necessary to protect uniquely federal interests,' such as federal proprietary interests, federal interests in international law and to resolve conflicts among the states." *McGurl v. Trucking Emps. of N.J. Welfare Fund, Inc*., 124 F.3d 471, 480 (3d Cir. 1997) (internal citations omitted).   That principle is controlling here.   The Southern District of New York, addressing nearly identical claims, rejected the state-law labels the plaintiff had attached and held that these claims arise under federal common law.   *City of New York*, 325 F. Supp. 3d at 472 ("[T]he City's claims are ultimately based on the 'transboundary' emission of greenhouse gases, indicating that these claims arise under federal common law."), *appeal argued*, No. 18-2188 (2d Cir. Nov. 22, 2019).

20.     Although Plaintiff purports to style its nuisance and other common law claims as arising under state law, it is the inherently federal nature of the claims stated on the face of the complaint, not the plaintiff's characterization of them as state law claims, that is controlling.[57]   It is well-settled that the question of whether a case arises

---

[57]  14C Wright et al., Fed. Prac. & Proc. Juris. § 3722.1 (rev. 4th ed.) ("[A] plaintiff cannot frustrate a defendant's right to remove by pleading a case without reference to any federal law when the plaintiff's claim is necessarily federal."); *accord, e.g.*, *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n.2 (1981) (noting courts will "determine whether the real nature of the claim is federal, regardless of plaintiff's characterization"); *Club Comanche, Inc. v. Gov't of Virgin Islands*, 278 F.3d 250, 259 (3d Cir. 2002) (in determining whether "a federal question is presented on the face of the plaintiff's properly pleaded complaint . . . [a] plaintiff's lack of reference . . . to federal law is not controlling.") (citing *Am.*

under state or federal law, and is, therefore, properly removable, is a question of subject matter jurisdiction that the federal removal court must resolve for itself, subject to the court's "unflagging obligation" to exercise such jurisdiction where it does exist.[58]  A federal court would contravene both of these fundamental obligations were it to treat as controlling a complaint's characterization of its claims as state law claims where, as here, the substance of the complaint's allegations and demands for relief reveals that those claims are exclusively federal by virtue of the structure of our Constitution and, therefore, necessarily arise under federal law.  *See supra* nn. 58–59; *see also United States v. California*, 932 F.2d 1346, 1349 (9th Cir. 1991) ("The issue of whether state or federal [common] law governs is a question of law and is reviewable de novo.").

21.    The two-step analysis the Supreme Court established in *Standard Oil* for determining whether a common law claim arises under state or federal law makes

---

*Phillips Corp. v. Emery Air Freight Corp.*, 579 F.2d 229, 233 (2d Cir. 1978) ("[T]he lack of any reference to federal law in the complaint is not controlling" where "the substance of the[] allegations . . . sets forth a claim arising under federal law."); *Sam L. Majors Jewelers*, 117 F.3d at 928 (citing *Emery*, 579 F.2d at 234) (same); *City of Camden v. Beretta U.S.A. Corp.*, 81 F.Supp.2d 541, 546 (D.N.J. 2000) (same).

[58]  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) ("We have often acknowledged that federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress. *See Colorado River,* 424 U.S. at 821 (Stewart, J. dissenting) ("[F]ederal courts have a 'virtually unflagging obligation'…to exercise the jurisdiction given them''); *England v. Louisiana Bd. of Medical Examiners*, 375 U.S. 411, 415 (1964) ('When a federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction'') (quoting *Wilcox v. Consolidated Gas Co.,* 212 U.S. 19, 40 (1909); *Cohens v. Virginia*, 6 Wheat. 264, 404, 5 L.Ed. 257 (1821) (federal courts 'have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not').").

clear that this threshold jurisdictional question does *not* depend on the answer to the distinct substantive question of whether the plaintiff has stated a viable claim under federal law.   Under the applicable two-step approach, courts must (1) determine whether the source of law is federal or state based on the nature of the issues at stake; and (2) if federal law is the source, then determine the substance of the federal law, including whether plaintiff has stated a viable federal claim.   *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 42–45 (1st Cir. 1999) ("*Swiss American*") (citing *United States v. Standard Oil Co.*, 332 U.S. 301 (1947)).

22.    Adhering to the "two-part approach" articulated in *Standard Oil*, the First Circuit in *Swiss American* likewise recognized the difference between the "source question and the substance question."   191 F.3d at 43, 45.   The Court explained that the "source question" asks whether "the source of the controlling law [should] be federal or state."   *Id*. at 43.   The substance question, on the other hand, "which comes into play only if the source question is answered in favor of a federal solution," asks whether the governing rule should be borrowed from state law or instead be a "uniform federal rule."   *Id*.   Whether a claim "arises under" federal law thus "turns on the resolution of the source question."   *Id*. at 44.   But only the first question—what law applies—is relevant in addressing whether removal is proper and must be resolved by a federal court.   As the Supreme Court explained, this "choice-

of-law task is a federal task for federal courts." *Milwaukee II*, 451 U.S. at 349 (quoting *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592 (1973)).

23.    The Third Circuit has followed this same jurisdictional analysis.  In *United States v. Sommerville*, 324 F.2d 712, 714–15 (3d Cir. 1963), the court held that a tort claim for conversion brought by the United States was governed by federal law.  As the court explained, "[a]n independent federal rule of decision *must* be applied when a genuine federal interest would be subjected to uncertainty by application of disparate state rules." *Id*. (emphasis added).  This analysis does not turn on whether the United States is a party to the action, and the same rule applies when the genuine federal interest is raised in a dispute between private parties.  *See, e.g.*, *New SD, Inc. v. Rockwell Intern. Corp.*, 79 F.3d 953, 954–55 (9th Cir. 1996) (dispute between private contractors involving government contract).  "When federal law applies . . . it follows that the question arises under federal law, and federal question jurisdiction exists." *Id*. at 955; *see also Sam L. Majors Jewelers*, 117 F.3d at 928–29 (removal of state law claims was proper because federal common law governed liability of air carriers).

24.    Because Plaintiff alleges that climate change occurs as the result of the undifferentiated accumulated emissions of all emitters in the world over an extended period of time, *see, e.g.*, Compl. ¶¶ 30–31, 36–37, 42, any judgment as to the reasonableness of particular emissions, or as to their alleged causal contribution to

the overall phenomenon of climate change, inherently requires an evaluation at an interstate and, indeed, international level. *See AEP*, 564 U.S. at 422 (noting that "[g]reenhouse gases once emitted become well mixed in the atmosphere") (internal quotation marks omitted); *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 880 (N.D. Cal. 2009) ("*Kivalina I*") ("Significantly, the source of the greenhouse gases are undifferentiated and cannot be traced to any particular source, let alone defendant, given that they 'rapidly mix in the atmosphere' and 'inevitably merge[ ] with the accumulation of emissions in California and the rest of the world.'"). Thus, even assuming that state tort law may properly address local source emissions within a specific state, that is unquestionably not the nature or theory of Plaintiff's claim, nor could it be. Plaintiff seeks to impose tort liability for Defendants' alleged contributions to *global* climate change, based on *global* production and sales, and would require an overarching consideration of *all* of the emissions traceable to the extraction and sale of Defendants' products in each of the states, and, in fact, in the approximately 195 countries of the world. Plaintiff does not seek damages from Defendants as a result of their *intrastate* activity. Indeed, Plaintiff did not even attempt to disclaim oil and gas sales and their attendant emissions to the extent they occurred outside New Jersey or internationally. Nor could it. Just as with its failed attempt to exclude emissions resulting from sale to the federal government and the military, there is no method by which to distinguish the

effect of emissions originating inside or outside the forum. Therefore, given the federal government's exclusive authority over foreign affairs and foreign commerce, and its preeminent authority over interstate commerce, tort claims concerning climate change directly implicate uniquely federal interests as "the immense and complicated problem of global warming requires a comprehensive solution[.]" *City of New York*, 325 F. Supp. 3d at 475. As the Ninth Circuit has noted, "any effective plan [to reduce fossil fuel emissions] would necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and legislative branches" of the federal government. *Juliana*, 947 F.3d at 1171. In cases like this, "borrowing the law of a particular State would be inappropriate." *AEP*, 564 U.S. at 422.

25.     The international nature of the claims further underscores why they are exclusively federal in nature, and, therefore, may properly be removed to federal court. *See Sabbatino*, 376 U.S. at 425 (issues involving "our relationships with other members of the international community must be treated exclusively as aspects of federal law"); *accord Republic of Philippines v. Marcos*, 806 F.2d 344, 352 (2d Cir. 1986) (explaining that "there is federal question jurisdiction over actions having important foreign policy implications" under federal common law).

26.     Plaintiff's attempts to avoid federal jurisdiction by framing the cause of the alleged harm as an alleged "campaign of deception" are fundamentally flawed and of no effect. *See, e.g.*, Compl. ¶ 172. As discussed in detail above, Defendants

deny that they misrepresented their knowledge of the science or effects of climate change, and will show at the appropriate time that their public statements with respect to climate change were both in good faith and had no material effect on consumer demand for petroleum products.  This is due to, among other things, the widespread public awareness about climate change and the many other factors that have influenced and caused a consistent worldwide growth in oil and gas consumption over the last many decades, even as widespread public awareness of climate change issues has continued to deepen.  Notwithstanding Plaintiff's baseless "deception" allegations, the gravamen of Plaintiff's claims is that "Defendants' production, marketing, and sale of fossil fuels on a massive and unprecedented scale has been a substantial factor in causing . . . skyrocketing emissions[,]" which are "[t]he leading driver of global warming in the last several decades[.]"  Compl. ¶¶ 30, 42; *see also id.* ¶¶ 32, 58, 68.  And Plaintiff's Complaint specifically alleges that "a substantial portion" of "[t]he recent surge of anthropogenic emissions" and resulting "sea level rise" is attributable to Defendants' "extraction, production, and sale of fossil fuels." *Id.* ¶ 58.  Thus, Plaintiff's causes of action, which all require some showing of harm or injury, are squarely based on the production, sale, and use of oil and gas.

27.     As is evident from Plaintiff's repeated use of the term "*global* warming," both the causes and the injuries Plaintiff alleges are not confined to particular sources, cities, counties, or even states, but rather implicate inherently national and

international interests, including treaty obligations and federal and international regulatory schemes. *See id*. ¶ 38, Figure 2 (depicting $CO_2$ emissions from various sources); ¶ 48 & n.24 ($CO_2$ emissions cause "sea level rise" based on source describing "*Global* Mean Sea-Level Rise" (emphasis added)); *see also, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 509, 523–24 (2007) (describing Senate rejection of the Kyoto Protocol because emissions reduction targets did not apply to "heavily polluting nations such as China and India," and EPA's determination that predicted magnitude of future Chinese and Indian emissions "offset any marginal domestic decrease"); *AEP*, 564 U.S. at 427–29 (describing regulatory scheme of the Clean Air Act and role of the EPA); *accord* Remarks Announcing United States Withdrawal From the United Nations Framework Convention on Climate Change Paris Agreement, 2017 Daily Comp. Pres. Doc. 373 (June 1, 2017) (statement by President Trump announcing United States' withdrawal from Paris Climate Accord based on financial burdens, energy restrictions, and failure to impose proportionate restrictions on China's emissions).

28.    In short, and as the United States explained as amicus in a similar case, "federal law and policy has long declared that fossil 'fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports.'" Brief of the United States as Amicus Curiae at 10, *City of Oakland v. BP*

*p.l.c*, No. 18-16663, (9th Cir. Aug. 3, 2020) (ECF No. 198) (quoting 42 U.S.C. § 15927(b)(1)).

29.    The Complaint itself demonstrates that the unbounded nature of greenhouse gas emissions, diversity of sources, and the magnitude of the alleged attendant consequences have catalyzed myriad federal and international efforts to understand and address such emissions. *See, e.g.*, Compl. ¶¶ 108–11. But these are complex policy-balancing problems, on a necessarily national scale, and without fixed "right answers." As the Supreme Court put it in *AEP*, "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum:  As with other questions of national or international policy, informed assessment of competing interests is required.  Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance." *AEP*, 564 U.S. at 427.  As a "question[] of national or international policy," the question of how to address greenhouse gas emissions (which underlies Plaintiff's claims and its requested relief) inherently federal concerns and can be resolved only by application of federal law; state law simply has no role to play. *See id*.  The Complaint's dependence on the navigable waters of the United States as the instrument of the asserted nuisance, *see* Compl. ¶ 293(a), reinforces that conclusion. *See Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 778, 780 (7th Cir. 2011) (finding that nuisance action involving

navigable waters arose under federal common law).  Put simply, "[w]hen we deal with air and water in their ambient or interstate aspects, there is a federal common law."  *Milwaukee I*, 406 U.S. at 103.

30.     Finally, the remedies Plaintiff seeks confirm that this case arises under federal law.  Among other things, Plaintiff requests "an Order compelling Defendants to abate the nuisance alleged" in the Complaint, and "an Order preliminarily and permanently enjoining Defendants from engaging in future acts of trespass as alleged" in the Complaint.  Compl. at 144–45, Prayer for Relief.  In other words, Plaintiff requests that a court craft a rule of decision to regulate Defendants' prospective, worldwide operations to the extent that those operations could relate to climate change.  While Defendants dispute that any court has the authority to take such action, it is nevertheless plain that any such injunctive relief would necessarily regulate interstate and international conduct occurring far outside the boundaries of Hoboken, New Jersey, implicating a vast array of national and foreign affairs considerations that cannot be governed by state law.  The Constitution dictates that any such claims must arise exclusively under federal law, and this Court therefore has original jurisdiction over this action.

## V.     THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

31.     This Court also has original jurisdiction pursuant to OCSLA.  43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline*, 87 F.3d at 155.  In OCSLA, Congress granted

federal courts original jurisdiction over all actions "arising out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) ("[T]h[e] language [of § 1349(b)(1)] [i]s straightforward and broad."). The OCS includes all submerged lands that belong to the United States but are not part of any State. 43 U.S.C. §§ 1301, 1331. Because Plaintiff's claims encompass *all* of Defendants' worldwide "exploration, development, extraction . . . and . . . production" of fossil fuels, Compl. ¶ 19(a); *see also id.* ¶¶ 20(a), 21(b), 22(a), those claims necessarily encompass all such activities by Defendants on the OCS and fall within the "broad . . . jurisdictional grant of section 1349." *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).

32.    The breadth of OCSLA federal jurisdiction reflects the Act's "expansive substantive reach." *See id.* Congress passed OCSLA "to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources." *Id.* at 566. "[T]he efficient exploitation of the minerals of the OCS . . . was . . . a primary reason for OCSLA." *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988). Indeed, OCSLA declares it "to be the policy of the United States that . . . the [OCS] . . . should be made available for

expeditious and orderly development." 43 U.S.C. § 1332(3). The statute further provides that "since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States . . . such States, and through such States, affected local governments, are entitled to an opportunity to participate, *to the extent consistent with the national interest*, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf." *Id.* § 1332(4) (emphasis added).

33. Consistent with Congress's intent, courts repeatedly have found OCSLA jurisdiction where the claims involved conduct that occurred on the OCS or where resolution of the dispute foreseeably could affect the efficient exploitation of minerals from the OCS. *See, e.g.*, *EP Operating*, 26 F.3d at 569–70; *United Offshore v. S. Deepwater Pipeline*, 899 F.2d 405, 407 (5th Cir. 1990).

34. OCSLA jurisdiction exists even if the Complaint pleads no substantive OCSLA claims. *See, e.g.*, *Deepwater Horizon*, 745 F.3d at 163 (denying motion to remand complaint pleading no substantive OCSLA claims on the basis of OCSLA jurisdiction). Although the Complaint attempts to "disclaim[] injuries arising on federal property," *see* Compl. ¶ 222 n.202, Plaintiff's claims and injuries necessarily arise out of and are connected with production and exploration on the OCS. Greenhouse gas emissions cannot be traced to their source, *see AEP*, 564 U.S. at 422;

*Kivalina I*, 663 F. Supp. 2d at 880, and Plaintiff's purported injuries are allegedly caused by commingled "atmospheric greenhouse gasses" generally.  Compl. ¶ 9.

35.    Under OCSLA, the U.S. Department of the Interior administers an extensive federal leasing program that aims to develop and exploit the oil and gas resources of the federal OCS.  43 U.S.C. § 1334 *et seq.*  Under this authority, the Interior Department "administers more than 5,000 active oil and gas leases on nearly 27 million OCS acres.  In FY 2015, production from these leases generated $4.4 billion . . . in leasing revenue . . . [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production." Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Management, Before the House Committee on Natural Resources (Mar. 2, 2016), https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.[59]    In 2019, OCS leases supplied more than 690 million barrels of oil, a figure that has risen substantially in each of the last six years, together with 1.034 trillion cubic feet of natural gas.  Bureau of Safety and Environmental Enforcement, Outer Continental

---

[59] The Court may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists.  *See, e.g., Plains Gas Solutions, LLC v. Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 2011 A.M.C. 2624, 2640 (D. Del. 2011) (citing *Amoco Prod. Co.*, 844 F.2d at 1205).

Shelf Oil and Gas Production (Oct. 6, 2020), https://www.data.bsee.gov/Production/OCSProduction/Default.aspx.

36. Certain Defendants (or their predecessors, subsidiaries, or affiliates) participate in the federal OCS leasing program. For example, from 1947 to 1995, Chevron U.S.A. Inc. produced 1.9 billion barrels of crude oil and 1.1 trillion cubic feet of natural gas from the federal OCS in the Gulf of Mexico alone. Dick Decl., Ex. 22 (Production by Operator Ranked by Volume for the Gulf of Mexico Region, 1947-1995, MMS). In 2016, Chevron U.S.A. produced over 49 million barrels of crude oil and over 49 billion cubic feet of natural gas from the OCS in the Gulf of Mexico. U.S. Dep't of Interior, *Bureau of Safety & Envtl. Enf't, Gulf of Mex. Region, Prod. by Operator Ranked by Vol.* (2016), https://www.data.boem.gov/ Production/Files/Rank%20File%20Gas%202016.pdf. According to data published by the U.S. Bureau of Ocean Energy Management, numerous other Defendants conduct, and have conducted for decades, similar oil and gas operations on the federal OCS. According to data published by the Department of Interior for the period 1947 to 1995, sixteen of the twenty largest — including the five largest — OCS operators in the Gulf of Mexico, measured by oil volume, were a Defendant (or predecessor of a Defendant) or one of their subsidiaries.[60] Also according to the Department of the

---

[60] U.S. Dep't of Interior, *Bureau of Ocean Energy Mgmt., Ranking Operator by Oil,* https://www.data.boem.gov/Main/HtmlPage.aspx?page=rankOil.

Interior, in every subsequent year, from 1996 to the present, at least three of the top five OCS operators in this area have been a Defendant (or a predecessor) or one of their subsidiaries.[61]  Indeed, Defendants (and their subsidiaries or affiliates) presently hold, in whole or in part, approximately 20.5% of all OCS leases.  *See Bureau of Ocean Energy Management, Lease Owner Information*, https://www.data.boem.gov/Leasing/LeaseOwner/Default.aspx.[62]

37.    The Complaint itself makes clear that a substantial part of Plaintiff's claims "arise[] out of, or in connection with," Defendants' "operation[s] conducted on the outer Continental Shelf" that involve "the exploration and production of minerals." *Deepwater Horizon*, 745 F.3d at 163.  Plaintiff, in fact, challenges *all of* Defendants' "extraction" of "oil, coal, and natural gas[.]" Compl. ¶¶ 208, 291.  And a substantial quantum of those activities arise from OCS operations. *See* Cong. Rsch. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 3, 5 (updated Oct. 23, 2018), https://crsreports.congress.gov/product/pdf/R/R42432 (recounting that, historically, annual oil and gas production from federal leases has accounted for as much as 36%

---

[61]  *Id.*

[62]  The Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates. Although Defendants reject Plaintiff's erroneous attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of this notice of removal only, Defendants describe the conduct of certain predecessors, subsidiaries, and affiliates of certain Defendants to show that the Plaintiff's Complaint, as pleaded, can and should be removed to federal court.

of domestic oil production and 25% of domestic natural gas production).  Plaintiff also alleges that emissions have risen due to increased OCS extraction technologies. *See, e.g.*, Compl. ¶¶ 163–65 (discussing Arctic offshore drilling equipment and patents potentially relevant to conduct near Alaskan OCS).  And while Plaintiff identifies certain additional energy projects that occurred in Canadian waters, *id.* ¶ 170, Defendants conduct similar activity in American waters.

38.    Even if Plaintiff's claims were based solely on allegedly deceptive promotion of oil and gas by Defendants (which they clearly are not, as explained above), that would not prevent removal based on OCSLA.  For example, Plaintiff contends that Defendants funded "think tanks" and other organizations to "deceive the public about the impacts of fossil fuels . . . and oppose greenhouse gas regulation."  *Id.* ¶¶ 121, 210.  Even if this were true, Plaintiff's claims would be removable under OCSLA because, as explained above, its theory of causation includes the increased production of oil and gas leading to increases in greenhouse gas emissions, which has caused changes to the climate and Plaintiff's alleged injuries.  Thus, production of oil and gas—a substantial portion of which occurred on the OCS—is a direct and necessary link in the alleged causal chain upon which Plaintiff's claims depend.   Moreover, Defendants' alleged concealment and misrepresentations would have had the alleged effect of convincing policy makers to continue production on the OCS.

39.    The *relief* sought also arises in connection with and affects OCS extraction and development.  *See, e.g.*, Compl. at 144–45 (Prayer for Relief seeking abatement, damages, and injunctive relief that would inevitably affect exploration and production on the OCS).  Plaintiffs' desired remedies would clearly "alter[] the progress of production activities on the OCS" and "threaten[] to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS.  Such a dispute was intended by Congress to be within the grant of federal jurisdiction contained in § 1349."  *Amoco Prod. Co.*, 844 F.2d at 1210.

40.    Moreover, OCSLA makes clear that oil and gas activities on the OCS can only be governed by federal law.  As the Supreme Court recently confirmed, "[T]he OCSLA defines the body of law that governs the OCS."  *Parker Drilling Management Services, Ltd. v. Newton*, 139 S. Ct. 1881, 1887 (2019).  In particular, OCSLA extends "[t]he Constitution and laws and civil and political jurisdiction of the United States" to the OCS.  43 U.S.C. § 1333(a)(1).  Federal law applies "to the same extent as if the [OCS] were an area of exclusive Federal jurisdiction located within a State."  *Id.*  Disputes under OCSLA may borrow from the law of adjacent states, but such claims remain creatures of federal law.  "[T]he civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the [OCS]."  *Id.* at § 1333(a)(2)(A).

41. Thus, as *Parker Drilling* explains, the choice-of-law "question under the OCSLA" is not one of "ordinary" preemption. 139 S. Ct. at 1889. "The OCSLA makes apparent that federal law is exclusive in its regulation of [the OCS], and that state law is adopted only as surrogate federal law." *Id.* (quotation marks omitted, alteration in original). Thus, the courts have affirmed removal jurisdiction where plaintiff's claims, "though ostensibly premised on [state] law, arise under the 'law of the United States' under [43 U.S.C.] § 1333(a)(2)" such that "[a] federal question . . . appears on the face of [plaintiff's] well-pleaded complaint." *Ten Taxpayer Citizens Grp. v. Cape Wind Assoc.*, LLC, 373 F.3d 183, 193 (1st Cir. 2004). Accordingly, Plaintiff's claims are removable under OCSLA.[63]

## VI.   THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

42. The Federal Officer Removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). A party seeking removal under section 1442 must show that: (1) it is a "person" within the meaning of the statute; (2) plaintiff's claims are based upon the defendants' conduct "acting under" the United States, its agencies, or its officer; (3) plaintiff's claims are "for or relating to" an act under color of federal office; and (4)

---

[63] Under *Parker Drilling*, Plaintiff's claims related to operations on the OCS are also removable under 28 U.S.C. §1331 because they arise under federal law.

the party raises a colorable federal defense.  *Def. Ass'n of Philadelphia*, 790 F.3d at 467.  All elements are satisfied here with respect to the Chevron Parties and many other Defendants, which have engaged in activities pursuant to the directions of federal officers that "relate to" Plaintiff's claims.   So long as federal officer jurisdiction can be exercised as to one Defendant, jurisdiction over the entire action is permissible.  *See* 28 U.S.C. § 1367.   Among other things, Defendants have performed critical and necessary functions for the U.S. military in furtherance of national defense policy and have acted pursuant to government mandates, leases, and contracts under which they assisted the federal government in achieving federal policy goals, all under federal direction, oversight, and control.  And "in the absence of [these] contract[s] with [] private firm[s], the Government itself would have had to perform" these essential tasks.  *Watson*, 551 U.S. at 154.

43.    First, Defendants are "persons" within the meaning of the statute.  The Complaint alleges that Defendants are corporations, Compl. ¶¶ 18–23, which the Third Circuit has held qualify as "persons" under the statute.  *See Def. Ass'n of Philadelphia*, 790 F.3d at 468, as amended (June 16, 2015).

44.    Second, Defendants "acted under" a federal officer because the government exerted extensive "subjection, guidance, or control" over Defendants' fossil fuel production and because Defendants engaged in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."  *Watson*, 551 U.S. at 143,

152.   Both the Supreme Court and the Third Circuit have made clear that "the statute must be liberally construed" and, in particular, "[t]he words 'acting under' are broad." *Id.* at 147; *Def. Ass'n of Philadelphia*, 790 F.3d at 468; *see also Baran v. ASRC Fed. Mission Sols.*, 2018 WL 3054677, at *5 (D.N.J. June 20, 2018) ("The 'acting under' requirement, like the federal removal statute overall, is to be 'liberally construe[d]'") (quoting *Papp*, 842 F.3d at 812)).   Where, as here, a private party has specifically contracted with "the Government to produce an item that [the Government] needs," such assistance "goes beyond simple compliance with the law" and satisfies the "acting under" prong.  *Baker*, 962 F.3d at 942.  "The words 'acting under' describe 'the triggering relationship between a private entity and a federal officer.' The 'triggering relationship' encompasses a broad range of relationships, including, but not limited to, agent-principal, *contract or payment*, and employer-employee relationships."  *Doe v. UPMC*, 2020 WL 5742685 at *3 (W.D.Pa. Sept. 25, 2020) (emphasis added and internal citations omitted).

45.   Third, Plaintiff's claims are "for or relating to" acts Defendants performed under color of office.   To meet this prong, there need only be "a 'connection' or 'association' between the act in question and the federal office."  *Def. Ass'n of Philadelphia*, 790 F.3d at 471.  Even before the 2011 Removal Clarification Act, a removing party only was required to "'demonstrate that the acts for which they [we]re being sued' occurred *at least in part* '*because of* what they were asked to do

by the Government.'" *Id.* (quoting *Isaacson*, 517 F.3d at 137) (first emphasis added).

When Congress in the Removal Clarification Act of 2011 inserted the words "or

relating to" into the statute, it "broaden[ed] the universe of acts that enable Federal

officers to remove to Federal court" even further. *Id.*, 790 F.3d at 467 (quoting H.R.

Rep. 112-17, at 6, 2011 U.S.C.C.A.N. 420, 425).  Congress thus "broadened federal

officer removal to actions, not just *causally* connected, but alternatively *connected* or

*associated*, with acts under color of federal office." *Latiolais*, 951 F.3d at 292; *see*

*also Baker*, 962 F.3d at 943.  It is not necessary "that the complained-of conduct *itself*

was at the behest of a federal agency"; rather, it is "sufficient" if Plaintiffs'

"allegations are directed at the relationship between the [Defendants] and the federal

government" for at least *some* of the time frame relevant to Plaintiffs' claims.[64]

*Baker*, 962 F.3d at 944–45; *accord Def. Ass'n of Philadelphia*, 790 F.3d at 470–71;

*Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805 (3d Cir. 2016).  For instance, in

*Baker*, a case similar to this case, the federal officer removal statute was found to

apply when certain products that allegedly contributed to plaintiffs' purported

pollution-based harms had, at times, been "critical wartime commodities" subject to

"price controls," detailed federal oversight, and mandatory orders "setting aside" a

---

[64] *See also Williams v. Todd Shipyards Corp.*, 154 F.3d 416, 1998 WL 526612, at
   *1, *6 (5th Cir. 1998) (per curiam) (federal officer removal was proper where the
   plaintiff was exposed to asbestos while working for the defendant, even though
   the defendant "did both commercial work for private parties" and worked under
   government contract on ships owned or operated by the federal government).

portion of the defendants' products for the government's own use.  *Id*. at 940–41, 945.  Similarly, in *Defenders Association of Philadelphia*, the "for or relating to" element was satisfied even though the Federal Community Defender was *not* directed by the government to represent defendants in state post-conviction proceedings, the conduct at issue in the suit, because doing so was "related to" representing defendants in federal habeas proceedings, which *was* done under federal direction.  790 F.3d at 471–72.

46.    "[D]efendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute."  *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014).  At this stage, a defendant's allegations "in support of removal" only need to be "facially plausible," and the defendant receives the "benefit of all reasonable inferences from the facts alleged."  *Baker*, 962 F.3d at 941, 945.  In *Def. Ass'n of Philadelphia*, the Third Circuit made clear that in assessing a motion to remand a case removed to federal court, the Court must "construe the facts in the removal notice in the light most favorable to the" existence of federal jurisdiction, and the *defendant's theory* of the case is the basis for determining the propriety of removal.  790 F.3d at 471, 474 ("[W]e must accept the [defendant's] theory of the case at this juncture."); *see also Baker*, 962 F.3d at 947 ("Our role at this stage of the litigation is to credit only the [defendant's] theory.").  This conclusion is based on the Supreme Court's decision in *Acker,* in

which the Court "credit[ed] the [Defendants'] theory of the case for purposes of both elements of [the] jurisdictional inquiry and conclude[d] that the [Defendants] made an adequate threshold showing that the suit is 'for a[n] act under color of office.'" *Acker*, 527 U.S. at 432. Accordingly, this Court must defer to Defendants' reasonable theory for federal officer removal—that Defendants acted under the direction and control of federal officers to carry out essential functions for the federal government and this conduct is related to and connected with Plaintiff's asserted claims and alleged injuries.

47. Defendants' efforts to assist and help carry out essential tasks for the federal government are numerous, to say the least. Defendants' grounds for federal officer removal span decades and cover multiple federal programs and contracts. At their core, though, each relates back to the United States government's vital interest in assuring adequate energy sources for the national defense and economic well-being.[65]

A. **The Federal Government's "Special Relationship" With The Energy Industry**

---

[65] The examples provided in this section, and other sections, of this Notice of Removal are meant only to provide illustrative examples. These examples are by no means an exhaustive collection of the factual bases that support the grounds for removal asserted herein. Defendants expressly reserve all rights to include additional support for any and all grounds for removal in any further briefing should Plaintiff challenge removal.

48.     The association between oil and national security began in the early 1900s, when the world's leading navies switched from coal to oil as the preferred energy source for ships.  President Taft recognized the national interest in developing domestic oil sources in his address to Congress on December 6, 1910:  "As not only the largest owner of oil lands, but as a prospective large consumer of oil by reason of the increasing use of fuel oil by the Navy, the federal government is directly concerned both in encouraging rational development and at the same time inuring the longest possible life to the oil supply."[66]  This national security concern led to the September 2, 1912 executive order creating the Naval Petroleum Reserve at Elk Hills, California, which was intended to preserve oil in the ground for national emergencies.

49.     Following World War I, the United States continued to explore for and develop its own domestic resources, while other nations pursued policies to maintain access and to develop oil resources in the Middle East, Venezuela, and Mexico. Although the United States produced a significant amount of the world's oil in the interwar years, it also began to push European powers to open Middle East oil reserves for American companies.[67]

---

[66] Dick Decl., Ex. 23 (*Hearings Before Committee on Naval Affairs of the House of Representatives on Estimates Submitted by the Secretary of the Navy*, 64th Cong. 761 (1915)).

[67] *See generally* Dick Decl., Ex. 24 (Daniel Yergin, The Prize: The Epic Quest for Oil, Money & Power 399 (1991)).

50.     World War II confirmed petroleum's role as a key American resource, and underscored the government's interest in maintaining and managing it.   *See* Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, Special Committee Investigating Petroleum Resources, S. Res. 36, at 4 (Nov. 28, 1945) ("Our overseas forces required nearly twice as many tons of oil as arms and armament, ammunition, transportation and construction equipment, food, clothing, shelter, medical supplies, and all other materials together.   In both essentiality and quantity, oil has become the greatest of all munitions").   As the United States prepared for war in 1941, its need for large quantities of oil and gas to produce high-octane fuel for planes ("avgas"), oil for ships, lubricants, and synthetic rubber far outstripped the Nation's current capacity.   The government created agencies to control the petroleum industry; it built refineries; it directed the production of certain petroleum products; and it managed scarce resources for the war effort.   "No one who knows even the slightest bit about what the *petroleum industry* contributed to the war can fail to understand that it was, without the slightest doubt, *one of the most effective arms of this Government…* in bringing about a victory."   Statement of Senator O'Mahony, Chairman, Special Committee Investigating Petroleum Resources, S. Res. 36, at 1 (Nov. 28, 1945).   Put simply, "[b]y controlling the nation's crude oil supply, ***the federal government controlled the nation's petroleum industry***."   *Exxon Mobil*, 2020 WL 5573048, at *11 (emphasis added).

51.     The controls placed on the production of petroleum during World War II extended through the Korean War.  *See Exxon Mobil*, 2020 WL 557304 at *27 (detailing the government's use of the Defense Production Act of 1950 "to force" the petroleum industry to "increase their production of wartime . . . petroleum products"). The United States government also authorized the full development of its own energy resources by directing large-scale oil production at the Naval Petroleum Reserve at Elk Hills, which was operated by Chevron's predecessor Standard Oil of California under contract with the U.S. Navy.

52.     During the Cold War, the U.S. military continued to purchase and consume large amounts of avgas and jet fuel, and participated in the development of innovative military fuels.  For example, Shell Oil Company developed and produced specialized high-altitude fuels for the federal government's U-2 and SR-71 Blackbird overhead reconnaissance programs.

53.     The United States Department of Defense is the United States' single largest consumer of energy, and one of the world's largest users of petroleum fuel. In fiscal year 2019 alone, the Department of Defense purchased 94.2 million barrels of fuel products in compliance with military specifications, totaling $12.1 billion in procurement actions.[68]

---

[68]  Def. Logistics Agency Energy, *supra* n.11.

54.     During the 1960s, U.S. oil consumption increased 51%, compared to only 36% during the previous decade.[69]  Demand continued to climb into the early 1970s, and domestic supply failed to keep pace, so the United States soon found itself facing a precarious shortage of oil, which in turn, threatened domestic stability.  The United States increasingly turned to foreign countries, particularly in the Middle East, for oil—indeed, the amount of oil that the United States imported doubled from 3.2 million barrels per day in 1970 to 6.2 million barrels per day in 1973.[70]  By April 1973, President Nixon was sounding the alarm to Congress:

> As America has become more prosperous and more heavily industrialized, our demands for energy have soared. Today, with 6 per cent of the world's population, we consume almost a third of all the energy used in the world. Our energy demands have grown so rapidly that they now outstrip our available supplies, and at our present rate of growth, our energy needs a dozen years from now will be nearly double what they were in 1970. . . . If recent trends continue unchecked, we could face a genuine energy crisis. But that crisis can and should be averted, for we have the capacity and the resources to meet our energy needs if only we take the proper steps —and take them now.[71]

55.     One of Nixon's immediate suggestions to avert a national energy crisis was to dramatically increase production on the OCS:

---

[69]  Dick Decl., Ex. 25 (Jay Hakes, A Declaration of Energy Independence 17 (2008)).

[70]  Dick Decl., Ex. 24 (Yergin, 591).

[71]  Excerpts From Nixon Message, N.Y. Times, Apr. 19, 1973, https://www.nytimes.com/1973/04/19/archives/excerpts-from-nixon-message-developing-our-domestic-energy.html.

> Approximately half of the oil and gas resources in this country are located on public lands, primarily on the Outer Continental Shelf [OCS]. The speed at which we can increase our domestic energy production will depend in large measure on how rapidly these resources can be developed.  I am therefore directing the Secretary of the Interior to take steps which would triple the annual acreage leased on the Outer Continental Shelf by 1979, beginning with expanded sales in 1974 in the Gulf of Mexico and including areas beyond 200 meters in depth under conditions consistent with my oceans policy statement of May, 1970.[72]

56.    Before the nation's precarious energy balance could stabilize, events abroad would exacerbate the crisis.  The 1973 Arab Oil Embargo "led to nationwide shortages of petroleum, a $60 billion drop in GNP, [and] more rapid inflation," among other harms.[73]  The nation's energy woes continued to mount in the mid-late 1970s, with a natural gas shortage caused by an abnormally cold winter in 1976–77, a national coal strike in 1978, and a substantial reduction in crude oil supplies following the Iranian Revolution of 1979.[74]  Yet the nation's dependency on imported oil continued to increase.  By January and February of 1977, the U.S. was importing up to 9.6 billion barrels per day—fully half of the nation's total domestic oil consumption.[75]  The growing influence of the Organization of Petroleum Exporting

---

[72]  *Id.*

[73]  U.S. Dep't of Energy, National Energy Plan II, at 1 (1979), https://books.google.com/books?id=VR7PpPbRKFgC&printsec=frontcover#v=o nepage&q&f=false.

[74]  *Id.*

[75]  *Id.* at VII.

Countries ("OPEC"), the quadrupling of oil prices during the energy crises of the 1970s, the staggering loss in GNP, and the now-infamous gas lines, price controls, and rationing that accompanied these energy crises spurred the U.S. Government to take action over the ensuing decades to quickly and dramatically increase domestic oil production.

57.    In 1973, President Nixon established the goal of energy independence for the U.S. by 1980.  President Nixon dubbed this plan "Project Independence 1980" and, among other things, ordered the Secretary of the Interior "to increase the acreage leased on the [OCS] to 10 million acres beginning in 1975, more than tripling what had originally been planned."[76]  Nixon explained:  "Let me conclude by restating our overall objective.  It can be summed up in one word that best characterizes this Nation and its essential nature.  That word is 'independence.'  From its beginning 200 years ago, throughout its history, America has made great sacrifices of blood and also of treasure to achieve and maintain its independence.  In the last third of this century, our independence will depend on maintaining and achieving self-sufficiency in energy. . . .  What I have called Project Independence 1980 is a series of plans and goals set to insure that by the end of this decade, Americans will not have to rely on

---

[76]  Annual Message to the Congress on the State of the Union, 1 Pub. Papers 56, 94 (Jan. 23, 1974), https://quod.lib.umich.edu/p/ppotpus/4731948.1974.001/134?rgn=full+text;view=image.

any source of energy beyond our own."[77]

58.    Importantly, the federal government has promoted the production of oil and gas for decades to meet this goal, even as the public and the world increasingly recognized and understood the potential link between greenhouse gas emissions and global climate change.[78]  Although the nation did not meet President Nixon's goal of energy independence by 1980, it did so in 2019:  total U.S. energy exports were greater than total energy imports in that year, and the United States became a net total energy exporter for the first time since 1952.[79]

---

[77]  Address to the Nation about National Energy Policy, 1 Pub. Papers 973, 976 (Nov. 25, 1973), https://quod.lib.umich.edu/p/ppotpus/4731942.1973.001/1030?rgn=full+text;view=image.  After the Arab Oil Embargo, there was immense public pressure for Washington to "do something"— to return prices to what they had been before the embargo and, at the same time, ensure adequate domestic supplies.  *See also* Meg Jacobs, *America's Never-Ending Oil Consumption*, Atlantic (May 15, 2016), https://www.theatlantic.com/politics/archive/2016/05/american-oil-consumption/482532/ (hereafter, "Atlantic article").

[78]  The federal government took a number of other actions to promote the domestic production of oil and gas to protect important state actions.   These include the Energy Petroleum Allocation Act of 1973, Pub L. No. 93-159, 87 Stat. 627 (1973) and the Federal Energy Administration ("FEA") Act of 1974, Pub. L.No. 93-275, 88 Stat. 96 (1974).  The report published pursuant to the FEA stated, "Prospects for large, new discoveries of onshore oil and gas deposits in the lower 48 States are small. For this reason, it is proposed that leasing of the Federal OCS be accelerated, to include frontier areas of Alaska, the Atlantic and Pacific coasts, and the Gulf of Mexico."  Dick Decl., Ex. 10 (H.R. Doc. No. 93-406, at 1012).  The report further noted that "there would be strategic foreign policy and national security advantages in having energy sources which are not susceptible to interruption by a foreign power." *Id.*.  More recent administrations have continued to promote the development of oil and gas on the OCS through, *e.g.*, the Energy Policy Act of 2005 which, among other things, sought "to promote oil and natural gas production from the [OCS] and onshore Federal lands under lease by providing royalty incentives to use enhanced recovery techniques."  Pub. L. No. 109-58, § 357(a)(2)(B), 119 Stat. 594 (2005).

[79]  U.S. Energy Info. Admin., U.S. energy facts explained (Apr. 27, 2020), https://www.eia.gov/energyexplained/us-energy-facts/imports-and-exports.php.

59.   The federal government continues the active promotion of domestic production of fossil fuels through a variety of lease programs, grants, loan guarantees, tax provisions, and contracts.  For example, the Office of Fossil Energy states that the government seeks American energy dominance, which "promotes U.S. domestic homegrown energy development to achieve energy security and jobs in energy and technology around the world."[80]

60.   For decades, Defendants have acted under the direction of federal officers and have assisted them in securing domestic energy independence and meeting the requirements of the U.S. military and the national economy.  Under these circumstances, 28 U.S.C. § 1442(a)(1) affords Defendants a right to insist that any claims based on this "special relationship" may be heard in federal court.  *Baker*, 962 F.3d at 941–42 (holding that "[t]he crux of the ['acting under'] inquiry . . . is whether there was a special relationship between the defendant and the federal government," which exists where an entity "provide[s] the federal government with materials that it need[s]"—particularly during wartime).

**B.**   ***Defendants Acted Under Federal Officers By Producing Or Supplying Oil At The Government's Direction To Implement Federal Policy Mandates and Objectives***

---

[80]   U.S. Dep't of Energy, Office of Fossil Energy, 2018-2022 Strategic Vision, https://www.energy.gov/sites/prod/files/2019/12/f69/FE%20Strategic%20Vision .pdf.

61.     Defendants have assisted the government to develop the Nation's fossil fuel resources in furtherance of the government's national policy goals by exploring for and producing oil, gas, and other minerals on federal lands, including pursuant to leases governed by OCSLA and the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq.* ("MLA"), under the direction and control of the federal government.  *See, e.g.*, Dick Decl., Exs. 4–8.

62.     ***The Outer Continental Shelf***.  As noted above, Congress first passed OCSLA in 1953, providing federal control over the OCS to assure the "expeditious and orderly development" of what it recognized to be a "vital national resource" in "a manner which is consistent with . . . national needs."[81]  In 1978, Congress amended OCSLA to further encourage the leasing of the OCS to meet national energy and security needs created by the oil embargos beginning in 1973.  Congress's express purpose was to foster "expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments," including by "develop[ing] oil and natural gas resources in the Outer Continental Shelf in a manner which is consistent with the

---

[81]  43 U.S.C. § 1332(3).

need . . . to make such resources available to meet the Nation's energy needs as rapidly as possible."[82]

63.     During the debate over the 1978 amendments, Senator Fritz Hollings submitted a proposal suggesting that the federal government create a national oil company to facilitate the development of oil and gas on the OCS: "My bill authorizes and directs the Secretary of the Interior to initiate a major program of offshore oil exploration—including deep drilling—in frontier areas of the Outer Continental Shelf . . . .  The Federal Government can conduct this program by using the same drilling and exploration firms that are usually hired by oil companies.  The taxpayers of the United States—rather than the oil companies—would be the clients for these drilling companies, and the information received would pass directly into the public domain."[83]  The proposal to create a government agency to develop the OCS was ultimately rejected—instead, the government decided to contract with private energy companies to perform these essential tasks on its behalf with expanded oversight and control by the government.

---

[82] 43 U.S.C. § 1802 (1) & (2); *see Watt*, 668 F.2d 1290, 1296 (D.C. Cir. 1981); *see also* S. Rep. No. 93-1140, at 4937 (1974) ("During the next decade, development of conventional oil and gas from the United States Outer Continental Shelf can be expected (a) to provide the largest single source of increased domestic energy, (b) to supply this energy at a lower average cost to the U.S. economy than any alternative and (c) to supply it with substantially less harm to the environment than almost any other source.").

[83] *See* Dick Decl., Ex. 9 (121 Cong. Rec. S903-11 (1975)).

64.     Around this time, it was necessary to spur production of oil and gas on the OCS because alternatives were infeasible.   In the lead-up to the 1978 amendments, the Ad Hoc Select Committee on the OCS published a report stating that "alternative sources of energy will not be commercially practical for years to come," and thus, "a healthy economy remains dependent on supplies of oil and gas."[84] The Committee concluded that "[d]evelopment of our OCS resources will afford us needed time—as much as a generation—within which to develop alternative sources of energy."[85]

65.     The 1978 OCSLA amendments greatly increased the Secretary of the Interior's control over the OCS leasing program to align production with national goals.[86]   The amendments instructed the Secretary of the Interior to create an oil and gas leasing program on a five-year review cycle that provides as precisely as possible the size, timing, and location of leasing activities "which [the Secretary] determines will best meet national energy needs for the five-year period following its approval or reapproval."[87]   Since 1977, several federal statutes have further expanded the OCS leasing program to promote the development of national energy supplies, including

---

[84]   Dick Decl., Ex. 54 (H.R. Rep. No. 94-1084, at 3438 (1976)).

[85]   Dick Decl., Ex. 26 (H.R. Rep. No. 95-590, at 1460 (1977)).

[86]   *See id.* at 173 (recognizing that the amendments provided the federal government with the power and oversight capability to "expedite the systematic development of the OCS, while protecting our marine and coastal environment").

[87]   43 U.S.C. § 1344(a)-(e).

reductions in royalty payments to increase participation by Defendants to explore and develop deepwater resources.[88]

66.     As a major federal action, authorization of each five-year OCS leasing program is subject to environmental review under the National Environmental Policy Act, requiring the preparation of an Environmental Impact Statement ("EIS") to support the Record of Decision approving the scope of the program.  The EIS approving each five-year leasing program is massive, and includes details regarding the national need for oil and gas and how the leasing program meets those needs.[89]

67.     These environmental analyses confirm that the OCS leasing program exists to fulfill Congress's mandate to manage and encourage production of oil and natural gas from the OCS in order to further the national interest, not merely the commercial interests of the lessees.  In 2009, for example, oil produced from the OCS accounted for 30% of all domestic production.  The U.S. treasury averages more than $10 billion per year from OCS bonuses, rental payments, and royalties.  In evaluating alternatives that could replace OCS leases or the required "no action" alternative (i.e., no OCS leases), the EIS concludes that such alternatives would not meet the federal

---

[88]   *See, e.g.*, Outer Continental Shelf Deep Water Royalty Relief Act, Pub. L. No. 104-58, 109 Stat. 557 (1995); Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005); Gulf of Mexico Energy Security Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922 (2006).

[89]   *See, e.g.*, 2012-2017 EIS.

government's purpose and need because any reduction in production would be replaced mostly by foreign imports of oil and gas, frustrating congressional intent.[90]

68.    The Record of Decision approving the 2017-2022 OCS Leasing Programs recognizes that the Secretary of Interior must develop schedules of OCS oil and gas leasing that "best meet national energy needs for the 5-year period following its approval or re-approval."   Although the no-lease alternative was identified as the most environmentally preferred alternative, it was rejected because it did "not meet the purpose and need for the action . . . as it leaves a void in planning for national energy needs."[91]

69.    Defendants that agree to the OCS leases must develop the OCS areas identified for exploration and development.  The leases provide that recipients must "develop[] . . . the leased area" diligently, including carrying out exploration, development, and production activities approved by Interior Department officials for the express purpose of "maximiz[ing] the ultimate recovery of hydrocarbons from the leased area."[92]  The Bureau of Ocean Energy Management ("BOEM") maintains oversight over the lessees as they operate on federal land.  Prior to exploration,

---

[90]  *See id.* at 1-4, 4-606, 4-643 (projecting changes in oil markets if OCS production was halted).

[91]  U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., Record of Decision and Approval of the 2017-2022 Outer Continental Shelf Oil and Gas Leasing Program (Jan. 17, 2017), https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2017-2022/2017-2022-Record-of-Decision.pdf.

[92]  *See* Dick Decl., Ex. 5 § 10.

development, or production, lessees must prepare and comply with detailed plans that are subject to comment and amendment by BOEM, state reviewer, or other agencies.[93]

70. Under these requirements, OCS lessees are subject to exacting oversight by BOEM and Bureau of Safety and Environmental Enforcement ("BSEE") over each stage in developing the leasehold property.[94] At all stages—from exploration, to preparation for developing and producing oil and gas reserves that have been discovered, to actual drilling and production—OCS lessees must submit exhaustive operational plans demonstrating how they will comply with the complex and detailed technical requirements imposed by these agencies. The relevant agency must then find, complete, and approve these plans before any such work can begin. BSEE then carefully monitors compliance with the approved plan and must approve any significant modification thereof.

71. The federal government supervises and controls the oil and gas development and production activities of its lessees, like Defendants, in myriad and

---

[93] *See generally* Adam Vann, Cong. Rsch. Serv., RL33404, Offshore Oil and Gas Development: Legal Framework (2018), RL33404, Offshore Oil and Gas Development: Legal Framework (2018), https://fas.org/sgp/crs/misc/RL33404.pdf (describing the multi-step process for approval of development plans and oversight procedures).

[94] *E.g.*, 30 C.F.R. §§ 250.101-115, §§ 250.130-146, §§ 250.168-295, §§ 250.400-463 (BSEE) & §§ 550.101-147 (BOEM).

extensive ways.  Many of these requirements and reserved authorities are for the purpose of assisting the federal government in furthering public purposes.

72.    OCS leases obligate lessees like Defendants to "develop[] . . . the leased area" diligently, including carrying out exploration, development, and production activities approved by Interior Department officials for the express purpose of "maximiz[ing] the ultimate recovery of hydrocarbons from the leased area."[95] Indeed, for decades, Defendants' OCSLA leases have instructed that "[t]he Lessee *shall comply* with all applicable regulations, orders, written instructions, and the terms and conditions set forth in this lease" and that "[a]fter due notice in writing, the Lessee *shall conduct* such OCS mining activities at such rates as the Lessor may require in order that the Leased Area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles."[96]   All drilling must take place "in accordance with an approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD) [as well as] approval conditions"—all of which must undergo

---

[95]   Dick Decl., Ex. 5 § 10; *see* 30 C.F.R. § 250.1150 ("[Lessees] must produce wells and reservoirs at rates that provide for economic development while maximizing ultimate recovery without adversely affecting correlative rights.").

[96]   Dick Decl., Ex. 5 § 10 (emphases added).

extensive review and approval by federal authorities, and all of which further must conform to "diligence" and "sound conservation practices."[97]

73.     The federal government retains the right to control a lessee's rate of production from its lease.[98]  In particular, BSEE, within the Interior Department, may set the Maximum Efficient Rate ("MER") for production from a reservoir—that is, a cap on the production rate from all of the wells producing from a reservoir.[99]  This requirement has existed since 1974,[100] and the government adopted this "significant burden" to control production from its leases for the purpose of responding to "a period of oil shortages and energy crises."[101]  Capping production levels to serve the public policy of ensuring sufficient petroleum reserves for the country is not a feature of a typical commercial lease, and thus is another example of how the OCS leases are not merely commercial transactions, but rather are used to further federal objectives.

[97]   Dick Decl., Ex. 5 §§ 9, 10; *see* Dick Decl., Ex. 7 (MLA leases grant rights subject to terms and conditions of the lease, federal laws, and the Interior Secretary's orders).

[98] *See* Dick Decl., Ex. 5 § 10; 43 U.S.C. § 1334(g) (The lessee "shall produce any oil or gas, or both, . . . at rates consistent with any rule or order issued by the President in accordance with any provision of law.").

[99]   30 C.F.R. § 250.1159.

[100]  *See* 39 Fed. Reg. 15885 (May 6, 1974) (approving OCS Order No. 11).

[101]  75 Fed. Reg. 20271, 20272 (Apr. 19, 2010).

74.    For onshore operations, the Interior Department's Bureau of Land Management ("BLM") leases similarly provide that the United States "reserves the right to specify rates of development and production in the *public interest*."[102]

75.    The federal government also maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property. For example, the government conditions OCS leases with a right of first refusal to purchase all minerals "[i]n time of war or when the President of the United States shall so prescribe."[103]  The government also reserves the right to purchase up to 16⅔% of lease production, less any royalty share taken in-kind.[104]  The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration (government civilian operations), the Department of Defense (military operations), or the Department of Energy (*e.g.*, Strategic Petroleum Reserve).[105]

76.    For onshore leases, the Secretary may take any royalty owed on oil and gas production in-kind and "retain the same for the use of the United States."[106]  BLM leases also provide that "Lessor reserves the right to ensure that production is sold at

---

[102] Dick Decl., Ex. 7 § 4 (emphasis added).

[103] Dick Decl., Ex. 4 § 14; Dick Decl., Ex. 5 § 15(d); *see* 43 U.S.C. § 1341(b).

[104] 43 U.S.C. § 1353(a)(2).

[105] 43 U.S.C. § 1353(a)(3).

[106] 30 U.S.C. § 192.

reasonable prices and to prevent monopoly."[107]   In addition, the Secretary may

compel a lessee to offer a percentage of lease production "to small or independent

refiners" (*e.g.*, in shortage situations where independent refiners may not have access

to production to the same extent as integrated producers/refiners).[108]

77.     The federal government also uniquely reserves the authority to

determine the value of production for purposes of determining how much royalty a

lessee owes.[109]  The standard BLM lease for onshore minerals in effect for decades

has a similar provision.[110]  A typical commercial private (*i.e.*, fee) lease would never

reserve similar unilateral authority to one contracting party to control a material

economic term of the lease contract; this would be akin to an apartment rental lease

providing that the landlord has sole discretion to specify the rent owed.

78.     Through   federal   leases,   the   government   balances   economic

development with environmental considerations.   The Secretary may reduce or

eliminate the United States' royalty share, and thus provide the lessee an additional

economic incentive to produce oil and gas.[111]   The Secretary may also suspend

---

[107] Dick Decl., Ex. 5 § 10.

[108] Dick Decl., Ex. 5 § 15(c); *see* 43 U.S.C. § 1337(b)(7) (OCS leases); 30 U.S.C. § 192 (onshore leases).

[109] *See* Dick Decl., Ex. 5 § 6(b) ("The value of production for purposes of computing royalty shall be the reasonable value of the production *as determined by the Lessor*.") (emphasis added).

[110] *See* Dick Decl., Ex. 7 § 2 ("Lessor reserves the right . . . to establish reasonable minimum values on products . . . .").

[111] 43 U.S.C. § 1337(a)(3) ("The Secretary may, in order to promote increased production on the lease area, through direct, secondary, or tertiary recovery

production from an OCS lease "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment."[112]   For onshore federal leases, the Secretary may similarly direct or grant suspensions of operations.[113]   The standard BLM onshore lease also requires the lessee to cease any operations that would result in the destruction of threatened or endangered species or objects of historic or scientific interest.[114]

79.    Through federal leases, the government retains supervision and control over the use of federal property.   The mineral leasing laws, including OCSLA and the MLA, are an exercise of Congress's power under the Property Clause of the Constitution.   U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.").   The government issues onshore and offshore leases for a primary term of five to 10 years, with a habendum clause under which the lessee retains the lease for so long after the primary term as the lease

---

means, reduce or eliminate any royalty or net profit share set forth in the lease for such area.") (OCS leases); 43 C.F.R. § 3103.4-1(a) ("[T]he Secretary . . . may waive, suspend or reduce . . . the royalty on an entire leasehold, or any portion thereof.") (MLA leases).

[112] 43 U.S.C. § 1334(a)(1); *see* 43 U.S.C. § 1334(a)(2) (authority to cancel any lease for similar reasons); Dick Decl., Ex. 5 § 13 (offshore lease provision governing suspension or cancellation).

[113] *See* 30 U.S.C. § 226(i); 43 C.F.R. § 3103.4-4.

[114] Dick Decl., Ex. 7 § 6.

produces oil and gas in paying quantities.  30 U.S.C. § 226(e) (onshore); 43 U.S.C.

§ 1337(b)(2) (OCS); Dick Decl, Ex. 5 § 3.  But when the lease terminates, the

property interest reverts to the United States; the lessee cannot acquire fee title

interest.  Nor may a federal lessee assign its lease to another person without express

government approval.  30 U.S.C. § 187; 43 C.F.R. § 3106 (onshore leases); 30 C.F.R.

§§ 556.701(a), 556.800 (OCS leases).

80.    The United States controls federal mineral lessees like Defendants in

other ways.  An OCS lessee does not have an absolute right to develop and produce;

rather, it has only an exclusive right to seek approval from the United States to

develop and produce under the lease.  *See Sec'y of the Interior v. California*, 464 U.S.

312, 337–39 (1984); *Vill. of False Pass v. Clark*, 733 F.2d 605, 614–16 (9th Cir.

1984).  The MLA limits the onshore federal oil and gas lease acreage that may be

held by any one person, enforceable by an action in federal court.  30 U.S.C. § 184(d),

(h).  The government has the right to obtain "prompt access" to facilities and records.

*See* Dick Decl, Ex. 4 § 11, Dick Decl, Ex. 5 § 12; 30 U.S.C. § 1713.  And the United

States also reserves the right to all helium produced from federal leases, which the

lessee produces solely for the government's benefit.  *See* 43 U.S.C. § 1341(f); Dick

Decl, Ex. 5 § 6(a) (OCS leases); 30 U.S.C. § 181 (onshore leases).

81.    As the above statutory and lease provisions demonstrate, a federal oil

and gas leases is a contract to develop federal minerals on the government's behalf,

and the government retains extensive supervision and control over the lessees for many purposes, including in some cases solely to further public policy or achieve purely governmental objectives.  These are activities that the federal government would itself have to undertake unless the Defendants did it for the government through the obligations of federal leases on federal lands.  Under *Watson*, this is not run of the mill regulation; rather it is the kind of "special relationship" that supports federal officer removal.  *Watson*, 551 U.S. at 157.

82.    In 2019, oil production by private companies, including some Defendants, from federal offshore and onshore leases managed by the Interior Department was nearly one billion barrels.  Historically, annual oil and gas production from federal leases has accounted for as much as 36% of domestic oil production and 25% of domestic natural gas production.[115]  The federal government has reaped enormous financial benefits from the ongoing policy decision to contract for the production of oil and gas from federal lands in the form of royalty regimes that have resulted in billions of dollars of revenue to the federal government. Moreover, the activities of lessees (including Defendants) pursuant to these leases further Congress's directives to the Executive Branch to facilitate and manage the production of oil and natural gas from the OCS in order to achieve the federal

---

[115] *See* Cong. Rsch. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 3, 5 (updated Oct. 23, 2018), https://crsreports.congress.gov/product/pdf/R/R42432.

government's policy objectives.  If not for these activities of lessees under the direction and control of federal resource-management agencies, the federal government would have needed to perform those activities itself in order to implement Congress's directives regarding production of oil and gas from the OCS.

83.  ***Naval Petroleum Reserve at Elk Hills***.  At the turn of the 20th century, government lands in the West were being rapidly turned over to private owners.  At the same time, there was a growing realization of the importance of oil for the Navy, which was then changing its ships from coal- to oil-burning.  In response to arguments that the government should preserve oil for Naval purposes, President Taft withdrew large portions of land in California and Wyoming from eligibility for private ownership, and in 1912 set aside Naval Petroleum Reserve No. 1 at Elk Hills by an Executive Order.  The establishment of the Reserve, however, was expressly made subject to pre-existing private ownership.  There are approximately 46,000 acres within the Reserve: approximately one-fifth was owned by Standard Oil of California ("Standard Oil") (Chevron's predecessor) and the remainder by the Navy. The Standard Oil lands are not in one block, but are checker-boarded throughout the Reserve. [116]

---

[116] The history of Elk Hills is recounted in *United States v. Standard Oil Co. of Cal.*, 545 F.2d 624 (9th Cir. 1976).

84.     "The Elk Hills Naval Petroleum Reserve (NPR-1) . . . was originally established in 1912 to provide a source of liquid fuels for the armed forces during national emergencies."[117]   "Congressional intent was to retain the oil [at the Reserve] in the ground except when it was needed for national defense or to avoid damage to the field and the irretrievable loss of oil."[118]   In other words, Congress's policy objective was to take those steps necessary to maintain and preserve the fields exclusively for federal defense purposes.   Standard Oil and the Navy eventually developed an understanding that neither would drill additional wells or produce oil inside the Reserve without providing six months' notice to the other.[119]   In doing so, Standard Oil agreed to maintain the Reserve for national security purposes.   The maintenance of the Reserve itself under the direction of the federal government in furtherance of federal policy gives rise to federal officer removal.[120]   Standard Oil's efforts paid off, as the Reserve was ready to produce oil for the U.S. war efforts in World War II.

---

[117] U.S. Gov't Accountability Off., GAO/RCED-87-75FS, Naval Petroleum Reserves: Oil Sales Procedures and Prices at Elk Hills, April Through December 1986, at 3 (1987) ("GAO Fact Sheet"), http://www.gao.gov/assets/90/87497.pdf.

[118] U.S. Gov't Accountability Off., *Naval Petroleum Reserve No. 1: Efforts to Sell the Reserve*, GAO/RCED-88-198 at 15 (July 1988) (emphasis added) ("GAO Report").

[119] *See United States v. Standard Oil of California*, 545 F.2d 624, 627 (9th Cir. 1976).

[120] *See generally* GAO Report.

85.    World War II marked a new phase.  "Shortly after the entrance of the United States into World War II, it became apparent that additional crude oil production would be required on the West Coast."[121]   Standard Oil and the Navy began negotiations for production on the Reserve.  On March 1, 1942, President Roosevelt "stated that if satisfactory arrangements could not be promptly concluded with [Standard Oil], the Secretary of the Navy was authorized to start condemnation proceedings through the Department of Justice to acquire the property" for the federal government.[122]

86.    The Navy and Standard Oil entered into a Unit Plan Contract ("UPC") that President Roosevelt approved on June 28, 1944.  The UPC "governed the joint operation and production of the oil and gas deposits . . . of the Elk Hills Reserve." *Chevron U.S.A., Inc. v. United States*, 116 Fed. Cl. 202, 205 (Fed. Cl. 2014).  It provided that the Elk Hills Reserve "was to be operated as a single property (a unit) and granted the Navy, subject to the provisions of the contract, ***absolute control*** over (1) the time and rate of exploration and development and (2) the quantity and rate of production."[123]   The UPC shows the federal government's "full and absolute" power and "complete control" over fossil fuel exploration, production, and sales at the reserve.

---

[121] *Id.* at 14.

[122] *Id.*

[123] *Id.* at 15.

87.     The plan was designed to "[a]fford [the] Navy a means of acquiring *complete control over* the development of the entire Reserve *and the production of oil therefrom*."[124]

88.     "[The] Navy shall, subject to the provisions hereof, have the *exclusive control* over the exploration, prospecting development and operation of the Reserve."[125]

89.     "[The] Navy shall have *full and absolute power* to determine from time to time the rate of prospecting and development on, and the quantity and rate of production from, the Reserve, and may from time to time shut in wells on the Reserve if it so desires."[126]

90.     "[A]ll exploration, prospecting, development, and producing operations on the Reserve" occurred "under the supervision and direction of an Operating Committee" tasked with "supervis[ing]" operations and "requir[ing] the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the reserve."[127]   In the event of disagreement, "such matter shall be

---

[124] Dick Decl., Ex. 6, Recitals § 6(d)(i) (emphases added).

[125] *Id.* § 3(a) (emphasis added).

[126] *Id.* § 4(a) (emphasis added).

[127] *Id.* § 3(b).

referred to the Secretary of the Navy for determination; and his decision in each such instance shall be final and binding upon Navy and Standard."[128]

91.    The Navy retained ultimate and even "absolute" discretion to suspend production, decrease the minimum amount of production per day that Standard was entitled to receive, or increase the rate of production.[129]

92.    Standard (and later Chevron) could participate in an Operating Committee, which was responsible for production decisions such as the number, design, and location of wells and facilities.  Both the Navy and Standard had an equal vote on the Committee, but in the event of a tie the Secretary of Navy held the tiebreaker.[130]

93.    The "***Navy chose to operate the reserve through a contractor rather than with its own personnel***" and opened the contract to competitive bidding.[131] Standard Oil "bid for the operator's contract in 1944, was awarded the contract, and continued to operate NPR-1 [for the Navy] for the next 31 years."[132]   The Navy decided to use a third-party contractor to operate the Reserve instead of undertaking such activities on its own to maximize production as quickly as possible.  This is

---

[128] *Id.* § 9(a).
[129] *Id.* §§ 4(b), 5(d)(1).
[130] *See id.*
[131] *Id.*
[132] *Id.*

reflected in government documents explaining the decision to hire Standard to operate the Reserve, which also noted that Standard offered to perform the work without making a profit:

> A substantial increase in production at the earliest possible date was urgently requested by the Joint Chiefs of Staff to meet the critical need for petroleum on the West Coast to supply the armed forces in the Pacific theatre . . . . The Standard Oil Company of California was chosen as operator because it was the only large company capable of furnishing the facilities for such a development program and partially because it was the largest private owner of lands in the Reserve. The Navy has expressed its appreciation of the patriotism of the Standard Oil Company in undertaking such a project at cost with no profit to be received by the Company.[133]

94.     "Shortly after the unit plan contract was signed, the Congress, according to DOE, authorized the production at [the Elk Hills Reserve] at a level of 65,000 B/D [barrels per day] to address fuel shortages and World War II military needs."[134] Production reached this "peak of 65,000 barrels per day in 1945."[135]

95.     Standard Oil's production and operations of the Reserve for the Navy in furtherance of the government's war effort were subject to substantial and continued oversight and inspections by Navy officers.  The Operating Agreement between the U.S. Navy and Standard Oil directs that "OPERATOR [Standard Oil] is in the employ of the Navy Department and is responsible to the Secretary thereof through the

---

[133] *See* Dick Decl., Ex. 8 (Elk Hills Historical Documents at 1).
[134] GAO Report at 15.
[135] GAO Fact Sheet at 3.

Officer in Charge and Director, Naval Petroleum and Oil Shale Reserves."[136]   In November 1974, for example, when a dispute arose concerning whether it was possible to produce 400,000 barrels per day to meet the unfolding energy crisis, the Navy directed the Unit Operator (Standard Oil) to prepare a plan, rejecting objections and advising Standard that "since you are in the employ of the Navy and have been tasked with performing a function which is within the exclusive control of the Secretary of Navy to order accomplished, the approval of the Operating Committee is not to be considered a prerequisite to the initiation of the above action on your part."[137]

96.     Accordingly, for at least 31 years, Standard operated Elk Hills under the "subjection, guidance or control" of federal Navy officers.  *Watson*, 551 U.S. at 151. At a minimum, Defendants' theory, which must be credited for purposes of removal, *see Def. Ass'n of Philadelphia*, 790 F.3d at 474, is that Standard Oil's relationship with the federal government was "an unusually close one involving detailed regulation, monitoring, or supervision," *id.* at 468.

97.     After the OPEC oil embargo in 1973-74, Congress authorized preliminary activity to develop Elk Hills and other National Reserves to their full economic potential.  *See* Supplemental Appropriation Act of 1974, Pub. L. No. 93-

---

[136] *See* Dick Decl., Ex. 27 (Contract No. Nod-9930).
[137] *See* Dick Decl., Ex. 6.

245 (1974).  In 1975, Standard Oil chose to withdraw from operating Elk Hills to concentrate on other federal objectives:

> [T]he current domestic energy situation is so serious that all oil companies are devoting their available resources to the discovery and production of new oil reserves.  The President has requested that every effort be made to increase production of petroleum, and Standard is focusing its attention on this objective.[138]

98.    A year later, Congress enacted the Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258 (1976), which reopened the Elk Hills Reserve and "authorized and directed that [the Reserve] be produced at the *maximum efficient rate for 6 years*."[139]   Congress directed production at Elk Hills to be significant.  Indeed, Commander Roger Martin, the naval officer in charge of the facility explained:  "We expect to reach a level of about 100,000 barrels daily in a few months, and 300,000 by the end of the [1970s]."[140]  Production of 100,000 barrels would amount to about 5% of then-current imports and result in a cost saving to the federal government of approximately $1 billion annually.

99.    In 1977, Congress transferred the Navy's interests and management obligations to the Department of Energy ("DOE"), and Chevron continued its interest

---

[138] *See* Dick Decl., Ex. 28 (letter from J.R. Grey, Standard, to Jack L. Bowers, Acting Secretary of the Navy, requesting to terminate its position as Operator of the Elk Hills Reserve).

[139] Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258 (1976); *see also* Dick Decl., Ex. 2; Dick Decl., Ex. 3.

[140] Dick Decl., Ex. 3.

in the joint operation until 1997, when the reserve was sold.  From 1976 to 1998, Elk Hills generated over $17 billion for the United States Treasury.[141]

100.   Although other prime contractors operated Elk Hills for the Navy following 1975, Standard and later Chevron were still actively involved in the operations, both through their role on the Operating Committee *and* as subcontractors.[142]   Under the Navy's direction and control, Chevron conducted exploration and drilling activities on the Reserve to fulfill the government's demand for significant production from the Reserve.  Accordingly, Chevron's activities under federal officers went far beyond its role as co-owner under the auspices of the UPC or simple compliance with the law as a participant in a regulated industry.

101.   ***Strategic Petroleum Reserve***.  In response to the 1970s Oil Embargoes, Congress created the Strategic Petroleum Reserve ("SPR") in the 1975 Energy Policy Conservation Act, Pub. L. No. 94-163, 89 Stat. 871, to blunt the use of petroleum as a weapon against the United States.  The SPR was a "stockpile of government-owned petroleum managed by the Department of Energy [created] as a response to gasoline supply shortages and price spikes . . . to reduce the impact of disruptions in supplies

[141] *See* U.S. Dep't of Energy, *Naval Petroleum Reserves*, https://www.energy.gov/fe/services/petroleum-reserves/naval-petroleum-reserves (last visited Oct. 7, 2020).

[142] *See* Dick Decl., Ex. 64 (History of Naval Petroleum Reserve No. 1 at 192) (describing the June 13, 1978 contract between Chevron and Williams brothers for 60 million cubic feet of gas to be process by Chevron's 17Z McKittrick plant, and an agreement with Chevron and Atlantic Richfield to acquire pipeline capacity of 220,000 barrels per day.)

of petroleum products and to carry out U.S. obligations under the 1974 Agreement on an International Energy Program."[143]  Several Defendants "acted under" federal officers in producing oil for the SPR and managing it for the federal government.

102.   Under 43 U.S.C. § 1353(a)(1), "all royalties . . . accruing to the United States under any oil and gas lease [under OCSLA] . . . shall, on demand of the Secretary [of the Interior], be paid in oil and gas."  For example, after the September 11 attacks, President George W. Bush ordered that the SPR, "an important element of our Nation's energy security," "will be filled . . . principally through royalty-in-kind transfers to be implemented by the Department of Energy and the Department of the Interior."[144]  From 1999 to December 2009, the U.S. government's "primary means of acquiring oil for the [SPR]" was by taking its royalties from oil produced from federal offshore leases as royalties "in kind" as part of the so-called Royalty In Kind ("RIK") program.[145]  During that time, "the Strategic Petroleum Reserve received 162 million barrels of crude oil through the RIK program" valued at over $6 billion.[146]

---

[143] *See* H.R. Rep. No. 115-965, at 3 (2017).

[144] Statement on the Strategic Petroleum Reserve, 2 Pub. Papers 1406 (Nov. 13, 2001), https://www.govinfo.gov/content/pkg/PPP-2001-book2/pdf/PPP-2001-book2.pdf.

[145] U.S. Dep't of Energy, *Filling the Strategic Petroleum Reserve,* https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/filling-strategic-petroleum-reserve (last visited Oct. 7, 2020).

[146] U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report for Calendar Year 2010, at 18 (2011) ("SPR 2010 Report"); *see id.* at 39 (Table 13).

103.    The federal government also required certain Defendants (and/or their predecessors, subsidiaries, or affiliates), as lessees of federal offshore leases on the OCS, to pay royalties "in kind," which the government used for its strategic stockpile, a crucial element of U.S. energy security and treaty obligations.[147]    The federal government also contracted with some of the Defendants (including predecessors, subsidiaries, or affiliates) to deliver to the SPR millions of barrels of oil under the RIK program.[148]

104.    Finally, some of the Defendants acted under federal officers by operating the SPR infrastructure for the government.  For example, from 1997 to 2019, DOE leased to Defendant Shell Oil Company affiliates the Sugarland/St. James Terminal and Redstick/Bayou Choctaw Pipeline in St. James, Louisiana.  "Under the lease agreement, Shell provide[d] for all normal operations and maintenance of the terminal and [wa]s required to support the Strategic Petroleum Reserve as a sales and

---

[147] *See, e.g.*, Dick Decl., Ex. 29 (Dear Operator Letter) (invoking OCSLA and royalty provisions in federal leases operated by certain Defendants, and/or their predecessors, subsidiaries, or affiliates, "to use royalties in kind (RIK) to replenish the Strategic Petroleum Reserve (SPR)").

[148] *See, e.g.,* Dick Decl., Ex. 30 (U.S. Dep't of Interior, Minerals Management Service, *MMS RIK Program to Help Fill Strategic Petroleum Reserve* (May 31, 2007)) (describing such contracts "to transport Royalty in Kind (RIK) crude oil that will be used to resume filling the nation's Strategic Petroleum Reserve (SPR)"); Minority Staff of the Permanent Subcomm. On Investigations of the Comm. on Gov'tal Affairs, S. Prt. 108-18, U.S. Strategic Petroleum Reserve: Recent Policy Has Increased Cost to Consumers But Not Overall U.S. Energy Security, (1st Sess. 2003) (describing government contract with a predecessor affiliate of Defendant Shell Oil Company to deliver nearly 19 million barrels of oil to the Strategic Petroleum Reserve as part of the RIK program).

distribution point in the event of a drawdown."[149]  Starting January 2020, the DOE leased the St. James facilities to an affiliate of Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation (ExxonMobil Pipeline Company).[150]  Similarly, "[u]nder the lease agreement, Exxon Mobil [Pipeline Company] . . . *must support the SPR as a sales and distribution point in the event of an SPR drawdown*."[151]  And the DOE has leased to the same ExxonMobil affiliate two government-owned pipelines that are part of the SPR near Freeport, Texas.[152]

105.  The SPR subjects Defendants to the federal government's supervision and control in the event of the President's call for an emergency drawdown.[153]  The United States has exercised this control, including in response to President Bush's executive order to draw down the reserve in response to Hurricane Katrina in 2005 and President Obama's executive order to draw down the reserve in response to

---

[149] *See* SPR 2010 Report at 16.

[150] *See* U.S. Dep't of Energy, *Department of Energy Awards Strategic Petroleum Reserve Lease to ExxonMobil* (Oct. 28, 2019), https://www.energy.gov/articles/department-energy-awards-strategic-petroleum-reserve-lease-exxonmobil.

[151] U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report for Calendar Year 2018, at 15 (Jan. 2020), https://www.energy.gov/sites/prod/files/2020/01/f70/2018%20SPR%20Report%20to%20Congress.pdf (emphasis added).

[152] *See* SPR 2010 Report at 25, 49; U.S. Dep't of Energy, *DOE Signs Major Agreement with Exxon Pipeline to Lease Idle Pipelines at Strategic Reserve* (Jan. 14, 1999), https://fossil.energy.gov/techline/techlines/1999/tl_bmlse.html.

[153] *See* 42 U.S.C. § 6241(d)(1) ("Drawdown and sale of petroleum products from the Strategic Petroleum Reserve may not be made unless the President has found drawdown and sale are required by a severe energy supply interruption or by obligations of the United States under the international energy program.").

disruptions to oil supply in Libya in 2011.[154]  Thus, the hundreds of millions of barrels of oil flowing through these facilities were subject to federal government control and supervision.

### C.    *Defendants Acted Under Federal Officers By Supplying Highly Specialized Fuels For Military Use*

106.    Many of the Defendants have produced and supplied to the U.S. military highly specialized petroleum products required for national defense and wartime efforts.  Federal officer removal precisely "covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."  *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012); *see also E.I. Du Pont De Nemours*, 2020 WL 2611539, at *3.

107.    During World War II, the federal government asserted substantial control over Defendants, directing the development and production of high-octane aviation fuels ("avgas").[155]  Because avgas was "the most critically needed refinery product during World War II and was essential to the United States' war effort,"[156] the United States government exercised significant control over the means of its

---

[154] *See* U.S. Dep't of Energy, *History of SPR Releases*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/releasing-oil-spr (last visited Oct. 7, 2020).

[155] During the war, more than 80 percent of the seven billion barrels of crude oil needed to support the U.S. war effort was produced in this country.  Dick Decl., Ex. 31 (John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War, 1941-1945*, at 1, 169 (1946)).

[156] *Shell Oil Co. v. United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014) ("*Shell II*").

production during World War II.  In 1942, President Roosevelt established several agencies to oversee war-time production.  Among those with authority over petroleum production were the War Production Board ("WPB") and the Petroleum Administration for War ("PAW").  The WPB established a nationwide priority ranking system to identify scarce goods, prioritize their use, and facilitate their production; it also limited the production of nonessential goods.  The PAW centralized the government's petroleum-related activities.  It made policy determinations regarding the construction of new facilities and allocation of raw materials, had the authority to issue production orders to refineries and contracts that gave extraordinary control to federal officers, and "programmed operations to meet new demands, changed conditions, and emergencies."[157]  The "PAW told the refiners what to make, how much of it to make, and what quality."[158]  *See* Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, S. Res. 96 at 11 (Nov. 28, 1945) ("The supply of crude to each refinery, the finished and intermediate products to be made in each plant, and the disposition of the products were all closely scheduled, by daily telegraphic directives when necessary."); Statement of George A. Wilson, Director of Supply and Transportation Division, Wartime Petroleum Supply and Transportation, Petroleum Administration for War, Special Committee Investigating

---

[157] *See generally Shell I*, 294 F.3d at 1049 (discussing federal control).

[158] *Shell II*, 751 F.3d at 1286 (quoting John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War, 1941-1945*, at 219 (1946)).

Petroleum Resources, S. Res. 36, at 212 (Nov. 28, 1945) ("PAW was further expected to designate for the military forces the companies in a given area from which the product could be secured, as well as the amount to be produced by each company and the time when the product would be available."). The Office of the Petroleum Coordinator for National Defense stated that "It is *essential*, in the national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses *be increased immediately to the maximum*."[159]

108. The PAW's directives to Defendants were often coercive. The PAW's message to the oil and gas industry was clear: it would "get the results" it desired, and if "we can't get them by cooperation, then we will get them some other way."[160] The PAW also maintained "disciplinary measures" for non-compliance, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance."[161] In sum, the federal government deployed an array of threats and sanctions to ensure Defendants assented to PAW's production directives.

---

[159] *Shell II*, 751 F.3d at 1286 (quoting Office of Petroleum Coordinator for National Defense Recommendation No. 16).

[160] Dick Decl., Ex. 59 (Secretary Harold Ickes, Conference of Petroleum Industry Chairmen, 8 (Aug. 11, 1941)).

[161] Dick Decl., Ex. 55 (Telegram from P.M. Robinson, PAW Assistant Director of Refining, to Ralph K. Davies, PAW Deputy Administrator, Refiners Who Did Not Reply to the Gasoline Yield Reduction Telegrams (Aug. 12, 1942)).

109.   In addition, the government's need for highly specified fuels necessitated changes to Defendants' refining equipment and operations.[162]  And the impacts of the government's particular fuel specifications on Defendants' operations were typically long lasting.[163]  For example, JP-4 was developed in 1951 and was the most heavily used Air Force fuel until it was phased out around 1998.[164]

110.   The federal government entered into contracts with predecessors or affiliates of Defendants Chevron and Shell Oil Company, as well as ExxonMobil, to obtain "vast quantities of avgas."[165]  These contracts provided federal officers with the power to direct the operations of Defendants.  For example, the government's contract with Shell Oil Company's predecessor or affiliate specified that it "*shall* use its best efforts" and work "*day and night*" to expand facilities producing avgas "*as soon as possible* and not later than August 1, 1943."[166]  And to maximize production of this critical product, "[t]he Government directed [those companies] to undertake extraordinary modes of operation which were often uneconomical and unanticipated

---

[162] *See* Dick Decl., Ex. 56 (W. J. Sweeney, Aircraft Fuels and Propellants, Report for the Army Air Force Scientific Advisory Group (1946)).

[163] Dick Decl., Ex. 57 (I. Waitz, S. Lukachko, & J. Lee, Military Aviation and the Environment: Historical Trends and Comparison to Civil Aviation, 42 J. of Aircraft 2 (2005)).

[164] Dick Decl., Ex. 58 (Coordinating Research Council, Handbook of Aviation Fuel Properties, CRC Report No. 635 (2004)).

[165] Several prior decisions discuss these contracts, and the power that the federal government held over Defendants to control production of oil and gas.  *See, e.g. Shell II*, 751 F.3d at 1286; *Exxon Mobil*, 2020 WL 5573048, at *31.

[166] JA002, JA027, *Shell Oil Co. v. United States*, No. 1:06-cv-00141-SGB (Nov. 20, 2012), ECF No. 106-1 (emphases added).

at the time of the refiners' entry into their [avgas] contracts." *Shell II*, 751 F.3d at 1287.  At the direction of the federal government, the oil companies, which include certain Defendants here, increased avgas production "over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945, [which] was crucial to Allied success in the war."[167]

111.   With respect to Exxon Mobil's affiliates, the government exerted substantial control over the refineries' actions, including decisions on how to use raw materials and labor, including demands that the plants operate 24 hours a day, 7 days a week, year round.[168]   Courts have concluded that "[b]y controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry," and that it "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials."[169]

112.   Defendants also acted under the federal government as agents in constructing and operating pipelines transporting oil for war.  During World War II,

---

[167] *Shell II*, 751 F.3d at 1287.
[168] *Exxon Mobil Corp.*, 2020 WL 4818881, at *1, *8.
[169] *Id*. at *8, *14.

oil transportation by tankers "experienced major disruption as a result of attacks by German submarines."[170]

113.   "To insure adequate supplies of petroleum through the east during the late World War II, the Government caused to be constructed, between the Texas oilfield and the Atlantic seaboard, two large pipelines, commonly known as the 'Big Inch' and the 'Little Big Inch,' respectively" (together, the "Inch Lines").[171]   War Emergency Pipelines, Inc. ("WEP"), "a Delaware corporation created by eleven of the major oil companies," including predecessors or affiliates of Defendants,[172] constructed and operated the Inch Lines "under contracts" and "as agent" for the federal government.[173]

114.   Federal officers exerted operational control over the Inch Pipelines and Defendants' affiliates.   WEP operated wholly on capital from the government, and

---

[170] Dick Decl., Ex. 32 (National Park Service, Historic American Engineering Record No. TX-76, War Emergency Pipeline (Inch Lines) Inch Lines Historic District (1968), at 3).

[171] *Schmitt v. War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949) ("*WEP II*").

[172] The eleven companies that constituted WEP were Shell Oil Company, Inc., Standard Oil Company (New Jersey), The Texas Company, Gulf Refining Company, Pan American Petroleum & Transport Company, Cities Service Company, Atlantic Pipe Line Company, Sinclair Oil Corporation, Sun Pipe Line Company (Texas), Socony-Vacuum Oil Company, Inc, and Tidal Pipe Line Company.   Several of these companies are predecessors or affiliates of current Defendants. *See* Dick Decl., Ex. 33 (Certificate of Dissolution of War Emergency Pipelines, Inc. 1-2 (Aug. 28, 1947)); *id.* Ex. 31 (John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War: 1941-1945* at 108 (1946)).

[173] *WEP II*, 175 F. 2d at 335; *Schmitt v. War Emergency Pipelines, Inc.*, 72 F. Supp. 156, 157 (E.D. Ark. 1947) ("*WEP I*").   These decisions provide details of the construction contracts under which the government "delegat[ed] operating function to [WEP]" "by a document called 'Agency Agreement.'" *Id.*

"received no fee or profit."[174]   The government also required approval and set the salaries of all personnel that WEP employed.[175]   "After completion of the pipe lines, [WEP], in the name of, and acting as agent for [the government], purchased petroleum or petroleum products at the origins of the respective pipe lines, at OPA prices, and as such agent delivered and sold the through-put at the respective termini. The sales price was a cost plus a sum specified by Defense Supplies Corporation. The Petroleum Administration for War issued directives to . . . [WEP], which, among other things, designated from whom products should be purchased and to whom they should be sold."[176]

115.   Petroleum Directives 63 and 73 governed the Big Inch and Little Big Inch pipelines, respectively, and exerted substantial control over WEP, and thus Defendants.  The government required WEP to prepare and file "daily reports" and a monthly "forecast" regarding its operation of the Inch Lines. The government had power to "direct such affirmative action as may be necessary to accomplish the purposes" of the Inch Lines—namely, "relieving shortages" and "augmenting supplies for offshore shipments" while replacing "tankers normally engaged in the transportation of petroleum products from the United States Gulf Coast to the Atlantic ports" that were "los[t] through enemy action."  The goal was to ensure "maximum

---

[174] *See, e.g.*, *WEP I*, 72 F. Supp. at 157; *WEP II*, 175 F.2d at 336.
[175] *See WEP II*, 175 F.2d at 336.
[176] *WEP I*, 72 F. Supp. at 158.

operating capacity for the prosecution of the war and most effective utilization of petroleum."[177]

116.    The government controlled all oil WEP moved through the pipelines on its behalf.[178]   During their operation by WEP, the Inch Lines provided "life lines to the east," delivering "379,207,208 barrels of crude oil and refined products" and serving "military necessity" for "the cross-Atlantic fronts."[179]   The Inch Lines "were built for a single purpose, to meet a great war emergency…. [T]hey helped to win a war that would have taken much longer to win without them."  Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, S. Res. 96 at 11 (Nov. 28, 1945). Without Defendants as contractors and agents (via WEP), "the Government itself would have had to perform" these essential wartime activities.  *Watson*, 551 U.S. at 154.

117.    At the advent of the Korean War in 1950, President Truman established the Petroleum Administration for Defense ("PAD") under authority of the Defense Production Act of 1950, Pub. L. No. 81–774 ("DPA").   The PAD issued production

---

[177] Utilization of War Emergency Pipeline, 8 Fed. Reg. 1068-69 (Jan. 20, 1943) (Petroleum Directive 63); War Emergency Petroleum Products Pipeline, 8 Fed. Reg. 13343 (Sept. 30, 1943) (Petroleum Directive 73).

[178] 8 Fed. Reg. at 1069, § (e)(4) ("No petroleum or petroleum products shall be transported through the facilities of the War Emergency Pipeline System except in pursuance of this Directive or amendments and supplements thereto."); *id.* at 13343, § (d)(3) (same).

[179] Dick Decl., Ex. 31 at 104-05, 108.

orders to Defendants and other oil and gas companies, including to ensure adequate quantities of avgas for military use.[180]

118.   The government also invoked the DPA immediately after the 1973 Oil Embargo to address "immediate and critical" petroleum shortages by the military.[181] Interior Priority Regulation 2 authorized "directives" to ensure "normal supply of petroleum products required by the Department of Defense" and provided companies that complied with immunity from "damages or penalties."[182]   The Interior Department subsequently "issued directives to 22 companies [including Defendants or their predecessors or subsidiaries[183]] to supply a total of 19.7 million barrels of petroleum during the two-month period from November 1, 1973, through December 31, 1973, for use by the DOD."[184]

---

[180] *See* Dick Decl., Ex. 34 (Fourth Annual Report of the Activities of the Joint Committee on Defense Production, H. Rep. No. 84-1, at 122 (Jan. 5, 1955, 1st Sess.)).   *See also Exxon Mobil*, 2020 WL 5573048, at *15 (detailing the government's use of the DPA "to force" the petroleum industry to "increase their production of wartime . . . petroleum products").

[181] *See* Dick Decl., Ex. 35 (Twenty-Fourth Annual Report of the Activities of the Joint Committee on Defense Production, S. Rep. No. 94-1, Pt. 1, at 442 (Jan. 17, 1975, 1st Sess.)).

[182] Petroleum Products Under Military Supply Contracts, 38 Fed. Reg. 30572 §§ 1, 3 (Nov. 6, 1973).

[183] The companies included Amoco Oil Co., Exxon Co., U.S.A., Mobil Oil Corp., Marathon Oil Co., Standard Oil Co. of California, and Shell Oil Co.  Dick Decl., Ex. 36 (*Naval Petroleum Reserve Numbered 1, Elk Hills, Calif.: Hearing Before the Subcommittee On National Stockpile and Naval Petroleum Reserve of the Committee on Armed Services on S.J. Res. 176*, 93d Cong. 73-74 (1st Sess. 1973)) (reprinting Department of Interior, Office of Oil and Gas, *News Release: Companies Directed to Supply the Needs of Defense Department* (Nov. 28, 1973) (listing companies and quantities)). Ex. 37 (John W. Finney, *Fuel is Diverted for the Military*, N.Y. Times (Nov. 28, 1973) (reporting on directives)).

[184] *See* Dick Decl., Ex. 37.

119.    During the Cold War, Shell Oil Company developed and produced for the federal government specialized jet fuel to meet the unique performance requirements of the U-2 spy plane and later the OXCART and SR-71 Blackbird programs.[185]  Shell Oil Company produced millions of gallons of "Processing Fluid (PF-1)" under government contracts with specific testing and inspection requirements, as well as packaging that mandated "no other identification."[186]  Shell Oil Company also constructed "special fuel facilities" to handle and store PF-1, including a hangar, pipelines, and storage tanks at air force bases at home and abroad, and "agreed to do this work without profit" under special security restrictions per detailed government contracts for the OXCART program.[187]  Under the OXCART

---

[185] *See* Dick Decl., Ex. 38, Gregory W. Pedlow & Donald E. Welzenbach, The Central Intelligence Agency and Overhead Reconnaissance: The U-2 and OXCART Programs, 1954-1974 61-62 (1992), https://www.archives.gov/files/declassification/iscap/pdf/2014-004-doc01.pdf ("Gen. James H. Doolittle (USAF, Ret.) . . . arranged for Shell to develop a special low-volatility, low-vapor-pressure kerosene fuel for the craft.  The result was a dense mixture, known as LF-1A, JP-TS (thermally stable), or JP-7, with a boiling point of 300ºF at sea level.  Manufacturing this special fuel required petroleum byproducts . . . ."); *id.* Ex. 39, CIA Doc. No. CIA-RDP90B00170R000100080001-5, Clarence L. Johnson, Development of the Lockheed SR-71 Blackbird (Aug. 3, 1981) ("The Government stated that the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the technological challenge. . . . The extreme environment presented a severe cooling problem. . . .  A new fuel and a chemical lubricant had to be developed to meet the temperature requirements. . . .  Shell, and [other] [c]ompanies[,] took on the task of developing these fluids."); *see also id.* Ex. 40 (Ben Rich & Leo Janis, Skunk Works 127, 205 (1994)).

[186] Dick Decl., Ex. 41, CIA Doc. No. CIA-RDP67B00074R000500400016-2, Contract No. AF33(657)-8577 (SH-511) (Aug. 14, 1962); *see id.* Ex. 42, CIA Doc. No. CIA-RDP67B00074R000500400012-6, Amendment No. 2 to Contract No. AF33(657)-5577 (SH-511) (Aug. 26, 1963).

[187] Dick Decl., Ex. 43, CIA Doc. No. CIA-RDP67B00074R000500440005-0, Concurrence in Contract No. SH-515 with Shell Oil Company, Project OXCART (Sept. 20, 1963); *see id.* Ex. 44, CIA Doc. No. CIA-

program, Shell Oil Company also "tested" "refinery procedures" to ensure fuels were "up to standard."[188]   In providing specialized fuel and facilities under contracts for the federal government's overhead reconnaissance programs, Shell Oil Company was helping the government to produce an item that it needed for national defense purposes.  *See Watson*, 551 U.S. at 153.

120.   To this day, Defendants supply the DOD with highly specialized fuels to meet its need to power planes, ships, and other vehicles, and to satisfy other national defense requirements.  Defendants Shell Oil Company, BP, and ExxonMobil (or their predecessors, subsidiaries, or affiliates), for example, have been three of the top four suppliers of fossil fuel products to the United States military, whose energy needs are coordinated through the Defense Energy Support Center ("DESC").[189] DESC procures a range of military-unique petroleum-based products from Defendants, including JP-8 fuel (MIL-DTL-83133) for the U.S. Air Force and Army, JP-5 fuel (MIL-DTL-5624 U) for the U.S. Navy, and a variety of other alternative

---

RDP67B00074R000500450004-0, Contract No. AF33(657)-13272 (SH-516) (June 30, 1964); *id.* Ex. 45, CIA Doc. No. CIA-RDP67B00074R000500440006-9, Contract No. AF33(657)-12525 (SH-515) (Sept. 20, 1963); *id.* Ex. 46, CIA Doc. No. CIA-RDP67B00074R000500430003-3, Concurrence in Contract No. SH-514 with Shell Oil Company, New York, N.Y. (June 28, 1963); *id.* Ex. 47, CIA Doc. No. CIA-RDP67B00074R000500420006-1, Contract No. AF33(657)10449 (SH-513) (Feb. 25, 1963); *id.* Ex. 48, CIA Doc. No. CIA-RDP67B00074R000500410006-2, Contract No. AF33(657)-8582 (SH-512) (Sept. 13, 1962).

[188] Dick Decl., Ex. 49, CIA Doc. No. CIA-RDP63-00313A000500130031-9, Summary of OSA Activities for Week Ending 21 August 1963 (Aug. 23, 1963).

[189] *See* Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 10 (2009), https://fas.org/sgp/crs/natsec/R40459.pdf.

fuels.  Several other Defendants have also produced these critical products for the U.S. military.

121.   For example, Marathon subsidiary Tesoro Corporation entered into at least fifteen contracts with the Department of Defense Defense Logistics Agency between 1983 and 2011 to supply highly-specialized military jet fuels, such as JP-4, JP-5, and JP-8.[190]   The Department of Defense exerted *significant control* over Tesoro's actions in fulfilling the contracts with the Department of Defense seeking to ensure that the unique jet fuels ignite, but do not freeze, at low temperatures from high altitudes, rapidly dissipate accumulated static charge so as not to produce sparks or fires during rapid refueling (such as on an aircraft carrier where such a fire would be devastating), efficiently combust to allow for longer flights on less fuel, and maintain the integrity of the fuel handling systems over a long period of time.[191]

122.   To meet its unique operational needs, the Department of Defense required that Tesoro supply each fuel in accordance with highly specialized, Department of Defense-specific specifications.  As one would expect when dealing

---

[190] The contracts were executed by various Tesoro subsidiaries, such as Tesoro Refining and Marketing Company and Tesoro Alaska Petroleum Company.  For a list of the Tesoro contract numbers and dates, *see* Dick Decl., Ex. 60..

[191] Dick Decl., Ex. 66 (Dep't of Defense Handbook Aerospace Fuels Certification, MIL-HDBK-510A, at § 1.2.2 (Aug. 2014)); Air Force Wight Aeronautical Lab., *Military Jet Fuels, 1944-1987,* AFWAL-TR-87-2062, Table 1, 2-9 (Dec. 1987) [hereinafter "Air Force Lab, *Military Jet Fuels*"]; NREL, *Investigations of Byproduct Application to Jet Fuel,* NREL/SR-510-30611, at 4-6 (Oct. 2001).

with highly specialized military equipment, these fuel contracts are far more specialized and prescriptive than for fuel intended for consumer-type vehicles.[192]

123.   In particular, the specifications require explicit amounts of "military unique additives that are required by military weapon systems," such as static dissipator additive ("SDA"), fuel system icing inhibitor ("FSII"), and corrosion inhibitor/lubricity improver ("CI/LI").   Dick Decl., Ex. 50 (DLA, *Detail Specifications, Turbine Fuels, Aviation Kerosene Types, NATO F-34(JP-8), NATO F-35, AND JP-8+100, MIL-DTL-83133E* at 5, 7, 10 (April 1, 1999)).[193]   "[T]his [additive] requirement is unique to military aircraft and engine designs," *id.* at 10, and each additive served a vital role in allowing the Department of Defense to fulfill its mission safely and efficiently.

124.   The Department of Defense *required* Tesoro to use SDA, a conductivity improver additive, to dissipate static charge created during military jet distribution and refueling.   If the charge is not dissipated, refueling could result (and has resulted) in a spark or fire, especially when rapid refueling is necessary during combat with hot military engines.   MIL-HDBK-510A at § 1.4.1.2; Air Force Lab, *Military Jet Fuels* at 28, 35; Air Force Wright Aeronautical Laboratories, *Effect of Corrosion*

---

[192] Upon information and belief, Defendants entered into similar types of contracts.

[193] Tesoro Alaska Petroleum Company's September 5, 2007 contract with DLA Defense Energy Supply Center to supply JP-8 required that Tesoro meet the specifications of MIL-DTL-83133E.   *See* Dick Decl., Ex. 60.

*Inhibitors on Conductivity of Avian Turbine Fuel,* ARWAL-TR-85-2076, at 1 ("The Air Force and Navy have reported numerous incidents in the [1980s] solely related to electrostatic discharge.").

125.   The Department of Defense *required* Tesoro to use FSII to depress the freezing point of military jet fuels.  FSII ensures that the fuels' natural water content does not freeze at low temperatures encountered by military jets at high altitudes, which would result in slush or ice crystal formation causing blockages of fuel filters, pumps, or lines and could ultimately cause engine flameout. Dept of Defense, FSII Specifications, MIL-DTL-85470B (June 1999); MIL-HDBK-510A at § 1.4.1.1; Air Force Lab, *Military Jet Fuels* at 30, 41-44.

126.   The Department of Defense *required* Tesoro to use CI/LI to (1) improve lubricity, which reduces friction and ensures that the military engines do not seize during operation; and (2) prevents corrosion in military fuel handling, transportation, and storage equipment, primarily constructed of uncoated steel.  Dept of Defense, Performance Specification, Inhibitor, Corrosion / Lubricity Improver Fuel Soluble, MIL-PRF-25017H (Aug. 2011); MIL-HDBK-510A at § 1.4.1.3; Air Force Lab, *Military Jet Fuels* at 28, 30, 38-39.

127.   In addition, the Department of Defense specifications required Tesoro to conform the fuels to specific chemical and physical requirements, such as enumerated ranges for conductivity, heat of combustion, thermal stability, and

freezing point, specifications which are essential to performance of the military function.   MIL-DTL-83133E at 6; Air Force Lab, *Military Jet Fuels* at 17-35 (describing the necessity for specific physical and chemical requirements in military jet fuels).  The specifications also required adherence to specific testing methods for the various additives and chemical and physical requirements in accordance with enumerated American Society for Testing and Materials ("ASTM") standards, such as ASTM D2624 for conductivity and ASTM D3241 for thermal stability. MIL-DTL-83133E at 6.

128.   If the fuels did not conform to the exact specifications, the Department of Defense exerted control over Tesoro by requiring it to either repair or replace the products at no increase in contract price.

129.   The Department of Defense's detailed specifications for the makeup of the military jet fuels and "the compulsion to provide the product to the government's specifications" demonstrate the necessary "acted under" special relationship between Tesoro and the government.   *See Baker*, 962 F.3d at 943 (holding that the government's detailed specifications for the makeup of materials and the compulsion to provide the product to the government's specifications demonstrated the necessary "acted under" relationship to support federal officer removal).

130.   These and other federal activities are encompassed in Plaintiff's Complaint and relate to Plaintiff's causes of action.  Plaintiff alleges that Defendants'

drilling operations and other activities led to the combustion of oil and gas—including by the federal government—which led to the release of greenhouse gases by end-users—also including the federal government. Furthermore, the oil and gas upon which Plaintiff bases its claims is the very same oil and gas that Defendants extracted and produced under the control and supervision of the federal government and which the federal government, in furtherance of federal policy, (i) reserved the right to buy in total in the event of a time of war or whenever the President so prescribed; (ii) directed the development of unique products for military operations and purchased those products; and (iii) has promoted through its leasing and other subsidy programs. Plaintiff seeks to hold Defendants liable for the very activities Defendants performed in the implementation of federal policy initiatives under federal direction and control. This is more than enough to satisfy the nexus element of the Federal Removal Statute, which requires only "a connection or association between the act in question and the federal office." *Sawyer*, 860 F.3d at 258; *Def. Ass'n of Philadelphia*, 790 F.3d at 474 (holding same). At a minimum, under Defendants' reasonable theory of the case, which the Court must credit in assessing whether the nexus element is satisfied, *Acker*, 527 U.S. at 432; *Def. Ass'n of Philadelphia,* 790 F.3d at 474; *Baker*, 2020 WL 3287024, at *7, a clear connection or association exists between Defendants' "acting under" federal officers by extracting and producing oil and gas pursuant to federal contracts and specifications,

and Plaintiff's attempt to impose liability on Defendants for that very same conduct. *See also Leite*, 759 F.3d at 1124 ("In assessing whether a causal nexus exists, we credit the defendant's theory of the case.").

131.   Finally, Defendants intend to raise numerous meritorious federal defenses, including the government-contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 70 (3d Cir. 1990), preemption, *see Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010), federal immunity, *see Campbell-Ewald v. Gomez*, 136 S. Ct. 663 (2016), and others. In addition, Plaintiff's claims are barred by the United States Constitution, including the Interstate and Foreign Commerce Clauses and Due Process clauses, as well as the First Amendment and the foreign affairs doctrine.  These and other federal defenses are more than colorable.  *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (defendant invoking section 1442(a)(1) "need not win his case before he can have it removed").  Accordingly, removal under Section 1442 is proper.

132.   Plaintiff attempts to disclaim "injuries arising on federal property and those that arose from Fossil Fuel Company Defendants' provision of fossil fuel products to the federal government for military and national defense purposes." Compl. ¶ 222 n.202.  This disclaimer is a transparent—and ineffective—attempt to artfully plead around removal.  Courts consistently reject plaintiffs' attempts to frustrate federal removal with carefully worded disclaimers where, as in this case,

Defendants' federal officer defenses are still clearly applicable to one or more of Plaintiff's claims. *See Rhodes v. MCIC, Inc.*, 210 F. Supp. 3d 778, 786 (D. Md. 2016) ("[Plaintiffs] have cited no authority that allows such language to bar the assertion of the federal officer defense where it is otherwise applicable. . . . [T]hey are clearly keeping in play a claim against Defendants who could legitimately assert the federal officer defense"); *see also, e.g.*, *Ballenger v. Agco Corp.*, 2007 WL 1813821, at *1 n.2, *4 (N.D. Cal. June 22, 2007) (finding disclaimer ineffective where the plaintiff waived claims for exposure committed at the direction of a federal officer but nonetheless sought relief for exposure aboard Navy vessels). Indeed, the Supreme Court has recognized the impossibility of tracing greenhouse gases to one particular source in one particular jurisdiction. *AEP*, 564 U.S. at 422 ("Greenhouse gases once emitted become well mixed in the atmosphere"). Plaintiff's claims thus are based on *global* emissions that are impossible to trace to any particular source. Accordingly, Plaintiff has no basis on which to carve out fuel extraction and production on federal lands and at the direction of the federal government, or anywhere else for that matter.

133. Nor can Plaintiff's allegations regarding Defendants' purported "deceptive" marketing change any of the above facts showing the federal government's substantial control over an enormous amount of Defendants' production and sale of petroleum products. Plaintiffs' claims, as pleaded, depend on the premise that Defendants' production of fossil fuels caused Plaintiff's alleged

injuries. *See, e.g.*, Compl. ¶ 301. This case is therefore removable to federal court because Defendants acted under federal officers in producing fossil fuels. Moreover, Defendants deny that they misrepresented their knowledge of the science or effects of climate change. In any event, as discussed above, any public statements by Defendants with respect to climate change had no material effect on consumer demand for petroleum products, due to, among other things, the widespread public knowledge about climate change and the many other factors that have caused the consistent worldwide growth of oil and gas consumption over the course of many decades.

## VII.   THE ACTION IS REMOVABLE BECAUSE IT NECESSARILY RAISES DISPUTED AND SUBSTANTIAL FEDERAL ISSUES

134. "Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed . . . to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). Federal district courts, in turn, "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Supreme Court has held that suits alleging, on their face, only state law causes of action nevertheless "arise under" federal law if the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally

approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. Applying this test "calls for a common-sense accommodation of judgment to [the] kaleidoscopic situations that present a federal issue." *Id.* at 313 (internal quotation marks omitted) (alteration in original).

135. Plaintiff's Complaint attempts to undermine and supplant federal regulation of greenhouse gas emissions and hold an international industry responsible for the alleged consequences of rising ocean levels and hydrologic cycle disruptions such as drought, extreme precipitation, heat waves, and wildfires that are allegedly caused by global climate change. There is no question that Plaintiff's claims raise "federal issue[s], actually disputed and substantial," for which federal jurisdiction would not upset "any congressionally approved balance of federal and state judicial responsibilities." *Id.*

136. The issues of greenhouse gas emissions, global climate change, hydrologic cycle disruption, and sea level rise are not unique to Hoboken, the State of New Jersey, or even the United States. Yet the Complaint attempts to supplant decades of national energy, economic, and environmental policies by prompting a New Jersey state court to take control over an entire industry and its interstate commercial activities, and impose massive damages and injunctive relief contrary to long-standing federal regulatory schemes and systems.

137.   *First*, Congress has struck a careful balance between energy production and environmental protection by enacting federal statutes such as the Clean Air Act, 42 U.S.C. § 7401(c), and by directing the EPA to regulate Defendants' conduct and perform its own cost-benefit analyses, *see AEP*, 564 U.S. at 426–47.   *Second*, Plaintiff's claims impede the foreign-affairs power by seeking to regulate global climate change, which has been and continues to be the subject of major international treaties.   *Third*, Plaintiff alleges a causation theory that depends on proof that federal policymakers would have adopted different energy and climate policies absent the alleged conduct.   *Fourth*, the City's trespass claim raises the issue whether a state may, by lawsuit, assert control over the navigable waters of the United States.   *Fifth*, the City's claims require interpretation of international climate treaties, which is the exclusive province of the federal courts.   *Sixth*, the Complaint's reliance on injuries allegedly suffered by way of navigable waters provides an additional basis for the exercise of federal jurisdiction under *Grable*.   *Seventh*, as explained above, federal common law exclusively governs Plaintiff's claims because they implicate three areas which our constitutional design does not allow state or municipal law to control: transboundary pollution, navigable waters, and foreign relations.   *Eighth*, this action raises important constitutional issues regarding the relationship between states and the division of authority between the federal government and the states.

138.   Plaintiff's purported state-law claims seek to upend the careful balance Congress has struck between energy production and environmental protection. Collectively, as well as individually, Plaintiff's causes of action depend on the interpretation and application of federal statutes, federal regulations, and international treaties.  For example, domestically, the EPA regulates greenhouse gas emissions under the Clean Air Act and its rules for both stationary and mobile source emissions.  And, on the international front, the United States is party to the United Nations Framework Convention on Climate Change, May 9, 1992, 1771 U.N.T.S. 107.  Any attempt by a state court to balance the costs and benefits of the use of oil and gas under state nuisance law would constitute a collateral attack on the balance already struck under the laws and treaties of the United States.  It is well settled that a collateral attack on a federal regulatory regime—an attempt to substitute state law for existing federal standards—presents a substantial federal question.  *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).

139.   The Complaint's first and second causes of action both seek relief for an alleged nuisance.  Plaintiff alleges that Defendants, through their national and, indeed, global activities, "created a continuing and accelerating climate crisis." Compl. ¶ 286.  Plaintiff alleges that "more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat

waves and extreme temperatures, and the associated consequences of those physical and environmental changes," are consequences of Defendants' conduct. *Id.* ¶ 293(b).

140.   Under New Jersey law, were it to apply, nuisance claims require a plaintiff to prove that the defendant's conduct is "unreasonable," which depends upon whether "the gravity of the harm outweighs the utility of the actor's conduct" or that "the harm caused by the conduct is serious." *Seven Plus One, LLC v. Sellers*, 2016 WL 6994346, at *6 (N.J. Super. Ct. App. Div. Nov. 29, 2016) (quoting *Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes*, 90 N.J. 582, 592 (1982)).  But under federal law, federal agencies must "assess both the costs and the benefits of [an] intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs."  Exec. Order No. 12,866, 58 Fed. Reg. 51735 (Sept. 30, 1993).  In fact, Congress has directed a number of federal agencies to regulate Defendants' conduct, and thus to engage in the same analysis of benefits and costs that Plaintiff would have the state court undertake.   Federal agencies have performed, and continue to perform, these cost-benefit analyses.  *See, e.g.*, Final Carbon Pollution Standards for New, Modified and Reconstructed Power Plants, 80 Fed. Reg. 64510, 64518-21 (Oct. 23, 2015) (EPA considering the impacts of "wildfire" and "extreme precipitation events," such as "droughts, floods, hurricanes, and major storms").  The alleged effects of Defendants' operations are

broadly distributed throughout the nation, to all residents as well as all state and government entities.  Given this diffuse and broad impact, Congress has acted through a variety of federal statutes—primarily, but not exclusively, the Clean Air Act—to strike the balance between energy extraction and production and environmental protections.  *See* Clean Air Act, 42 U.S.C. § 7401(c) (congressional statement that the goal of the Clean Air Act is "to encourage or otherwise promote reasonable Federal, State, and local governmental actions . . . for pollution prevention"); *see also, e.g.*, Energy Reorganization Act of 1974, 42 U.S.C. § 5801(a) (congressional purpose to "develop, and increase the efficiency and reliability of use of, all energy sources" while "restoring, protecting, and enhancing environmental quality"); Mining and Minerals Policy Act, 30 U.S.C. § 21a (congressional purpose to encourage "economic development of domestic mineral resources" balanced with "environmental needs"); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201(b), (k) (congressional findings that coal mining operations are "essential to the national interest" but must be balanced by "cooperative effort[s] . . . to prevent or mitigate adverse environmental effects").

141.  Whether the federal agencies charged by Congress to balance energy and environmental needs for the entire Nation have struck an appropriate balance is a question that is "inherently federal in character" and gives rise to federal question jurisdiction.  *Buckman Co.*, 531 U.S. at 347; *see also Pet Quarters, Inc. v. Depository*

*Trust & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (affirming federal question jurisdiction where claims implicated federal agency's acts implementing federal law); *Bennett v. Southwest Airlines Co.*, 484 F.3d 907, 909 (7th Cir. 2007) (finding federal removal under *Grable* appropriate where claims were "a collateral attack on" agency action under a highly reticulated regulatory scheme).   Adjudicating these claims in federal court is appropriate because the relief sought by Plaintiff would necessarily alter the regulatory regime Congress designed, affecting residents of the Nation far outside the state court's jurisdiction.   *See, e.g.*, *Grable*, 545 U.S. at 312 (stating that claims that turn on substantial federal questions "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues"); *West Virginia ex rel. McGraw v. Eli Lilly & Co.*, 476 F. Supp. 2d 230, 234 (E.D.N.Y. 2007) (stating that removal under *Grable* is appropriate where state common law claims implicate "an intricate federal regulatory scheme . . . requiring some degree of national uniformity in interpretation").   Regulation of greenhouse gas emissions, including carbon dioxide, is governed by the Clean Air Act, *see Massachusetts*, 549 U.S. at 528–29, and EPA has regulated these emissions under the Act, *see, e.g.*, 40 C.F.R. §§ 51.166(b)(1)(i), 52.21(b)(1)(i) (regulation of greenhouse gases through the Act's prevention of significant deterioration of air quality permitting program); 2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions and Corporate Average Fuel Economy Standards, 77 Fed. Reg. 62,624

(Oct. 15, 2012) (regulation of greenhouse gas emissions from light-duty motor vehicles); Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2, 81 Fed. Reg. 73,478 (Oct. 25, 2016) (regulation of greenhouse gas emissions from medium- and heavy-duty engines and vehicles).  Put simply, "emissions have been extensively regulated nationwide" by the federal government under the Clean Air Act.  *Cooper*, 615 F.3d at 298.

142.   The Complaint also calls into question federal government decisions to contract with Defendants for the extraction, development, and sale of oil and gas resources on federal lands.  Such national policy decisions have expanded fossil fuel production and use, and produced billions of dollars in revenue to the federal Treasury.  Reliable, affordable energy is fundamental to economic growth and prosperity generally, as well as to national security and other issues that have long been the domain of the federal government.  *See, e.g.*, 83 Fed. Reg. 23295, 23296 (Final List of Critical Minerals 2018) (describing "fossil fuels" as "indispensable to a modern society for the purposes of national security, technology, infrastructure, and energy production").  Yet, Plaintiff's purported state law claims require a determination that the complained-of conduct—the lawful activity of placing oil and gas into the stream of interstate and foreign commerce—is unreasonable, and that determination raises a policy question that, under the U.S. Constitution and applicable

federal statutes, treaties, and regulations, is a federal question.  *See Peralta v. ABN AMRO Mortg. Grp., Inc.*, 2014 WL 1673737, at *5 (D.N.J. Apr. 24, 2014) (finding that under *Grable*, Plaintiff's claims presented "substantial questions of federal law [that] are properly before this Court").  The cost-benefit analysis required by Plaintiff's claims would necessarily disrupt the federal regulatory structure of an essential, national industry.  "The validity of [Plaintiff's] claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law."  *Bd. of Comm'rs v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 724 (5th Cir. 2017) ("*Levee Board*"); *see also Bader Farms, Inc. v. Monsanto Co.*, 2017 WL 633815, at *3 (E.D. Mo. Feb. 16, 2017) ("Count VII is in a way a collateral attack on the validity of APHIS's decision to deregulate the new seeds."); *Bennett*, 484 F.3d at 909 (holding that federal removal is proper under *Grable* "when the state proceeding amounted to a collateral attack on a federal agency's action").  Indeed, the "inevitable result of such suits," if successful, is that Defendants "would have to change" their federally regulated "methods of doing business and controlling pollution to avoid the threat of ongoing liability."  *Ouellette*, 479 U.S. at 495.

143.   Plaintiff's claims also necessarily implicate substantial federal questions by seeking to hold Defendants liable for compensatory and punitive damages, as well as injunctive relief, based on allegations that Defendants, through a trade association,

"employed a host of methods to deceive the public about the impacts of fossil fuels on the climate and oppose greenhouse gas regulation[.]" Compl. ¶ 121; *see also id.* ¶ 124.

144.   It is well settled that claims that a defendant has engaged in fraud on a federal agency arise under federal law.  "Claims of fraud on a federal agency arise exclusively under federal law." *Buckman Co.*, 531 U.S. at 347 ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law."); *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 235 (6th Cir. 2000) ("[C]laims alleging fraud on federal agencies have never come within the 'historic police powers of the States.'") (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495 (1996)).

145.  Plaintiff's causation theory also depends on proof that federal policymakers were misled *and* would have adopted different energy and climate policies absent the alleged misrepresentations.  Such a liability determination would require a court to construe federal decision-making standards and determine how federal policymakers would have applied those standards under counterfactual circumstances.  *See, e.g.*, Compl. ¶ 148 (alleging that Global Climate Science Communications Team plan sought to discredit the Kyoto Protocol).  As an example, under its theory, Plaintiff would need to show that the unanimously passed (95-0) Byrd-Hagel Resolution in the Senate, which put limitations on entering into

international treaties aimed at reducing greenhouse gas emissions, would have been rejected but for the alleged actions of Defendants.   Plaintiff's Complaint also necessarily implicates numerous other disputed and substantial federal issues. Beyond the strictly jurisdictional character of the points addressed above and herein, it is notable that this litigation places at issue multiple significant federal issues, including but not limited to:  (1) whether Defendants can be held liable consistent with the First Amendment for alleged "deceptive public communications and campaigns casting doubt on climate science," *id*. ¶ 156; (2) whether, consistent with the constitutional principles limiting the jurisdictional and geographic reach of state law and guaranteeing due process, a state court purporting to apply state law may hold Defendants liable for conduct global in scale (production of oil and gas), that allegedly produced effects that are global in scale (increased $CO_2$ levels and rising sea levels), and on that basis, order Defendants to modify their conduct on a global scale (abating the alleged effects of rising sea levels); (3) whether oil and gas *producers* may be held liable, consistent with the Due Process Clause, for climate change when it is the combustion of oil and gas—including by Plaintiff and the people of New Jersey themselves, who decide what types of fuel to use and how much—that leads to the release of greenhouse gases into the atmosphere; (4) whether liability may be imposed under state common law when the Supreme Court has held that the very same *federal* common law claims for domestic interstate greenhouse gas

127

emissions are displaced by federal statute, and notwithstanding the commonsense principle that "[i]f a federal common law cause of action has been extinguished by Congressional displacement, it would be incongruous to allow it to be revived *in any form*," *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 857 (9th Cir. 2012) (emphasis added); (5) whether, consistent with the United States Constitution's Commerce Clause and foreign affairs doctrine, as well as other constitutional principles, a state court purporting to apply state law may regulate and burden on a global scale the sale and use of what has deemed an essential resource at the federal level; (6) whether a state court purporting to apply state law may review and assess the validity of acts of foreign states in enacting and enforcing their own regulatory frameworks; and (7) whether a state court purporting to apply state law may determine the ability to sue based on alleged damages to land, such as coastal property, *see* Compl. ¶ 224, which depends on the interpretation of federal laws relating to the ownership and control of property.

146.   Plaintiffs' trespass claim raises substantial constitutional and statutory federal questions that must be decided in order to adjudicate that claim.  A necessary element of trespass is the invasion of real property.  Here, the City claims that invasion is caused by the rise of United States' and international waters.  But the federal government has exclusive jurisdiction over these waters and Congress has by statute empowered several federal agencies to address the issue of coastal sea rise.

While Hoboken has authority over its own shores and infrastructure and can take measures to mitigate sea rise, it does not have authority to address sea rise itself. Thus, under *Grable*, the City's trespass claim presents substantial federal questions regarding federal control over U.S. and international waters and the functioning of federal agencies like the U.S. Army Corps of Engineers and the National Oceanic and Atmospheric Agency which have been assigned by Congress to address the issue of sea rise. The navigable waters are thus a necessary part of the City's trespass claim and whether a state lawsuit can assert control over the navigable waters is a question of federal law.

147.   The City's complaint makes clear that the navigable waters of the United States are an integral part of its trespass claim and that one purpose of the lawsuit is to reduce sea rise by reducing the production, sale and use of fossil fuels. *See* Compl. ¶¶ 9–10 (alleging that greenhouse gases have "caused sea levels to rise by nearly a foot in and around Hoboken" and that sea level rise "threatens major sections of Hoboken with flooding at high tide"); ¶ 45 (alleging sea level rise "pose[s] an especially urgent threat to Hoboken"); ¶¶ 323–38 (alleging Defendants trespassed on the City by, inter alia, contributing to sea level rise). Plaintiffs attribute this flooding to Defendants' oil and gas production activities, which Plaintiffs allege will cause "multiple additional feet of seal revel rise . . . in the coming decades." Compl. ¶ 9; *see also id.* ¶¶ 46–58 (alleging Defendants' activities were a "central force" behind

sea level rise and Defendants' activities "will continue to have this effect [of raising sea levels] in the future"). To remedy their trespass claim, Plaintiffs ask the Court for damages and to enjoin Defendants from contributing to sea level rise and otherwise "trespassing" on the City. *Id.* at 144–45, Prayer for Relief (a)–(d).

148. Under New Jersey law an essential element of trespass is an incursion onto the real property of another. *Pinkowski v. Twp. of Montclair*, 299 N.J. Super. 557, 571, 691 A.2d 837, 843 (App. Div. 1997) ("An action for trespass arises upon the unauthorized entry onto another's property."); *see also* Restatement (Second) of Torts § 158 (Am. Law Inst. 1965) ("One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally (a) enters land in the possession of the other, or causes a thing or a third person to do so, or (b) remains on the land, or (c) fails to remove from the land a thing which he is under a duty to remove.").

149. It has been settled law for nearly two hundred years that the federal government has exclusive jurisdiction over the navigable waters of the United States. In 1845, Congress expanded federal maritime jurisdiction beyond the traditional understanding of waters within "the ebb and flow of the tide" to include "certain cases upon the lakes and navigable waters connecting the same." Act of February 26, 1845, ch. 20, 5 Stat. 726. The Supreme Court affirmed the statute's constitutionality, overruling earlier decisions restricting federal maritime jurisdiction to tide waters.

*The Propeller Genesee Chief v. Fitzhugh*, 53 U.S. (12 How.) 443, 457 (1852) (finding that "the ground that the lakes and navigable waters connecting them are within the scope of admiralty and maritime jurisdiction, as known and understood in the United States when the Constitution was adopted"). Since *Genesee Chief*, the Court has repeatedly recognized the federal government's "exclusive jurisdiction over the navigable waters of the United States." *Davenport & N.W. Ry. Co. v. Renwick*, 102 U.S. 180 (1880); *see also Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 22 (1824) (finding Congress has authority to regulate navigation under Commerce Clause and explaining "It is a common principle, that arms of the sea, including navigable rivers, belong to the sovereign, so far as navigation is concerned. . . . The United States possess the general power over navigation, and, of course, ought to control, in general, the use of navigable waters."). The constitutional question whether the navigable waters of the United States can be employed as the instrument of incursion in a state trespass action is a substantial question of federal law. *See Grable*, 548 U.S. at 312–13; *Smith v. Kansas City Title & Tr. Co.*, 255 U.S. 180, 199 (1921) (finding federal jurisdiction where state law claim had embedded constitutional question).

150.   The statutory scheme surrounding the navigable waters of the United States also indicates exclusive federal jurisdiction. Under the Clean Water Act, Congress granted the U.S. Army Corps of Engineers exclusive authority to issue

permits for filling or dredging and for ocean discharge.  33 U.S.C. §§ 1343, 1344.

Likewise, Congress granted expansive control to the Corps in the Rivers and Harbors

Act, authorizing the Corps to control the construction of any obstructions in navigable

waters.  33 U.S.C. §§ 403 *et seq.*  Congress has clearly given the Corps exclusive

authority over management of the navigable waters.

151.   Congress has also specifically tasked the Corps with studying and

addressing issues of sea rise within the navigable waters.  For example, the Corps is

given authority to "investigate, study, plan, and implement structural and

nonstructural measures for the prevention or mitigation of shore damages attributable

to Federal navigation works."  *Id.* § 426i(a).  Subject to this authority, the Corps has

developed its own programs for responding to rising navigable waters.  U.S. Army

Corps   of   Eng'rs,   Climate   Preparedness   and   Resilience,

https://www.usace.army.mil/corpsclimate/; *see also* Dick Decl., Ex. 51 (U.S. Army

Corps of Eng'rs, Eng'g Circular 1105-2-186, Planning Guidance on the Incorporation

of Sea Level Rise Possibilities in Feasibility Studies (Apr. 21, 1989)) (providing

"guidance for incorporating the effects of possible changes in relative sea level in

Corps of Engineers feasibility studies").  Plaintiff's trespass claim and its allegations

that rising sea levels have not been sufficiently abated are thus a challenge to

reasonableness and efficacy of the Corps' decisions in developing its programs.  As

in *Grable* itself and similar cases, the sufficiency of the Corps response to sea rise

must be evaluated in federal court.  Before a court can adjudicate the merits of the Plaintiff's trespass claim, it must decide whether a state tort claim for invasion of real property by the navigable waters interferes with the statutory authority and programs of the Army Corps.  Given the federal government's exclusive constitutional authority over the navigable waters, can a state court adjudicate a trespass case based upon the incursion of those waters and enjoin the incursion?  This is a question that precedes merits adjudication of Plaintiff's trespass claim and one that should be decided in federal court.  That question is a substantial one, it is "actually disputed" in this case, and obviously adjudicating an issue regarding the navigable waters of the United States in federal court will not upset the balance between the state and federal courts.  *Grable,* 545 U.S. at 314.

152.   Claims that turn on the interpretation of federal treaties fit this mold. The scope of a treaty "is a matter of federal law and federal treaty interpretation, and must be determined from an examination of the four corners of the treaty."  *Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256, 1258 (9th Cir. 1977); *see also Horton v. Toyota Tech. Ctr., U.S.A., Inc.*, 1991 WL 333722, at *2 (C.D. Cal. Dec. 2, 1991) (claims raised "substantial questions of federal law" because the "allegations necessarily require interpretation of the FCN Treaty").

153.   The Plaintiffs' claims necessarily involve the interpretation of treaties that regulate the global emission of greenhouse gases.  The Complaint repeatedly ties

the claims to climate change and its alleged consequences.  The Complaint recites reports and analyses that discussed the potential link between climate change and rising sea levels.  *E.g.*, Compl. ¶¶ 45–55.  And the Complaint's theory of causation for all its claims is clear: use of Defendants' products causes $CO_2$ emissions and those emissions cause climate change, which in turn cause sea rise.  *See id.* ¶¶ 9–15.

154.    The Complaint advances claims based on the contention that greenhouse gas emissions are a public nuisance.  "[T]o succeed on the merits of a public nuisance claim under New Jersey state law, a plaintiff must establish: "(1) an unreasonable interference and (2) a right common to the general public."  *Erlbaum v. New Jersey Dep't of Envtl. Prot.*, 2017 WL 465466, at *10 (D.N.J. Feb. 3, 2017).  To assess whether conduct qualifies as a nuisance, the court considers and weighs whether "the benefits" or "social utility of th[e conduct] is outweighed by the quantum of harm that it creates."  *Rose v. Chaikin*, 187 N.J. Super. 210, 219–20 (1982).

155.    Multiple federal treaties directly address and regulate the global emission of greenhouse gases.  A 1989 United Nations resolution called for coordinated action because climate change would contribute to "the potential global problem of sea-level rise."  *See* G.A. Res. 44/206 ¶ 1 (Dec. 22, 1989).  In 1992, many countries (including the United States) signed the United Nations Framework Convention on Climate Change.  That treaty required each signatory to, among other things, "adopt national policies and take corresponding measures on the mitigation

of climate change, by limiting its anthropogenic emissions of greenhouse gases." *See* UNFCCC Art. IV(2)(a) (May 9, 1992).  The Paris Accord recently imposed similar obligations.   After recognizing the "importance of ensuring the integrity of all ecosystems, including oceans," the treaty required signatories to commit to "[h]old[] the increase in the global average temperature to well below 2°C above pre-industrial levels."   Paris  Agreement,  T.I.A.S.  No.  16-1104  Art.  II(1)(a)  (Nov.  4,  2016). Notably, the Paris Accord explicitly balanced concerns about public health against continued economic growth—the same kind of balancing called for by New Jersey nuisance law.   *See id.* Art. IV(19) (not requiring developing countries to reduce emissions as quickly because the emission standards must "tak[e] into account their common but differentiated responsibilities and respective capabilities, in the light of different national circumstances"); *id.* Art. IX(4) (provision about financial resources "should  aim  to  achieve  a  balance  between  adaptation  and  mitigation,  taking  into account country-driven strategies, and the priorities and needs of developing country Parties" (emphasis added)).

156.   After first signing the Paris Accord, the United States opted out because of the domestic costs of implementing the treaty's obligations.   *See* Statement by President  Trump  on  the  Paris  Climate  Accord  (June  1,  2017),  available  at https://bit.ly/3nmgh29.  The United States decided to leave the Paris Accord in part because it believed that the treaty wrongly balanced economic growth against

environmental conservation:  "[W]e as a nation do it better than anyone in the world in striking the balance between growing our economy, growing jobs while also being a good steward of our environment."  *Id.*  The Plaintiffs' nuisance claims effectively seek to undo the United States' balancing of interests that led it to leave the Paris Accord.

157.   To adjudicate Hoboken's public nuisance claim a state court would have to interpret the Paris Accord (or the President's withdrawal from the Paris Accords).  In either case, the balance struck by treaty between limiting greenhouse gas emissions, reducing sea rise, and the economic health of the global economy would be at issue.  A state court would have to interpret the Paris Accord, whether approved or not by this or the next President, to determine the balance of costs and benefits struck by the treaty or Presidential action rejecting the treaty.   Under well-settled precedent, only a federal court can undertake this task.  *Maugnie*, 549 F.2d at 1258.

158.   Plaintiff's Complaint also raises substantial federal issues because the asserted claims necessarily encompass issues of foreign policy and carefully balanced regulatory considerations at the international level, including the foreign affairs doctrine.  Plaintiff's claims expressly challenge and seek to govern extraterritorial conduct, thereby implicating the foreign policy prerogatives of the federal government's executive branch as to climate change and energy security treaties.  Such claims are inherently federal in nature:  "an issue concerned with . . . ordering

our relationships with other members of the international community must be treated exclusively as an aspect of federal law." *Sabbatino*, 376 U.S. at 425 (1964); *see also United States v. Belmont*, 301 U.S. 324, 331 (1937) ("[T]he external powers of the United States are to be exercised without regard to state laws or policies. . . . [I]n respect of our foreign relations generally, state lines disappear."); *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government . . . requires that federal power in the field affecting foreign relations be left entirely free from local interference.").

159.   Accordingly, Plaintiff's claims necessarily raise a substantial federal question that is appropriate for federal court resolution because they implicate issues of foreign relations that are committed to the federal government and exclusively governed by federal law.  *See, e.g.*, *Republic of Philippines v. Marcos*, 806 F.2d 344, 346, 352–54 (2d Cir. 1986) (nominally state-law claim "arises under federal law" when it "necessarily require[s] determinations that will directly and significantly affect American foreign relations"); *Torres v. S. Peru Copper Corp.*, 113 F.3d 540, 542–43 (5th Cir. 1997) ("[S]tate-law tort claims" arose under federal law because they "raise[d] substantial questions of federal common law by implicating important foreign policy concerns.").

160.   Through its action, Plaintiff seeks to regulate greenhouse gas emissions worldwide, far beyond the borders of New Jersey or even the United States.  This is

premised in part, according to Plaintiff, on Defendants' purported campaign to undermine national and international efforts, like the Kyoto Protocol, to rein in greenhouse gas emissions.  Compl. ¶ 148.  In addition, the remedies Plaintiff seeks— massive damages backed up by an injunction that, functionally, would halt or drastically reduce fossil fuel production, *see id.* at 144–45, Prayer for Relief— contravenes and threatens to undermine U.S. energy security policy, including through international trade policy and treaties.  For example, in 1959, President Dwight D. Eisenhower invoked statutory authority to proclaim quotas on imports of petroleum and petroleum-based products into the United States "to avoid discouragement of and decrease in domestic oil production, exploration and development to the detriment of national security."  Proclamation No. 3279, 24 Fed. Reg. 1781 (Mar. 12, 1959); *see* Act of July 1, 1954, 68 Stat. 360, ch. 445, § 2, as amended by Pub. L. No. 85-686, , § 8(a), 72 Stat. 678 (1958).  The import system was "mandatory" and "necessary" to "preserve to the greatest extent possible a vigorous, healthy petroleum industry in the United States" and to regulate "patterns of international trade."  Statement by the President Upon Signing Proclamation Governing Petroleum Imports, 1 Pub. Papers 240 (Mar. 10, 1959), https://quod.lib.umich.edu/p/ppotpus/4728423.1959.001/286?rgn=full+text;view=i mage;q1=greatest+extent+possible.  President Eisenhower further explained United States foreign and domestic policy:  "Petroleum, wherever it may be produced in the

free world, is important to the security, not only of ourselves, but also of the free people of the world everywhere." *Id.* After the 1973 oil embargo, the United States signed a treaty that requires member countries of the International Energy Agency to hold emergency oil stocks—through government stocks or industry-obligated stocks—equivalent to at least ninety days of net oil imports. *See* Agreement on an International Energy Program art. 2, Nov. 18, 1974, 1040 U.N.T.S. 271. The United States meets part of its obligation through government-owned stocks held in the U.S. Strategic Petroleum Reserve. *See, e.g.*, 42 U.S.C. § 6231(b); Nat'l Energy Policy Dev. Grp., National Energy Policy 8-17, (2001), https://www.nrc.gov/docs/ML0428/ML042800056.pdf. Plaintiff's claims infringe on the federal government's environmental, trade, and energy policies that require the United States to speak with one voice in coordinating with other nations.

161. "No State can rewrite our foreign policy to conform to its own domestic policies. Power over external affairs is not shared by the States; it is vested in the national government exclusively. It need not be so exercised as to conform to state laws or state policies whether they be expressed in constitutions, statutes, or judicial decrees." *Pink*, 315 U.S. at 233. States have no authority to impose remedial schemes or regulations to address what are matters of foreign affairs. *Americans United for Separation of Church & State v. Reagan*, 786 F.2d 194, 199 (3d Cir. 1986) ("The power in question—the conduct of foreign affairs—is not only vested in the

Government of the United States, but is vested exclusively so."). Yet Plaintiff seeks to replace international negotiations and congressional and executive decisions with its own preferred foreign policy, using the ill-suited tools of injunctive relief under New Jersey common law and private litigation in a state court. Even when *states* (as opposed to the *City* of Hoboken here) have made similar efforts, by enacting laws seeking to supplant or supplement foreign policy, the Supreme Court has held that state law can play no such role. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375–81 (2000); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420–24 (2003).

162.    To adjudicate these purported state-law claims, a court must answer the antecedent federal constitutional issue whether such claims can exist under our constitutional structure. Of course, substantial constitutional issues embedded in a state-law claim justify removal under *Grable*. Indeed, the *Grable* Court cited *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180 (1921), as the "classic example" of substantial question removal. *Grable*, 545 U.S. at 312. The *Grable* Court noted that in *Smith*, "[a]lthough Missouri law provided the cause of action, the Court recognized federal-question jurisdiction because the principal issue in the case was the federal constitutionality of the bond issue." *Id.* Here, the issue of whether a state-law claim for worldwide greenhouse gas emissions and the global effects of climate change exists at all is a substantial federal question that must be decided by a federal court. Relatedly, because the Complaint relies upon and challenges Defendants' ability to

petition the government—much of which occurs on federal enclaves in the District of Columbia—it necessarily raises substantial federal and constitutional issues that must be decided in resolving Plaintiff's claims.

163.   A court would also need to evaluate whether the federal government exercised its authority over navigable waters reasonably over the past several decades.  For example, the Army Corps of Engineers has considered potential impacts of sea-level change in its planning activities since 1989.  *See, e.g.*, Dick Decl., Ex. 51 (Engineering Circular 1105-2-186); *id.* Ex. 52 (U.S. Army Corps of Engineers, Technical Letter 1100-2-1, Procedures to Evaluate Sea Level Change: Impacts, Responses and Adaptation (June 30, 2014)).

164.   Plaintiff's nuisance claims are grounded on alleged past and future "sea level rise," which Plaintiff alleges endangers its property and infrastructure, causing coastal flooding of low-lying areas, damage or destruction of assets and roads located within the coastal high hazard area, erosion, and storm surges.  Compl. ¶¶ 169, 224, 232.  Because Plaintiff alleges that the comprehensive regulatory scheme Congress established to address these very issues failed to prevent its injuries, its Complaint challenges—and necessarily requires evaluation of—a federal regulatory scheme and the adequacy of past federal decision-making under that scheme.  This gives rise to federal question jurisdiction.  *Levee Board*, 850 F.3d at 724 (finding that, in the context of a comprehensive regulatory scheme, nuisance claims amount to "a

collateral attack . . . premised on the notion that the scheme provides inadequate protection" (alteration omitted)); *Pet Quarters, Inc.*, 559 F.3d at 779 (holding complaint "presents a substantial federal question because it directly implicates actions taken by" a federal agency); *McKay v. City and Cty. of San Francisco*, 2016 WL 7425927, at *4 (N.D. Cal. Dec. 23, 2016) (denying remand and ruling that federal jurisdiction lies under *Grable* because state law claims were "tantamount to asking the Court to second guess the validity of the FAA's decision"); *Bader Farms, Inc.*, 2017 WL 633815, at *3 (denying remand and ruling that federal jurisdiction lies under *Grable* because "the outcome . . . necessarily depends on the interpretation and application of the federal regulatory process").

## VIII.   <u>THE ACTION IS REMOVABLE BECAUSE IT IS COMPLETELY PREEMPTED BY FEDERAL LAW</u>

165.   Separate and distinct from the bases for removal addressed above, this Court also has original jurisdiction over this lawsuit for the independent and separate reason that Plaintiff requests relief that would alter or amend the rules regarding interstate—and even international—regulation of greenhouse gas emissions. Accordingly, this action is completely preempted by federal law.

166.   The Supreme Court has held that a federal court will have jurisdiction over an action alleging only state law claims where the "extraordinary pre-emptive power [of federal law] converts an ordinary state common law complaint into one

stating a federal claim for purposes of the well-pleaded complaint rule." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987).

167.   Applying state law to the inherently transnational activity challenged by the Complaint would inevitably intrude on the foreign affairs power of the federal government and is completely preempted. *See Garamendi*, 539 U.S. at 418 ("[S]tate action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state [action], and hence without any showing of conflict."); *see also California v. Gen. Motors Corp.*, 2007 WL 2726871, at *14 (N.D. Cal. Sept. 17, 2007) (dismissing claims against automakers because the federal government "ha[s] made foreign policy determinations regarding the United States' role in the international concern about global warming," and a "global warming nuisance tort would have an inextricable effect on . . . foreign policy").

168.   In addition, Plaintiff's claims are completely preempted by the Clean Air Act.  A state law cause of action is preempted by a federal statute when the "pre-emptive force of the statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987); *see also Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 23 (1983) ("[P]reemptive force … is so powerful as to

143

displace entirely any state cause of action").  For instance, a state law cause of action may be completely preempted where a federal statutory scheme "provide[s] the exclusive cause of action for the claim asserted and also set[s] forth procedures and remedies," *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003), and the state law cause of action falls within the scope of the federal cause of action, including where it "duplicates, supplements, or supplants" that cause of action, *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).[194]

169.   Both requirements for complete preemption are present here.  Among other things, Plaintiff's Complaint seeks "entry of an order preliminarily and permanently enjoining Defendants from engaging in future acts of trespass" and "order compelling to abate the alleged nuisance"—namely, global climate change resulting in a rise in sea levels, an increase in the frequency and intensity of drought, an increase in the frequency and intensity of precipitation events, an increase in the frequency and intensity of heat waves and extreme temperatures, and the associated consequences of those physical and environmental changes.  *See, e.g.*, Compl. ¶¶ 64, 69, 293, at 144–45, Prayer for Relief.  It is indisputable that Plaintiff's Complaint does not seek relief only as to Defendants' *intra*state activities in New Jersey, but also Defendants' activities far beyond the borders of New Jersey and even the borders

---

[194] As discussed below, a state cause of action may also be completely preempted if it arises under federal law.  *See, e.g., Vaden v. Discover Bank*, 556 U.S. 49 (2009).

of the United States.  Under Plaintiff's theory, its alleged injuries could have been avoided, and could be abated, only by a nationwide and global reduction in the emission of greenhouse gases.  Even assuming that relief could be ordered against Defendants for the production, marketing, and sale of oil and gas, which are then combusted by others at a rate Plaintiff claims causes the alleged injuries, Defendants are entitled to have this claim decided in federal court, because Congress has created a right of action by which a party can seek the creation or modification of nationwide emission standards by petitioning the EPA.  That federal right of action was designed to provide the exclusive means for a party to seek nationwide emission regulations. Any state law claims to regulate emissions must be brought under the laws of the *source* state—and limited to emissions emanating from that state—which is not the case here.  State common law causes of action based on the *interstate* emission of greenhouse gases are completely preempted by the Clean Air Act, which provides the exclusive remedy for regulation of nationwide emissions.  Because Plaintiff's state law causes of action would "duplicate[], supplement[], or supplant[]" that exclusive federal cause of action, they are completely preempted.

170.   The Clean Air Act provides the exclusive means for regulation of interstate emissions.  The Act establishes a system that deploys federal and state resources to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."

42 U.S.C. § 7401(b)(1).  At the heart of this system are the emission standards set by the EPA.  Specific Clean Air Act provisions authorize or require emission standards to be set if certain findings are made, and such standards must comport with the statutory criteria set by Congress, consistent with the dual goals of the Act.  Under the Clean Air Act, "emissions have been extensively regulated nationwide." *Cooper*, 615 F.3d at 298.  Regulation of greenhouse gas emissions, including carbon dioxide, is governed by the Clean Air Act, *see Massachusetts*, 549 U.S. at 528–29, and the EPA has regulated these emissions under the Act, *see, e.g.*, 40 C.F.R. §§ 51.166(b)(48), 52.21(b)(48) (regulation of greenhouse gases through the Act's prevention of significant deterioration of air quality permitting program); 77 Fed. Reg. 62,624 (Oct. 15, 2012) (regulation of greenhouse gas emissions from light-duty motor vehicles); 81 Fed. Reg. 73,478 (Oct. 25, 2016) (regulation of greenhouse gas emissions from medium- and heavy-duty engines and motor vehicles).  The City of Hoboken could certainly petition the EPA for a rulemaking, and, if that petition were denied, bring a claim similar to that in *Massachusetts*; but it cannot circumvent the exclusive federal regulatory regime by bringing the claims it asserts here, which effectively seek to regulate national greenhouse gas emissions.  *See Massachusetts*, 549 U.S. at 510; *see also e.g.*, *Flyers Rights Educ. Fund, Inc. v. Fed. Aviation Admin.*, 864 F.3d 738, 743 (D.C. Cir. 2017).

171.   Plaintiff's claims also seek to review the actions of the EPA outside of the judicial review provisions of the Clean Air Act and the Administrative Procedure Act, which place judicial review of EPA actions exclusively in the federal courts. Under Plaintiff's nuisance theories, a state court would in essence sit in review of the EPA's regulatory decisions on both stationary and mobile sources of greenhouse gas emissions.

172.   Congress manifested a clear intent that judicial review of Clean Air Act matters must take place in federal court.  42 U.S.C. § 7607(b).  Thus, the federal courts review EPA regulation of greenhouse gases under the Administrative Procedure Act.  That jurisdiction is exclusive and a state court cannot sit in judgment of EPA policy decisions.  42 U.S.C. § 7607(e); *Commonwealth of Virginia v. United States*, 74 F.3d 517, 523 (4th Cir. 1996) (The CAA "channels review of final EPA action exclusively to the courts of appeals, regardless of how the grounds for review are framed."); *New Eng. Legal Found. v. Costle*, 666 F.2d 30, 31, 33 (2d Cir. 1981) ("All claims against the validity of performance standards approved by final decision of the [EPA] must be addressed to the courts of appeals on direct appeal.").

173.   Thus, irrespective of the savings clauses applicable to some other types of claims, the congressionally mandated statutory and regulatory scheme is the "exclusive" means for seeking the *nationwide* regulation of greenhouse gas emissions and "set[s] forth procedures and remedies" for that relief.  *Beneficial Nat'l Bank*, 539

U.S. at 8.  Plaintiff's claims go far beyond what is reserved to the states by the savings clause in the CAA, which merely permits states to regulate certain emissions within their own borders.

174.   As noted above, Plaintiff asks the Court to order Defendants to abate nuisances they are alleged to have caused—namely, global climate change resulting in a rise in sea levels, an increase in the frequency and intensity of drought, an increase in the frequency and intensity of precipitation events, an increase in the frequency and intensity of heat waves and extreme temperatures, and the associated consequences of those physical and environmental changes. *See, e.g.*, Compl. ¶¶ 64, 69, 293; *see also id.* at 144, Prayer for Relief (requesting "abate[ment] [of] the nuisance alleged herein").

175.   According to Plaintiff's own allegations, the alleged nuisances can be abated only by an interstate—in fact international—reduction in greenhouse gas emissions. *See* Compl. ¶ 3 (attributing share of "global" emissions to Defendants); *id.* ¶ 32 ("Global production and combustion of fossil fuels is the central reason why the atmospheric concentration of greenhouse gasses . . . has dramatically increased[.]").  Indeed, Plaintiff's allegations purport to show that Defendants sought to avoid even international regulations of emissions. *See id.* ¶ 148 (describing alleged efforts to encourage the United States to reject the international Kyoto Protocol).

176.   Plaintiff's putative state law tort claims are an end-run around a petition for a rulemaking regarding greenhouse gas emissions because they seek to regulate nationwide emissions that Plaintiff does not dispute conform to EPA's emission standards. *See, e.g.*, *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959) ("Even the State's salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme."). The claims would require precisely the cost-benefit analysis of emissions that the EPA is charged with undertaking and would directly interfere with the EPA's determinations. Because Congress has established a clear and detailed process by which a party can petition the EPA to establish stricter nationwide emissions standards, Plaintiff's claims are completely preempted by the Clean Air Act.

177.   Plaintiff's claims are also completely preempted because, as explained in Section IV, they arise under federal law. *See Vaden v. Discover Bank*, 556 U.S. 49 (2009) ("A complaint purporting to rest on state law, we have recognized, can be recharacterized as one 'arising under' federal law if the law governing the complaint is exclusively federal . . . . Under this so-called complete preemption doctrine, a plaintiff's state cause of action may be recast as a federal claim for relief, making its removal by the defendant proper on the basis of federal question jurisdiction." (citation and internal quotation marks omitted)); *Beneficial Nat. Bank v. Anderson*,

539 U.S. 1, 8 n.4 and accompanying text (2003) (recognizing that *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661 (1974), reflects a non-statutory form of complete preemption based on "the uniquely federal 'nature and source of the possessory rights of Indian tribes.'"); *Caterpillar*, 482 U.S. at 393 n. 8 (same); *Massachusetts v. Exxon Mobil Corp.*, 2020 WL 2769681, at *8 (D. Mass. May 28, 2020) ("Just as a congressional policy may sometimes require the federal cause of action to be exclusive and thus completely preempt state law, so too the 'basic scheme of the Constitution' may sometimes require an exclusively federal cause of action.").

## IX.   THIS ACTION IS REMOVABLE BECAUSE IT ARISES OUT OF FEDERAL ENCLAVES

178.   This Court also has original jurisdiction under the federal-enclave doctrine.  The Constitution authorizes Congress to "exercise exclusive legislation in all cases whatsoever" over all places purchased with the consent of a state "for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings."  U.S. Const., art. I, § 8, cl. 17.  "A suit based on events occurring in a federal enclave . . . must necessarily arise under federal law and implicates federal question jurisdiction under § 1331."  *Jones*, 2012 WL 1197391, at *1.

179.   The "key factor" in determining whether federal enclave jurisdiction exists "is the location of the plaintiff's injury or where the specific cause of action arose."  *Sparling v. Doyle*, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014).  The "[f]ailure to indicate the federal enclave status and location of the exposure will not

shield plaintiffs from the consequences" of "federal enclave status." *Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992). Federal jurisdiction is available if some of the events or damages alleged in the complaint occurred on a federal enclave. *See, e.g., Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (finding defendant was permitted "to remove to federal court" because "some of [plaintiff's] claims arose on federal enclaves"); *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1336 (N.D. Ala. 2010) (holding jurisdiction will lie where at least "some of the events alleged . . . occurred on a federal enclave").

180.   In targeting Defendants' oil and gas operations, Plaintiff necessarily sweeps in those activities that occur on military bases and other federal enclaves. *See, e.g.*, *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 372–74 (1964) (noting that the United States exercises exclusive jurisdiction over certain oil and gas rights within Barksdale Air Force Base in Louisiana); *see also Miss. River Fuel Corp. v. Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (on Barksdale Air Force Base, "the reduction of fugitive oil and gas to possession and ownership[] takes place within the exclusive jurisdiction of the United States"). Indeed, as of 2000, approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their land," and these activities were spread across 22 different states. U.S. Gov't Accountability Off., GAO-02-64R, U.S. Fish & Wildlife Service: Information on Oil and Gas Activities in the National Wildlife Refuge System 1 (Oct. 31, 2001),

http://www.gao.gov/new.items/d0264r.pdf. Furthermore, Chevron and its predecessor companies for many years engaged in production activities on the Elk Hills Reserve—a strategic oil reserve maintained by the Naval Department— pursuant to a joint operating agreement with the Navy. *See supra* ¶¶ 86–96; *Chevron U.S.A.*, 116 Fed. Cl. at 205.

181.   In addition, the Complaint relies upon conduct occurring in the District of Columbia, which is itself a federal enclave. *See, e.g.*, *Collier v. District of Columbia*, 46 F. Supp. 3d 6, 20 n.8 (D.D.C. 2014); *Hobson v. Hansen*, 265 F. Supp. 902, 929 n.42 (D.D.C. 1967). Plaintiff claims that Defendants, and certain industry trade associations, including Defendant American Petroleum Institute who Plaintiff alleges is "based in Washington, D.C.," Compl. ¶ 24(a), undertook a "campaign to turn public opinion" on climate change, *id.* ¶ 145, in part to "oppose greenhouse gas regulation," *id.* ¶ 121. The Complaint focuses directly on, and seeks to penalize and deter, Defendants' constitutionally protected right to petition the government under the First Amendment within the District, making federal enclave jurisdiction particularly appropriate. *See, e.g.*, *id*. ¶ 24(b) (alleging API speaks for the oil and gas industry to "promote 'a strong, viable U.S. oil and natural gas industry'"); ¶¶ 120–21 (alleging certain Defendants, including API, founded the Global Climate Coalition to "oppose greenhouse gas regulation[s]"); ¶ 147 (alleging API formed a group to "raise[] questions among those (e.g. Congress) who chart the U.S. future course on

152

global climate change" (internal quotation marks omitted)); ¶ 161 (alleging Defendants engaged in campaigns "to deceive the public into discrediting the scientific consensus on climate change"). This alleged lobbying activity, the misleading of federal regulators, and the resulting "under-regulation" of fossil fuels could only occur in the District of Columbia, where the EPA, the Department of the Interior, the Department of Energy, the Department of Transportation, Congress, and other departments of the federal government are located. Because Plaintiff claims that Defendants' speech within the federal enclave of the District of Columbia was, among other alleged causes, the basis of its injury, and because Plaintiff complains of damages allegedly occurring on federal enclaves, this Court is the appropriate forum to adjudicate the merits of this dispute.

182.   While Plaintiff attempts to disclaim injury arising from acts occurring on federal property, *see* Compl. ¶ 222 n.202, emissions from the combustion of oil and gas cannot be traced to their source, *see AEP*, 564 U.S. at 422; *Kivalina I*, 663 F. Supp. 2d at 880, and thus there is no rational way for Plaintiff to distinguish between the harms alleged to have occurred as a result of conduct occurring on federal enclaves from those alleged to have resulted from conduct at any other location. As such, because Plaintiff's claims derive from conduct on or in federal enclaves, this Court may review them. *See Fung*, 816 F. Supp. at 571 ("Failure to indicate the

federal enclave status and location of the exposure will not shield plaintiffs from the consequences of this federal enclave status.").

## X.    THE ACTION IS REMOVABLE UNDER THE CLASS ACTION FAIRNESS ACT

183.    In the alternative, even if this case were properly brought under state law, this Court would have original jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the City of Hoboken is bringing suit on behalf of a class of Hoboken consumers, and CAFA's statutory requirements are satisfied.

184.    CAFA permits removal of (i) any "class action," where (ii) minimal diversity exists; (iii) at least 100 class members are represented; and (iv) "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs."  28 U.S.C. § 1332(d)(1), (2), (5); *see also O'Brien v. Brain Research Labs, LLC*, 2012 WL 3242365, at *3 (D.N.J. Aug. 9, 2012); 28 U.S.C. § 1453(b).  Each criterion is satisfied here.

185.    CAFA defines a "class action" as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B). CAFA's legislative history provides that "the definition of 'class action' is to be interpreted liberally.  Its application should not be confined solely to lawsuits that are labeled 'class actions.'  Generally speaking,

lawsuits that resemble a purported class action should be considered class actions for the purpose of applying these provisions."   S. Rep. No. 109-14, at 35 (2005), as reprinted in 2005 U.S.C.C.A.N. 3, 34 (formatting altered); *see also Roberts v. Tribeca Auto., Inc.*, 2018 WL 7575102, at *3 (D.N.J. Dec. 28, 2018) (relying on CAFA's legislative history to interpret its scope and noting that "the presumption against removal does not apply to class actions invoking jurisdiction under the Class Action Fairness Act").  In other words, CAFA permits removal of a suit that is "in substance a class action" notwithstanding a plaintiff's "attempt to disguise the true nature of the suit." *Addison Automatics, Inc. v. Hartford Cas. Ins. Co.*, 731 F.3d 740, 742 (7th Cir. 2013); *see also, e.g., Williams v. Empl'rs Mut. Cas. Co.*, 845 F.3d 891, 901-02 (8th Cir. 2017); *Song v. Charter Commc'ns, Inc.*, 2017 WL 1149286, at *1 n.1 (S.D. Cal. Mar. 28, 2017).

186.  Jurisdiction here furthers CAFA's legislative purposes. CAFA's "primary objective" is to "ensure Federal court consideration of interstate cases of national importance." *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014); *accord* Pub. L. No. 109-02, § 2(b)(2), 119 Stat. 4, 5 (2005). The "Framers were concerned that state courts might discriminate against interstate businesses and commercial activities, and thus viewed diversity jurisdiction as a means of ensuring the protection of interstate commerce." S. Rep. No. 109-14, at 8. The state courts in which these nationwide cases were brought were effectively "invite[d]" to "dictate to

49 others what their laws should be on a particular issue, thereby undermining basic federalism principles." *Id.* at 24. To Congress, that was untenable. "A system that allows state court judges to dictate national policy" from the "local courthouse steps is contrary to the intent of the framers when they crafted our system of federalism." *Id.* Because Congress "firmly believed" that such "interstate class actions . . . properly belong in federal court," it enacted CAFA "to ensure that qualifying interstate class actions initially brought in state courts may be heard by federal courts if any of the defendants so desire." *Id.* at 5.

187. Notably, Congress did not exempt actions brought by governments or government officials from CAFA. To the contrary, Congress rejected an amendment proposing an exemption for actions brought by attorneys general. *See* Dick Decl., Ex. 53 (151 Cong. Rec. S1157-65 (daily ed. Feb. 9, 2005) (statement of Sen. Mark Pryor)).

188. Although Plaintiff's Complaint did not label it as such, this action is a putative "class action" under CAFA. Specifically, this suit was filed on behalf of a class of "consumers in New Jersey." Compl. ¶ 357; *see also, e.g.*, *id.* ¶ 188. While Plaintiff has not alleged a putative class action on the face of its Complaint, in reality, this lawsuit is "in substance a class action." *Addison Automatics,* 731 F.3d at 742.

189. The Complaint alleges (i) efforts by Defendants to mislead New Jersey consumers, and (ii) resulting injuries allegedly suffered by New Jersey consumers.

*See, e.g.*, Compl. ¶ 17 ("Plaintiff, the City of Hoboken . . . brings this action as an exercise of its police power . . . to protect . . . the property of the residents and businesses of the City."); ¶ 326(c) ("Defendants . . . coordinated campaigns . . . in order to mislead consumers and turn public opinion against actions to restrict their extraction, production, and sale of fossil fuels."); ¶ 357 ("Defendants' business practices . . . are deceptive, unconscionable, and . . . deceived consumers in New Jersey."); ¶ 365 ("Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations described in this Complaint."); ¶ 360 ("Consumers and the public are frequently deceived by the type of information disseminated by Defendants . . . when making decisions about purchasing [] potentially harmful products.").

190.   By bringing its suit in a representative capacity on behalf of "consumers in New Jersey," *id.* ¶ 357, Plaintiff has chosen to bring what is in substance a putative class action: a "representative suit[] on behalf of [a] group[] of persons similarly situated," 1 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 1.1 (4th ed. 2002).  Indeed, the New Jersey Supreme Court has explained that attorney general suits for damages under the New Jersey Consumer Fraud Act ("CFA") are "in the nature of a class action," such that the rules of civil procedure regarding class actions offer guidance for such suits.  *Kugler v. Romain*, 58 N.J. 522, 538–39 (1971); *see also Kugler v. Banner Pontiac-Buick, Opel, Inc.*, 120 N.J. Super. 572, 580 (Ch. Div.

157

1972) ("[T]he Attorney General . . . when he sues [under CFA] he sues for a class, the public as a consumer.").  Unlike a state, the *parens patriae* doctrine does not apply to towns, counties, or cities.  Rather, the power of a political subdivision is "derivative and not sovereign, and it may only sue to vindicate its own interests."  *Prince George's Cty. v. Levi*, 79 F.R.D. 1, 4 (D. Md. 1977) (citing *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973)); *see also United States v. Pittsburg, Cal.*, 661 F.2d 783, 786–87 (9th Cir. 1981) ("[O]nly the states and the federal government may sue as parens patriae."); *United States v. W.R. Grace & Co.-Conn.*, 185 F.R.D. 184, 190 (D.N.J. 1999) ("The doctrine of *parens patriae* does not extend to municipalities, except to the extent that [its] rights are congruent with those of its residents.").  Because Plaintiff cannot sue as *parens patriae*, its attempt to sue on behalf of a broad class of consumers constitutes a class action under CAFA.

191.   Minimal diversity is present here, too.  *See* 28 U.S.C. § 1332(d)(2)(A) (requiring that "any member of a class of plaintiffs" be "a citizen of a State different from any defendant").  This suit seeks to represent New Jersey consumers, *see, e.g.*, Compl. ¶ 11, at least one of whom, on information and belief, is a citizen of New Jersey.  A number of Defendants are not citizens of New Jersey:

- ExxonMobil Oil Corporation is incorporated in New York and has its principal place of business in Texas, *id.* ¶ 18(f);

- Royal Dutch Shell plc is incorporated in England and Wales and has its principal place of business in the Netherlands, *id.* ¶ 19(a);

- Shell Oil Company is incorporated in Delaware and has its principal place of business in Texas, *id.* ¶ 19(e);

- BP P.L.C. is incorporated in England and Wales and has its principal place of business in England, *id.* ¶ 20(a);

- BP America Inc. is incorporated in Delaware and has its principal place of business in Texas, *id.* ¶ 20(e);

- Chevron Corporation is incorporated in Delaware and has its principal place of business in California, *id.* ¶ 21(a);

- Chevron U.S.A. Inc. is incorporated in Pennsylvania and has its principal place of business in California, *id.* ¶ 21(f);

- ConocoPhillips is incorporated in Delaware and has its principal place of business in Texas, *id.* ¶ 22(a);

- ConocoPhillips Company is incorporated in Delaware and is alleged to have its principal place of business in Oklahoma, *id.* ¶ 22(e);[195]

---

[195] The Complaint incorrectly alleges that ConocoPhillips Company's principal place of business is in Bartlesville, Oklahoma, rather than in Houston, Texas (Compl. ¶ 22(e)), but this incorrect allegation is immaterial for diversity and personal jurisdiction purposes.

- Phillips 66 is incorporated in Delaware and has its principal place of business in Texas, *id.* ¶ 22(f);

- Phillips 66 Company is incorporated in Delaware and has its principal place of business in Texas, *id.* ¶ 22(g).[196]

192.   The number of represented plaintiffs necessary for CAFA jurisdiction is present here because the number of "consumers in New Jersey," *id.* ¶ 357, or even just in Hoboken, plainly exceeds 100, *see* 28 U.S.C. § 1332(d)(5)(B); U.S. Census Bureau, Quick Facts: City of Hoboken (July 1, 2019), https://www.census.gov/quickfacts/hobokencitynewjersey (estimating the Hoboken population at 52,677).

193.   Although the Complaint does not allege a specific amount in controversy, the Complaint's allegations demonstrate that CAFA's $5,000,000 threshold is satisfied.  *See* 28 U.S.C. § 1332(d)(2).  In noticing removal, a defendant need only include a "plausible allegation that the amount in controversy exceeds the jurisdictional threshold."  *Dart Cherokee*, 574 U.S. at 89.  Here, the Complaint alleges that Defendants are liable under the CFA for a pattern of deception that has purportedly led to excessive sales of oil and gas products and contributed to "catastrophic losses" from climate change, and seeks consequential damages

---

[196] That Defendant Exxon Mobil is a resident of New Jersey does not defeat *minimal* diversity, which is all that is required under CAFA.  *See* 28 U.S.C. § 1332(d)(2)(A).

therefrom, as well as "treble damages pursuant to" the CFA.  *See, e.g.*, Compl. ¶¶ 222–288, 366 & Prayer for Relief.  Those allegations alone establish that the amount in controversy plausibly exceeds $5,000,000.

194.  Finally, CAFA's purposes are best served by litigating this case in federal court, as the statute was intended "to strongly favor the exercise of federal diversity jurisdiction over class actions with interstate ramifications."  S. Rep. No. 109-14, at 35; *see also Dart Cherokee*, 574 U.S. at 89 ("CAFA's primary objective is to ensur[e] Federal court consideration of interstate cases of national importance." (internal quotation marks and citation omitted)); *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 595 (2013) (same); *accord Evans* v. *Walter Indus.*, *Inc.*, 449 F.3d 1159, 1164 (11th Cir. 2006) ("The language and structure of CAFA itself indicates that Congress contemplated broad federal court jurisdiction with only narrow exceptions.").  According to the Senate Report, "CAFA provides defendants with access to the federal courts, mak[ing] it harder for plaintiffs' counsel to 'game the system' by trying to defeat diversity jurisdiction, creat[ing] efficiencies in the judicial system by allowing overlapping and 'copycat' cases to be consolidated in a single federal court, [and] plac[ing] the determination of more interstate class action lawsuits in the proper forum—the federal courts."  *Freeman* v. *Blue Ridge Paper Prod., Inc.*, 551 F.3d 405, 408 (6th Cir. 2008) (citing S. Rep. No. 109-14, at 4 (2005)).

As described more fully above, this lawsuit implicates issues of national and international importance.  It belongs in federal court.

195.   CAFA jurisdiction is therefore proper because this suit is in substance a putative "class action" on behalf of more than 100 purported class members, for which there is (greater than) minimal diversity, and an amount in controversy in excess of $5,000,000.

## XI.   THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER

196.   Based on the foregoing allegations from the Complaint, and others not specifically described herein, this Court has original jurisdiction over this action under 28 U.S.C. § 1331.  Accordingly, removal of this action is proper under 28 U.S.C. §§ 1331, 1332(d), 1441(a), 1442, 1446, and 1367(a), as well as 43 U.S.C. § 1349(b).

197.   The United States District Court for the District of New Jersey is the appropriate venue for removal pursuant to 28 U.S.C. § 1441(a) because it embraces the place where Plaintiff originally filed this case, in the Superior Court of New Jersey.  *See* 28 U.S.C. § 110; 28 U.S.C. § 1441(a).  All defendants that have been properly joined and served (or purported to be served) have consented to the removal of the action, *see* Dick Decl. ¶ 2, and there is no requirement that any party not properly joined and served consent.  *See* 28 U.S.C. § 1446(b)(2)(A) (requiring consent only from "all defendants who have been properly joined and served"); *see*

*also Canon Fin. Servs., Inc. v. Kalmus*, 2020 WL 4333744, at \*2 (D.N.J. July 28, 2020).[197]   Copies of all process, pleadings, and orders from the state-court action being removed to this Court that are in the possession of the Chevron Parties are attached hereto as Exhibit A to the Stern Declaration.   Pursuant to 28 U.S.C. § 1446(a), this constitutes "a copy of all process, pleadings, and orders" received by the Chevron Parties in the action.

198.   Upon filing this Notice of Removal, Defendants will furnish written notice to Plaintiff's counsel, and will file and serve a copy of this Notice with the Superior Court of New Jersey, pursuant to 28 U.S.C. § 1446(d).

199.   Accordingly, Defendants remove to this Court the above action pending against them in the Superior Court of New Jersey.

Respectfully submitted,

Dated: October 9, 2020          By: */s/ Herbert J. Stern*
Florham Park, New Jersey                Herbert J. Stern

STERN, KILCULLEN & RUFOLO, LLC
Herbert J. Stern
  hstern@sgklaw.com
Joel M. Silverstein
  jsilverstein@sgklaw.com

---

[197] In addition, the consent of all defendants is not required for federal officer removal under 28 U.S.C. § 1442.  *See Durham*, 445 F.3d at 1253 ("Whereas all defendants must consent to removal under section 1441, . . . a federal officer or agency defendant can unilaterally remove a case under section 1442.") (citation omitted).

325 Columbia Turnpike, Suite 110
Florham Park, New Jersey  07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

GIBSON, DUNN & CRUTCHER LLP
Theodore J. Boutrous, Jr., *pro hac vice
forthcoming*
  tboutrous@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua D. Dick, *pro hac vice forthcoming*
  jdick@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.374.8451

*Attorneys for Defendants
Chevron Corp. and Chevron U.S.A. Inc.*