STERN KILCULLEN & RUFOLO, LLC
Herbert J. Stern
  hstern@sgklaw.com
Joel M. Silverstein
  jsilverstein@sgklaw.com
325 Columbia Turnpike, Suite 110
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

GIBSON, DUNN & CRUTCHER LLP
Theodore J. Boutrous, Jr., *pro hac vice*
  tboutrous@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

*Attorneys for Defendants*
*Chevron Corp. and Chevron U.S.A. Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF HOBOKEN,<br><br>              Plaintiff,<br><br>              v.<br><br>EXXON MOBIL CORP., EXXONMOBIL OIL CORP., ROYAL DUTCH SHELL PLC, SHELL OIL COMPANY, BP P.L.C., BP AMERICA INC., CHEVRON CORP., CHEVRON U.S.A. INC., CONOCOPHILLIPS, CONOCOPHILLIPS COMPANY, PHILLIPS 66, PHILLIPS 66 | Case No. 2:20-cv-14243<br><br>JMV-MF<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**<br><br>**ORAL ARGUMENT REQUESTED** |

COMPANY, AMERICAN
PETROLEUM INSTITUTE,

Defendants.

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................1

II.  BACKGROUND AND PROCEDURAL STATUS ...................................6

III.  LEGAL STANDARDS .........................................................................7

IV.  ARGUMENT........................................................................................8

    A.  Plaintiff's Claims Target Defendants' Production and Sale of
        Oil and Gas. ................................................................................ 8

    B.  Plaintiff's Claims Necessarily Arise Under Federal Law........ 12

    C.  Plaintiff's Claims Necessarily Raise Disputed and Substantial
        Federal Issues Satisfying *Grable* Jurisdiction.......................... 19

        1.  Plaintiff's Claims Attempt To Supplant Federal Energy
            Policy.................................................................................20

        2.  Plaintiff's Claims Necessarily Interfere With Foreign
            Affairs. ............................................................................. 22

        3.  Plaintiff's Claims Include Federal Constitutional
            Elements............................................................................ 24

    D.  The Action Is Removable Because It Is Connected to
        Defendants' Activities on the Outer Continental Shelf. .......... 27

    E.  The Action Is Removable Because It Is Connected to
        Defendants' Activities at the Direction of Federal Officers. ... 31

        1.  Defendants "Acted Under" Federal Officers. ................ 33

            a.  Defendants Produced Oil and Gas at Federal
                Direction in Furtherance of Important Federal
                Interests............................................................... 35

            b.  Defendants Have Acted Under Federal Officers to
                 Produce and Supply Specialized Fuels for the
                 Military. .............................................................. 45

        2.  Plaintiff's Claims Are "For or Relating To" Defendants'
            Acts Under Federal Officers. .......................................... 54

        3.  Defendants Raise "Colorable Federal Defenses." ......... 58

    F.  This Court Has Jurisdiction Under CAFA ............................... 59

V.  CONCLUSION.............................................................................60

# TABLE OF AUTHORITIES

**Cases**

*Agyin v. Razmzan,*
   2021 WL 243514 (2d Cir. Jan. 26, 2021) ................................................................34

*Am. Elec. Power Co. v. Connecticut,*
   564 U.S. 410 (2011).............................................................2, 13, 15, 20, 21

*Amoco Prod. Co. v. Sea Robin Pipeline Co.,*
   844 F.2d 1202 (5th Cir. 1988) ........................................................31

*Baker v. Atl. Richfield Co.,*
   962 F.3d 937 (7th Cir. 2020) .............................................51, 53, 54, 57

*Ballenger v. Agco Corp.,*
   2007 WL 1813821 (N.D. Cal. June 22, 2007).........................................58

*Banco Nacional de Cuba v. Sabbatino,*
   376 U.S. 398 (1964)............................................................14, 19, 23

*BMW of N. Am. v. Gore,*
   517 U.S. 559 (1996)...................................................................22

*Boyle v. United Techs. Corp.,*
   487 U.S. 500 (1988)..................................................................58

*California ex rel. Brown v. Watt,*
   668 F.2d 1290 (D.C. Cir. 1981) .....................................................39

*Campbell-Ewald Co. v. Gomez,*
   577 U.S. 153 (2016)..................................................................58

*Caterpillar Inc. v. Williams,*
   482 U.S. 386 (1987)...................................................................18

*Cipollone v. Liggett Grp., Inc.,*
   505 U.S. 504 (1992)...................................................................31

*City of Charleston v. West Virginia-American Water Co.,*
   2016 WL 3460439 (S.D. W. Va. June 21, 2016)....................................60

*City of Milwaukee v. Illinois & Michigan,*
   451 U.S. 304 (1981)............................................................2, 12, 18

*In re Commonwealth's Motion to Appoint Counsel Against or Directed to
   Defender Ass'n of Philadelphia,*
   790 F.3d 457 (3d Cir. 2015)................................................32, 54, 56

*North Carolina ex. rel. Cooper v. TVA*,
  615 F.3d 291 (4th Cir. 2010) .................................................................22

*County of San Mateo v. Chevron Corp.*,
  960 F.3d 586 (9th Cir. 2020) .................................................................40

*In re Deepwater Horizon*,
  745 F.3d 157 (5th Cir. 2014) .................................................................30

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  511 F. Supp. 2d 742 (S.D. Tex. 2005) ...................................................25

*EP Operating Ltd. v. Placid Oil Co.*,
  26 F.3d 563 (5th Cir. 1994) .......................................................27, 28, 30

*Erie R.R. Co. v. Tompkins*,
  304 U.S. 64 (1938) ................................................................................12

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
  545 U.S. 546 (2005).................................................................................8

*Exxon Mobil Corp. v. United States*,
  2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) ...............................47, 50

*Federated Dep't Stores, Inc. v. Moitie*,
  452 U.S. 394 (1981)...............................................................................17

*Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal.*,
  463 U.S. 1 (1983)...................................................................................16

*Gertz v. Boeing Co.*,
  654 F.3d 852 (9th Cir. 2011) .................................................................58

*Goepel v. National Postal Mail Handlers Union, a Division of LIUNA*,
  36 F.3d 306 (3d Cir. 1994)...............................................................15, 16

*Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*,
  865 F.3d 1237 (9th Cir. 2017) ...............................................................58

*Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*,
  545 U.S. 308 (2005)...........................................................3, 19, 20, 22, 26

*Hinderlider v. La Plata River & Cherry Creek Ditch Co.*,
  304 U.S. 92 (1938).................................................................................14

*Hussain v. PNC Fin. Servs. Grp.*,
  692 F. Supp. 2d 440 (D. Del. 2010)........................................................11

*Hustler Magazine, Inc. v. Falwell,*
   485 U.S. 46 (1988) ...........................................................................................25, 26

*Illinois v. City of Milwaukee,*
   406 U.S. 91 (1972) ...............................................................12, 13, 14, 15, 16

*Int'l Paper Co. v. Ouellette,*
   479 U.S. 481 (1987) ....................................................................13, 15, 21

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,*
   426 F.3d 694 (3d Cir. 2005) ...............................................................17

*Isaacson v. Dow Chem. Co.,*
   517 F.3d 129 (2d Cir. 2008) ...............................................................54

*Jarbough v. Attorney General,*
   483 F.3d 184 (3d Cir. 2007) ...............................................................17

*Jefferson Cnty., Ala. v. Acker,*
   527 U.S. 423 (1999) ...........................................................................56

*Jones v. John Crane-Houdaille, Inc.,*
   2012 WL 1197391 (D. Md. Apr. 6, 2012) .........................................53

*Joyner v. A.C. & R. Insulation Co.,*
   2013 WL 2460537 (D. Md. June 6, 2013) .........................................19

*Kansas v. Colorado,*
   206 U.S. 46 (1907) .............................................................................14

*Keeton v. Hustler Magazine, Inc.,*
   465 U.S. 770 (1984) ...........................................................................27

*Kugler v. Romain,*
   58 N.J. 522 (1971) .............................................................................60

*Laredo Offshore Constructors, Inc. v. Hunt Oil Co.,*
   754 F.2d 1223 (5th Cir. 1985) ...........................................................28

*Latiolais v. Huntington Ingalls, Inc.,*
   951 F.3d 286 (5th Cir. 2020) .......................................................48, 54

*Legg v. Wyeth,*
   428 F.3d 1317 (11th Cir. 2005) ...........................................................7

*Leite v. Crane Co.,*
   749 F.3d 1117 (9th Cir. 2014) .............................................................8

*In re Lipitor Antitrust Litig.*,
   855 F.3d 126 (3d Cir. 2017)....................................................................................5, 11

*Manning v. Gold Belt Falcon, LLC*,
   681 F. Supp. 2d 574 (D.N.J. 2010) ...........................................................................53

*Massachusetts v. EPA*,
   549 U.S. 497 (2007).....................................................................................................21

*MHA, LLC v. Amerigroup Corp.*,
   2021 WL 226110 (D.N.J. Jan. 21, 2021) .............................................................34, 55

*Milkovich v. Lorain J. Co.*,
   497 U.S. 1 (1990).........................................................................................................25

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964).....................................................................................................25

*Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*,
   471 U.S. 845 (1985)...............................................................................................15, 16

*Nat'l Review, Inc. v. Mann*,
   140 S. Ct. 344 (2019)...................................................................................................27

*Ortiz v. Univ. of Med. & Dentistry of N.J.*,
   2009 WL 737046 (D.N.J. Mar. 18, 2009)...................................................................25

*Papp v. Fore-Kast Sales Co.*,
   842 F.3d 805 (3d Cir. 2016)..................................................31, 32, 34, 45, 55, 56, 59

*Phila. Newspapers, Inc. v. Hepps*,
   475 U.S. 767 (1986)...............................................................................................24, 26

*Reaser v. Allis Chambers Corp.*,
   2008 WL 8911521 (C.D. Cal. June 23, 2008) ...........................................................58

*Republic of Philippines v. Marcos*,
   806 F.2d 344 (2d Cir. 1986).................................................................................19, 24

*Rivet v. Regions Bank of La.*,
   522 U.S. 470 (1998).....................................................................................................17

*San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*,
   359 U.S. 236 (1959)...............................................................................................21, 31

*Schmitt v. War Emergency Pipelines, Inc.*,
   175 F.2d 335 (8th Cir. 1949) ......................................................................................47

*Shell Oil Co. v. United States,*
   751 F.3d 1282 (Fed. Cir. 2014).................................................................47

*Tenn. Gas Pipeline v. Houston Cas. Ins. Co.,*
   87 F.3d 150 (5th Cir. 1996) .................................................................30

*Texas Indus., Inc. v. Radcliff Materials, Inc.,*
   451 U.S. 630 (1981)...................................................................18, 19

*Torres v. S. Peru Copper Corp.,*
   113 F.3d 540 (5th Cir. 1997) .................................................................24

*Treiber & Straub, Inc. v. U.P.S., Inc.,*
   474 F.3d 379 (7th Cir. 2007) .................................................................15

*United Offshore Co. v. S. Deepwater Pipeline Co.,*
   899 F.2d 405 (5th Cir. 1990) .................................................................30

*United States v. Bestfoods,*
   524 U.S. 51 (1998).................................................................48

*United States v. Pink,*
   315 U.S. 203 (1942).................................................................18, 58

*United States v. Shell Oil Co.,*
   294 F.3d 1045 (9th Cir. 2002) .................................................................46

*United States v. Standard Oil Co.,*
   332 U.S. 301 (1947).................................................................12, 14

*Watson v. Philip Morris Cos.,*
   551 U.S. 142 (2007).................................................32, 34, 37, 43, 44, 45, 51, 53

*Willingham v. Morgan,*
   395 U.S. 402 (1969).................................................................59

*Winters v. Diamond Shamrock Chem. Co.,*
   149 F.3d 387 (5th Cir. 1998) .................................................................53, 54

**Statutes**

28 U.S.C. § 1331.................................................................2, 7, 53

28 U.S.C. § 1441.................................................................7

28 U.S.C. § 1442.................................................................4, 31, 59

30 U.S.C. § 226.................................................................41

42 U.S.C. § 15927 ................................................................................................35

43 U.S.C. § 1332 ..................................................................................................37

43 U.S.C. § 1349 ............................................................................................29, 30

43 U.S.C. § 1802 ............................................................................................31, 39

Pub. L. No. 81-774, 64 Stat. 798 (1950) ............................................................45

Pub. L. No. 105-276, 112 Stat. 2461, 2496 (1998) ............................................23

Pub. L. No. 106-74, 113 Stat. 1047, 1080 (1999) ..............................................23

Pub. L. No. 106-377, 114 Stat. 1441, 1441A-41 (2000) ....................................23

**Treatises**

14C Wright & Miller, Federal Practice and Procedure: Jurisdiction § 3722.1 (rev. 4th ed. 2020) ........................................................................................17

**Regulations**

43 C.F.R. § 3103.4-4 ...........................................................................................41

19 Fed. Reg. § 250.11, 2656 ...............................................................................38

83 Fed. Reg. 23295, 23296 ..................................................................................35

**Constitutional Provisions**

U.S. Const. amend. I ...........................................................................6, 24, 25, 26, 27

U.S. Const. art. I, § 8, cl. 3 ..................................................................................58

## I.     __INTRODUCTION__

This case belongs in federal court because of its sweeping implications for national energy policy, national security, foreign policy, and other uniquely federal interests.  Plaintiff seeks to use state tort law and state courts to impose liability on the energy industry for the full extent of the alleged present and future harms resulting from global climate change, functionally levying a ruinous worldwide tax on lawful productive conduct.  Production of oil and gas has long been encouraged by the United States government, state and municipal governments, and foreign governments alike, and remains essential to the health of the economy and the security, stability, and economic interests of the United States.  Despite the obvious national and international reach of its claims, Plaintiff tried to evade federal jurisdiction by filing suit in state court and pleading nominally state-law claims.  But Plaintiff's artful pleading does not divest this Court of jurisdiction.

Under our federal constitutional structure, no state's law may regulate— through enacted legislation or court-imposed order—interstate pollution such as that for which Plaintiff here seeks to hold Defendants liable.  *All* of Plaintiff's theories depend upon the interstate, and, indeed, international activities of Defendants in "extracting, producing, and selling more than 12% of the world's fossil fuels since 1965," Compl. ¶ 319, 335—lawful products that innumerable non-parties then used to heat their homes and power their factories, hospitals, and myriad other defining

features of modern society.  Plaintiff alleges that the production and use of these fossil fuels has resulted in increased greenhouse gas emissions, which has contributed to global climate change and its alleged injuries.  *See, e.g.*, Compl. ¶ 33 ("[G]reenhouse gas emissions from fossil fuels are the main driver of global warming.").  Within our constitutional system there is, and can be, no state law of interstate pollution for Plaintiff's claims to "arise under."  Rather, "[w]hen we deal with air and water in their ambient or interstate aspects, there is a federal common law."  *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*") (citation omitted); *see also City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 313 n.7 (1981) ("*Milwaukee II*") ("If federal common law exists, it is because state law cannot be used.").  As a result, Plaintiff's claims necessarily arise under federal law and federal jurisdiction attaches under 28 U.S.C. § 1331.

Beyond the inherently interstate and international character of Plaintiff's liability theories, the properly federal character of this case derives from the vital federal laws and policies that Plaintiff's nominally state-law claims seek to supplant, which themselves provide their own bases for removal.  For fundamental reasons of national security and economic prosperity, the United States government has long undertaken specific steps to encourage the production of oil and gas.  In fact, every Administration since that of President Taft has taken active steps to increase U.S. oil production.  While concerns about global climate change have increased the focus

on alternative energy sources, petroleum remains the backbone of U.S. energy policy.  For this reason, in 2010, President Obama "announc[ed] the expansion of offshore oil and gas exploration, but in ways that balance the need to harness domestic energy resources and the need to protect America's natural resources." Dick Decl. Ex. 1.  President Obama explained that it was "not a decision that I've made lightly. . . .  But the bottom line is this: Given our energy needs, in order to sustain economic growth and produce jobs, and keep our businesses competitive, we are going to need to harness traditional sources of fuel even as we ramp up production of new sources of renewable, homegrown energy."  *Id.*

This lawsuit is a misguided attempt to regulate the energy industry outside of the proper political processes, and necessarily implicates disputed and substantial federal issues.  It is therefore also removable under *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005).  The Complaint singles out a small, select group of companies in ways far more onerous than those deemed advisable by the federal policymakers actually responsible for formulating the Nation's balanced response to global climate change.  In fact, much of the conduct on which Plaintiff bases its injury claims has furthered fundamental federal national and international security and economic policies.  Plaintiff's claims thus implicate federal energy policies and the federal government's exclusive authority over foreign affairs, and also require adjudication of the constitutional elements that

federal law imposes on claims by government entities challenging protected speech on subjects of public concern.

In addition, much of the conduct upon which Plaintiff seeks to base liability and damages took place in locations subject to exclusive federal jurisdiction and/or under the direction, supervision, and control of officers of the U.S. government, and thus Defendants properly removed this action pursuant to the express statutory authorizations set forth in the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)(1), and the federal officer removal provisions of 28 U.S.C. § 1442(a)(1).  OCSLA confers federal jurisdiction over all claims "in connection with" production on the Outer Continental Shelf, where Defendants have substantial operations.  And Plaintiff's claims challenge Defendants' conduct undertaken under federal direction and control, including the production and supply of oil and gas products for the United States armed forces and other federal agencies to enable them to accomplish critical national policy objectives.  On these points, Defendants here present a materially expanded evidentiary record—including the declarations of two prominent historians, Professor Tyler Priest of the University of Iowa and Professor Mark Wilson of the University of North Carolina—that is more extensive than any presented to a court that has decided these issues to date.  Finally, Plaintiff's claims constitute a class action removable under the Class Action Fairness Act.

Plaintiff argues that these removal grounds are not proper because its claims

are based *in part* on alleged "deception" and "misrepresentations" by Defendants in selling oil and gas products, rather than in producing them.  But Plaintiff does not allege that any deception or misrepresentation alone caused its alleged injuries.  In fact, Plaintiff pointedly asserts that it was "Defendants' *extraction, production, and sale* of fossil fuels [that] has substantially contributed to a range of devastating climate impacts" on Hoboken.  Compl. ¶ 74 (emphasis added).  When the Complaint is read "as a whole," as required when assessing jurisdiction, it is clear that Plaintiff's claims and the "theories undergirding those claims" center on Defendants' production and sale of oil and gas.  *In re Lipitor Antitrust Litig.*, 855 F.3d 126, 144–45 (3d Cir. 2017), as amended (Apr. 19, 2017).  At most, Plaintiff alleges that supposed deception caused some marginal increase in production and consumption of oil and gas, the activities that allegedly contributed to global climate change and Plaintiff's purported injuries.  *See* Compl. ¶ 358(j) ("Defendants' multifaceted and decades-long campaign to deceive consumers about the known consequences of the combustion of fossil fuels *unduly inflated the market for fossil fuels* and led more greenhouse gasses [sic] to be emitted into the environment than would have in the absence of their efforts.") (emphasis added).  Accordingly, Plaintiff's chain of causation necessarily includes Defendants' production and sales activities.  Even if this Court were, contrary to the Complaint's plain text, to construe Plaintiff's claims as limited to a "misrepresentation theory," removal is still proper, because that

theory itself implicates substantial and disputed federal questions, including federal constitutional elements imposed by the First Amendment.

In sum, no amount of artful pleading or tactical disclaimers can defeat this Court's jurisdiction over these claims. Plaintiff seeks to use state tort law and state courts to impose liability on the energy industry for the full extent of the alleged present and future harms resulting from global climate change. But New Jersey state law may no more assess liability against Defendants for their lawful conduct in other states or countries than New Jersey may tax those activities. This case belongs in federal court and removal is proper.[1]

## II.    BACKGROUND AND PROCEDURAL STATUS

The City of Hoboken brought nominally state-law claims for public nuisance, private nuisance, trespass, negligence, and violations of New Jersey's Consumer Fraud Act against Defendants in an attempt to impose liability in New Jersey state court for the effects of global climate change. Defendants removed this action to this Court on October 9, 2020, and Plaintiff moved to remand.

Since 2017, more than twenty state and municipal plaintiffs have brought similar claims against Defendants and others in various courts throughout the United

---

[1] Several Defendants contend that they are not subject to personal jurisdiction in New Jersey. Defendants submit this remand opposition subject to, and without waiver of, these jurisdictional objections.

States.  Eleven of these cases are now before the United States Supreme Court, with petitions for certiorari either granted or pending[2]—including *BP p.l.c. v. Mayor and City Council of Baltimore*, No. 19-1189 (U.S.), which was argued earlier this month—and offer an opportunity for the Supreme Court to resolve, in part, the question of whether there is federal jurisdiction over these types of claims. Defendants respectfully submit that it would be more efficient for this Court to await guidance from the Supreme Court before ruling on Plaintiff's Motion.[3]

## III.   <u>LEGAL STANDARDS</u>

Removal from state court is proper if the federal court would have had original jurisdiction of the action.  28 U.S.C. § 1441(a).  Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  "The removal process was created by Congress to protect defendants."  *Legg v. Wyeth*, 428 F.3d 1317, 1325 (11th Cir. 2005).  When invoking removal jurisdiction, a defendant's "factual allegations will ordinarily be

---

[2] *See BP p.l.c. v. Mayor & City Council of Balt.*, No. 19-1189 (U.S. argued Jan. 19, 2021); *Chevron Corp. v. County of San Mateo*, *petition for cert. filed*, No. 20-884 (U.S. Dec. 30, 2020) (consolidating six cases); *Shell Oil Prods. Co. v. Rhode Island*, *petition for cert. filed*, No. 20-900 (U.S. Dec. 30, 2020); *Suncor Energy (U.S.A.) Inc. v. Bd. of Cnty. Comm'rs of Boulder Cnty.*, *petition for cert. filed*, No. 20-783 (U.S. Dec. 4, 2020); *Chevron Corp. v. City of Oakland*, *petition for cert filed* (U.S. Jan. 8, 2020) (docket pending) (consolidating two cases).

[3] In *Oakland*, one of the questions presented is "[w]hether putative state-law tort claims alleging harm from global climate change are removable because they arise under federal law."  That issue was also briefed in *Baltimore*.

accepted as true unless challenged by the [plaintiff]." *Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 (9th Cir. 2014).  The removing party need show only that there is federal jurisdiction over a single claim.  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 559, 563 (2005).

## IV.   ARGUMENT

### A.   Plaintiff's Claims Target Defendants' Production and Sale of Oil and Gas.

Despite Plaintiff's attempt to recast its Complaint as based only on Defendants' purported "misrepresentations," Plaintiff's claims expressly—and unavoidably—target Defendants' production and sales activities as well.  Indeed, the alleged misrepresentations are almost completely beside the point, as Plaintiff seeks damages for alleged harms from the effects of global climate change, which, the Complaint makes plain, flow from production untethered to any misstatements.  For example, in identifying the threat of climate change, Plaintiff omits any reference to Defendants' purported statements:

- "Three types of climate disruption pose an [] urgent threat to Hoboken: sea level rise, extreme heat, and extreme rainfall events."  Compl. ¶ 45.
- "In addition to sea level rise and associated flooding risks, anthropogenic climate change poses specific risks to Hoboken from rising temperatures and disruptions in the hydrological cycle, which in turn result in extreme precipitation events."  *Id.* ¶ 239.

Plaintiff alleges that this climate change results from increases in global greenhouse gas emissions, again with no reference to Defendants' statements.  For example,

- "[G]reenhouse gas emissions from fossil fuels are the main driver of global warming."  *Id.* ¶ 33.
- "[F]ossil fuel emissions are the dominant source of increases in atmospheric $CO_2$ over the last fifty years."  *Id.* ¶ 38.

Plaintiff then acknowledges that it is the combustion of fossil fuels that releases greenhouse gases into the atmosphere.  For example,

- "Global production and combustion of fossil fuels is the central reason why the atmospheric concentration of greenhouse gasses . . . has dramatically increased over the last fifty years."  *Id.* ¶ 32.
- "Fossil fuel combustion is the dominant cause of sea level rise in recent decades.  In total, greenhouse gas emissions from fossil fuel combustion are responsible for more than 70% of sea level rise between 1970 and 2000."  *Id.* ¶ 48.

Plaintiff next alleges that Defendants are responsible for increased worldwide combustion, and the resulting increase in global emissions, because they "extracted, produced and sold*"* oil and gas, not because of Defendants' speech.  For example,

- "Defendants' *extraction, production, and sale* of fossil fuels on an enormous scale is the driving force behind the unprecedented combustion of fossil fuels."  *Id.* ¶ 68 (emphasis added).
- "Defendants' *extraction, production, and sale* of fossil fuels has substantially contributed to . . . devastating climate impacts."  *Id.* ¶ 74 (emphasis added).
- "Defendants are responsible for *extracting, producing, and selling* more than 12% of the world's fossil fuels since 1965, the combustion of which has been the driving force behind sea level rise, increasingly frequent and severe extreme precipitation events, and increasingly frequent extreme heat."  *Id.* ¶¶ 319, 335 (emphasis added).

Thus, Plaintiff's central theory is that Defendants' "extraction, production, and sale" has led to increased combustion, which has led to increased greenhouse gas emissions, which has led to climate change, which has resulted in its alleged injuries.

9

Despite these clear allegations, Plaintiff now tries to portray its case as revolving around Defendants' alleged misrepresentations. But, at the very most, Plaintiff alleges that misrepresentations may have increased some marginal consumer demand for oil and gas, which then prompted Defendants to extract, produce and sell some marginally greater quantities of those products. For example,

- "Defendants' business practices in marketing and promoting fossil fuels . . . led to the sale and consumption of fossil fuels that would otherwise not be consumed." *Id.* ¶ 357.
- "[Defendants'] campaign to deceive consumers about the known consequences of the combustion of fossil fuels unduly inflated the market for fossil fuels and led more greenhouse gasses [sic] to be emitted into the environment than would have in the absence of their efforts." *Id.* ¶ 358(j).

Plaintiff therefore places Defendants' production and sale of oil and gas directly in its alleged causal chain—and these links are closer to its alleged injuries than any alleged misrepresentations. This alleged causal chain is depicted below:



But Plaintiff's theory necessarily encompasses damages that far exceed any from purported misrepresentations, and Plaintiff makes no attempt to limit its claims or its remedies to its misrepresentation allegations. If Plaintiff's claims were based exclusively on alleged misrepresentations, the requested relief would necessarily be limited to—at most—any harms allegedly resulting from the purported marginal increase in fossil-fuel consumption caused by the asserted misrepresentations. But

the Complaint contains no such limit.  In fact, Plaintiff seeks far broader relief, including "millions of dollars of lost tax revenue and opportunity costs due to flooding events," "flood insurance," and so-called abatement in the form of a "$500 million . . . plan . . . to address and remediate ongoing and projected harm from anthropogenic sea level rise," none of which can plausibly be attributed to any alleged misrepresentations to Hoboken consumers.  Compl. ¶ 223.

Plaintiff tries to evade federal jurisdiction by asking this Court to ignore the core theory of its claims (worldwide production and emissions) and instead focus exclusively on one, relatively small aspect (alleged misrepresentations).  But "[t]he court must consider the complaint in its entirety and review the allegations as a whole and in context." *Hussain v. PNC Fin. Servs. Grp.*, 692 F. Supp. 2d 440, 442 (D. Del. 2010).  As the Third Circuit has explained, when assessing jurisdiction, "regardless of how a complaint labels its claims or counts, courts are to look to the complaint and its allegations as a whole to identify the plaintiff's claims and any theories undergirding those claims." *Lipitor*, 855 F.3d at 144–45.

Plaintiff's claims necessarily rest on the *extraction, production, sale, and consumption* of fossil fuels, and the resulting interstate and international greenhouse gas emissions.  Plaintiff expressly pleaded its claims this way in the Complaint, and the centrality of Defendants' production, extraction and sales activities is also clear as a matter of essential logic.  Plaintiff's claims are not and could not be limited to

injuries caused by Defendants' alleged misrepresentations.  Plaintiff's broad theory must be heard in federal court.

### B.    Plaintiff's Claims Necessarily Arise Under Federal Law.

As a matter of federal constitutional structure, Plaintiff's claims necessarily arise under federal, not state, law, because they seek to regulate transboundary and international emissions and pollution.   After *Erie*, there "is no federal general common law."  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  But *Erie* did not question federal authority over "matters . . . so vitally affecting interests, powers and relations of the Federal Government as to require uniform national disposition rather than diversified state rulings."  *United States v. Standard Oil Co.*, 332 U.S. 301, 307 (1947).   The "federal judicial power to deal with common-law problems" thus "remain[s] unimpaired for dealing independently, wherever necessary or appropriate, with essentially federal matters, even though Congress has not acted affirmatively about the specific question."  *Id.*  In these specialized areas, "where there is an overriding federal interest in the need for a uniform rule of decision," *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 n.6 (1972) ("*Milwaukee I*"), "state law cannot be used," *Milwaukee II*, 451 U.S. at 313 n.7 (1981).

Interstate pollution is one such area.  *Milwaukee I* held, and *AEP* reiterated, that claims based on ambient, cross-border pollution arise under federal common law, not any individual State's law.  "Environmental protection is undoubtedly an

area . . . in which federal courts may . . . 'fashion federal law.'" *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*"). In particular, "[w]hen we deal with air and water in their ambient or interstate aspects, there is a federal common law." *Id.* (quoting *Milwaukee I*, 406 U.S. at 103). Likewise, "the regulation of interstate water pollution is a matter of federal, not state, law." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 488 (1987). As the Supreme Court explained: "Federal common law and not the varying common law of the individual States is . . . necessary to be recognized as a basis for dealing in uniform standard with the environmental rights of a State against improper impairment by sources outside its domain." *Milwaukee I*, 406 U.S. at 107 n.9. Plaintiff's Complaint makes clear that this is a case about interstate and international pollution—indeed, the very first paragraph discusses the "catastrophic consequence[s] of pollution," which the Complaint expressly ties to sources outside New Jersey: "The leading driver of *global* warming in the last several decades is the dramatic increase in the atmospheric concentration of greenhouse gasses." Compl. ¶ 30 (emphasis added).

Given this transboundary pollution, the conclusion that state law cannot apply and that therefore federal law is exclusive here flows directly from the Constitution's structure. "[F]ederal common law addresses 'subjects within national legislative power' . . . where the basic scheme of the Constitution so demands." *AEP*, 564 U.S. at 421. The Constitution's allocation of sovereignty between the States and the

federal government, and among the States themselves, precludes applying state law in certain narrow areas whose inherently interstate nature requires uniform *national* rules of decision.  Allowing state law to govern such claims would permit one state to "impose its own legislation on . . . the others," violating the "cardinal" principle that "[e]ach State stands on the same level with all the rest."  *Kansas v. Colorado*, 206 U.S. 46, 97 (1907).

Just as "state courts [are] not left free to develop their own doctrines" of foreign relations, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426 (1964), or to decide disputes with neighboring states, *e.g.*, *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938), neither can they make rules that govern interstate or international pollution.  In these areas, "there is an overriding federal interest in the need for a uniform rule of decision," *Milwaukee I*, 406 U.S. at 105 n.6, so the "federal judicial power" must supply any rules necessary "to deal with common-law problems," *Standard Oil*, 332 U.S. at 307.

As the United States recently explained to the Supreme Court in *Baltimore*: "[C]ross-boundary tort claims associated with air and water pollution involve a subject that 'is meet for federal law governance'" because any such putative claims "that seek to apply the law of an affected State to conduct in another State" have an "inherently federal nature."  Brief of United States as Amicus Curiae at 26–27, *BP p.l.c. v. Mayor and City Council of Baltimore*, No. 19-1189 (U.S. Nov. 23, 2020)

(quoting *AEP*, 564 U.S. at 422).  Claims "that seek to apply the law of an affected State to conduct in *another* State" necessarily "arise under 'federal, not state, law' for jurisdictional purposes, given their inherently federal nature." *Id.* at 27 (quoting *Ouellette*, 479 U.S. at 488).[4]

Because Plaintiff's claims necessarily arise under federal common law, there is federal jurisdiction.  It is "well settled" that § 1331's "grant of 'jurisdiction will support claims founded upon federal common law as well as those of a statutory origin.'" *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 850 (1985) (quoting *Milwaukee I*, 406 U.S. at 100).  When a claim "arise[s] under federal common law" there "is a permissible basis for jurisdiction based on a federal question." *Treiber & Straub, Inc. v. U.P.S., Inc.*, 474 F.3d 379, 383 (7th Cir. 2007).

Plaintiff asserts that the Third Circuit's decision in *Goepel v. National Postal Mail Handlers Union, a Division of LIUNA*, 36 F.3d 306, 311–12 (3d Cir. 1994), forecloses a finding of federal question jurisdiction on this ground.  Mot. at 19–20. Not so.  To be sure, the Third Circuit stated that "the only state claims that are 'really' federal claims and thus removable to federal court are those that are preempted

---

[4]   At oral argument, the United States confirmed that Baltimore's claims, like Plaintiff's claims here, "are inherently federal in nature." Tr. at 31:4-5. The United States explained that although Baltimore "tried to plead around th[e Supreme] Court's decision in AEP, its case still depends on alleged injuries to the City of Baltimore caused by emissions from all over the world, and those emissions just can't be subjected to potentially conflicting regulations by every state and city affected by global warming." Tr. at 31:7-13.

completely by federal law."  Mot. at 20 (quoting *Goepel*, 36 F.3d at 311–12).  But Plaintiff takes this quote out of context.  The *Goepel* court was merely explaining the operation of the doctrine of complete preemption as enunciated by the Supreme Court, which applies that doctrine where "it appears that . . . [plaintiff's] claim is 'really' one of federal law."  *Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 13 (1983).  *Goepel* did not hold that complete preemption is the "only" basis for removal jurisdiction over nominally state law claims, which Plaintiff acknowledges would be incorrect, since it recognizes that, at a minimum, *Grable* supplies another recognized basis for federal question jurisdiction.  *See* Mot. at 24. The Supreme Court has expressly held that § 1331's grant of "jurisdiction will support claims founded upon federal common law as well as those of statutory origin.'"  *Milwaukee I*, 406 U.S. at 100; *Nat'l Farmers Union Ins.*, 471 U.S. at 850. The *Goepel* court did not hold otherwise; indeed, it had no need to address that question, because the fact the complaint "allude[d] to a federal contract" was insufficient to raise a federal question.  36 F.3d at 310 & n.4.

Plaintiff's reliance on the well-pleaded complaint rule is also misplaced.  *E.g.*, Mot. at 1, 9–10, 23.  "[I]t is an independent corollary of the well-pleaded complaint rule that a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint."  *Franchise Tax Bd.*, 463 U.S. at 22.  That is, "a plaintiff cannot frustrate a defendant's right to remove by pleading a case without reference

to any federal law when the plaintiff's claim is necessarily federal."  14C Wright & Miller, Federal Practice and Procedure: Jurisdiction § 3722.1 (rev. 4th ed. 2020).  In exercising its "independent duty" to ascertain its jurisdiction, *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 702 (3d Cir. 2005), the court must analyze the *substance* of the claim.  *See Jarbough v. Attorney General*, 483 F.3d 184, 189 (3d Cir. 2007) ("We are not bound by the label attached by a party to characterize a claim and will look beyond the label to analyze the substance of a claim.").[5]  As a result, a federal court must sometimes "determine whether the real nature of the claim is federal, regardless of plaintiff's characterization."  *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n.2 (1981).  The Third Circuit has done just that.  For example, in *First Pennsylvania Bank, N.A. v. Eastern Airlines, Inc.*, the Court held that nominally state-law claims seeking to recover damages for a lost interstate shipment arose under federal common law.  731 F.2d 1113, 1115–16 (3d Cir. 1984).

The same result is required here.  Federal law exclusively governs the types of claims Plaintiff brings, which seek damages for the alleged transboundary harms caused by worldwide emissions of greenhouse gases.  To be sure, plaintiffs can

---

[5] *Accord Rivet v. Regions Bank of La.*, 522 U.S. 470, 475 (1998) ("[A]n independent corollary to the well-pleaded complaint rule is the further principle that a plaintiff may not defeat removal by omitting to plead necessary federal questions. If a court concludes that a plaintiff has artfully pleaded claims in this fashion, it may uphold removal even though no federal question appears on the face of the plaintiff's complaint.") (internal quotations and citations omitted).

usually avoid removal by pleading only state-law claims, even if federal claims are available. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). But in an area governed *exclusively* by federal law as a matter of constitutional structure, there can be no state law. "If federal common law exists, it is because state law cannot be used." *Milwaukee II*, 451 U.S. at 313 n.7. Accordingly, a plaintiff asserting claims in one of these "narrow areas" like transboundary pollution cannot choose between state and federal law because *no state law exists*. *See Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). Under the Constitution, any claims asserted in this area are inherently federal no matter the labels attached to them. When a plaintiff brings a claim in an exclusively federal area, that claim necessarily arises under federal law, creating federal jurisdiction.

Plaintiff's claims also arise under federal law because they seek to regulate the production and sale of oil and gas abroad and, therefore, implicate the federal government's foreign affairs power and the Constitution's Foreign Commerce Clause. The federal government has exclusive authority over the nation's international policy on climate change and relations with foreign nations. *United States v. Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is not shared by the States; it is vested in the national government exclusively."). Accordingly, "our federal system does not permit the controversy to be resolved under state law," "because the authority and duties of the United States as sovereign are intimately

involved" and "because the interstate [and] international nature of the controversy makes it inappropriate for state law to control." *Texas Indus.*, 451 U.S. at 641; *see also Sabbatino*, 376 U.S. at 425 (noting that issues involving "our relationships with other members of the international community must be treated exclusively as aspects of federal law"); *Republic of Philippines v. Marcos*, 806 F.2d 344, 352–54 (2d Cir. 1986) (explaining that "there is federal question jurisdiction over actions having important foreign policy implications" under federal common law, and that a nominally state-law claim "arises under federal law" when it "necessarily require[s] determinations that will directly and significantly affect American foreign relations"). While Plaintiff attempts to disclaim federal production and emissions, it does not disclaim foreign production or emissions, which it would need to do even to try to "restrict [the Complaint's] scope and sculpt its language to avoid federal jurisdiction." Mot. at 43 (quoting *Joyner v. A.C. & R. Insulation Co.*, 2013 WL 2460537, at *5 (D. Md. June 6, 2013)).

### C.   Plaintiff's Claims Necessarily Raise Disputed and Substantial Federal Issues Satisfying *Grable* Jurisdiction.

The Supreme Court has held that even suits alleging only state-law causes of action nevertheless "arise under" federal law where the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prod.,*

*Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005).  Contrary to Plaintiff's assertion, Mot. at 25, Defendants do not base their *Grable* removal arguments on a federal defense.  Rather, as explained below, Plaintiff's claims themselves raise affirmative "federal issue[s]" that are "actually disputed and substantial." *Grable*, 545 U.S. at 314.  Plaintiff's claims necessarily involve inherently federal issues because they attempt to supplant federal energy policy, exercise the federal foreign affairs power, and regulate Defendants' speech over matters of public concern.

### 1.   Plaintiff's Claims Attempt To Supplant Federal Energy Policy.

Congress has struck a careful balance between energy production and environmental protection by enacting federal statutes such as the Clean Air Act, 42 U.S.C. § 7401(c), and by directing the EPA to regulate Defendants' and greenhouse gas emitters' conduct consistent with its own cost-benefit analyses, *see AEP*, 564 U.S. at 426–27; Notice of Removal ("NOR") ¶¶ 137–41.  The issues of greenhouse gas emissions, global climate change, hydrologic cycle disruption, and sea level rise are not unique to the City of Hoboken, the State of New Jersey, or even the United States.  Yet the Complaint attempts to strike a new regulatory balance that would supplant decades of national energy, economic, and environmental policies on these issues by inviting a New Jersey state court to assert control over an entire industry and its interstate commercial activities, and impose massive damages and injunctive relief contrary to long-standing federal law and regulatory schemes.

In *AEP*, the Supreme Court recognized that Congress has spoken directly to the issue of greenhouse gas emissions because they "qualify as air pollution subject to regulation under the [Clean Air] Act." 564 U.S. at 424 (citing *Massachusetts v. EPA*, 549 U.S. 497, 528–29 (2007)). Because Congress has "designated an expert agency, here, EPA, as best suited to serve as primary regulator of greenhouse gas emissions," Plaintiff's claims "cannot be reconciled with the decisionmaking scheme Congress enacted." *AEP*, 564 U.S. at 428–29.

As courts recognize and common sense confirms, "regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 247 (1959) ("*San Diego Unions*"); *see also Ouellette*, 479 U.S. at 495 (recognizing that damages addressing common law environmental tort claims often force defendants to "change [their] methods of doing business and controlling pollution to avoid the threat of ongoing liability"). Plaintiff seeks to use state tort law to impose these types of *de facto* regulations of interstate conduct. This Court, therefore, would need to decide substantial and disputed questions of whether existing federal regulations or *de facto* state regulations are best suited to address issues relating to global climate change.

The answer to that question is clear: A patchwork of fifty different state-law

21

responses to this global issue would be unworkable and precluded under our federal constitutional system. "If courts across the nation were to use the vagaries" of state "public nuisance doctrine to overturn the carefully enacted rules governing air-borne emissions, it would be increasingly difficult for anyone to determine what standards govern." *North Carolina ex. rel. Cooper v. TVA*, 615 F.3d 291, 298 (4th Cir. 2010). In our federal system, a state may make law within its own borders, but no state may "impos[e] its regulatory policies on the entire Nation." *BMW of N. Am. v. Gore*, 517 U.S. 559, 585 (1996). For this reason, this action is also removable under *Grable* because the claims necessarily incorporate federal common law and, accordingly, require the "construction or effect of [federal] law." *Grable*, 545 U.S. at 313.

### 2.   Plaintiff's Claims Necessarily Interfere With Foreign Affairs.

Plaintiff's claims also necessarily incorporate federal law by seeking to regulate global climate change, which is an inherently federal matter that is the subject of major international treaties. NOR ¶¶ 24, 161, 167. In international negotiations, the United States has always sought to balance environmental policy with robust economic growth. After President Clinton signed the Kyoto Protocol in 1997, for example, the U.S. Senate expressed its 95-0 view that the United States should not be a signatory to any protocol that "would result in serious harm to the economy" or fail to regulate the emissions of developing nations. *See* S. Res. 98, 105th Cong. (1997). Congress then enacted a series of laws barring the EPA from

implementing or funding the Protocol.  *See* Pub. L. No. 105-276, 112 Stat. 2461, 2496 (1998); Pub. L. No. 106-74, 113 Stat. 1047, 1080 (1999); Pub. L. No. 106-377, 114 Stat. 1441, 1441A-41 (2000).  And President Biden recently rejoined the Paris Agreement on January 20, 2021, *see* Dick Decl. Ex. 2, which provides that government efforts to address "the threat of climate change" should occur "in the context of sustainable development" and "take into consideration" the economic "impacts of response measures."  Dick Decl. Ex. 3, art. 2, § 1; *id.* art. 4, § 15.  More broadly, the nation's climate change policy is also inextricably "infus[ed]" into its "trade policies," "foreign aid programs," "bilateral discussions and even [its] military readiness."  Dick Decl. Ex. 4.

Plaintiff seeks to replace these international negotiations and decisions from the representative branches of government with a state-law solution crafted by a state court applying New Jersey law.  Plaintiff's claims attempt to regulate extraterritorial conduct occurring in foreign nations, giving them an inherently federal component: "an issue concerned with . . . ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law." *Sabbatino*, 376 U.S. at 425; *see also* NOR ¶ 158 (citing cases).  The United States has long sought multilateral reductions in worldwide carbon emissions, using domestic emissions reductions as negotiating leverage to extract similar

commitments from other nations.  If successful, Plaintiff's claims would take away that bargaining chip, undermining the U.S. response to a global issue.

Accordingly, Plaintiff's claims necessarily raise a substantial federal question that is appropriate for federal court resolution because they implicate issues of foreign relations and require the exercise of authority that is necessarily federal in nature.  *See, e.g.*, *Marcos*, 806 F.2d at 346, 352–54 (nominally state-law claim "arises under federal law" when it "necessarily require[s] determinations that will directly and significantly affect American foreign relations"); *Torres v. S. Peru Copper Corp.*, 113 F.3d 540, 542–43 (5th Cir. 1997) ("[S]tate-law tort claims" arose under federal law because they "raise[d] substantial questions of federal common law by implicating important foreign policy concerns.").

### 3. Plaintiff's Claims Include Federal Constitutional Elements.

Even if the Court were to construe Plaintiff's claims as limited to Defendants' alleged misrepresentations, which it should not, the claims would necessarily incorporate affirmative federal constitutional elements imposed by the First Amendment.  The Supreme Court has made clear that where nominally state-law tort claims target speech on matters of public concern, the First Amendment injects affirmative federal-law elements into the plaintiff's cause of action, including factual falsity, actual malice, and proof of causation of actual damages.  *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774–76 (1986) (state common-law

standards "must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages"); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (public officials have the burden of proving with "convincing clarity" that "the statement was made with 'actual malice'"); *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) ("[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.").

These First Amendment issues are not "defenses," but rather constitutionally required elements of the claim on which the plaintiff bears the burden of proof—by clear and convincing evidence—*as a matter of federal law*. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53, 56 (1988) (extending First Amendment substantive requirements beyond the defamation context to other state-law attempts to impose liability for allegedly harmful speech); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 811 (S.D. Tex. 2005) ("First Amendment protections and the actual malice standard . . . have been expanded to reach . . . breach of contract, misrepresentation, and tortious interference with contract or business."). As a result, federal jurisdiction exists over the misrepresentational aspects of Plaintiff's claims under *Grable*: when "a court will have to construe the United States Constitution" to decide Plaintiff's claim, the claim "necessarily raise[s] a stated federal issue" under *Grable*, and federal jurisdiction is proper. *Ortiz*

*v. Univ. of Med. & Dentistry of N.J.*, 2009 WL 737046, at \*3 (D.N.J. Mar. 18, 2009).

To be sure, most state-law misrepresentation claims are not subject to removal, because they do not implicate the broader federal interests at issue in this case. As shown above, those federal interests are themselves unquestionably "substantial" under *Grable*; so is the speech that Plaintiff is trying to suppress, because it addresses a subject of national and international importance that falls within the purview of federal authority over foreign affairs and domestic economic, energy, and security policy. Moreover, Plaintiff is a public entity seeking to use the machinery of its own state courts to impose *de facto* regulations on Defendants' nationwide speech on issues of national public concern. *See supra* Section IV.C.1. But "it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *Falwell*, 485 U.S. at 56 (internal quotation marks and citation omitted). Indeed, First Amendment interests are at their apex where, as here, it is a governmental entity that seeks to use state-law claims to regulate speech on issues of "public concern." *Hepps*, 475 U.S. at 774. Given the compelling federal interests at stake here, federal courts may entertain the claims at issue in this case "without disturbing any congressionally approved balance of federal and state judicial responsibilities," making removal appropriate. *Grable*, 545 U.S. at 314.

Indeed, the freedom of speech is "most seriously implicated . . . in cases

involving disfavored speech on important political or social issues," chief among which in the contemporary context is the question of "[c]limate change," which "has staked a place at the very center of this Nation's public discourse."  *Nat'l Review, Inc. v. Mann*, 140 S. Ct. 344, 347–48 (2019) (Alito, J., dissenting from denial of certiorari) (noting recourse to a federal forum is especially warranted in suits "concern[ing] a political or social issue that arouses intense feelings," because "a plaintiff may be able to bring suit in whichever jurisdiction seems likely to have the highest percentage of jurors who are sympathetic to the plaintiff's point of view" (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984))).  Plaintiff's attempt to regulate Defendants' speech through litigation thus necessarily raises substantial First Amendment questions that belong in federal court.

### D.    The Action Is Removable Because It Is Connected to Defendants' Activities on the Outer Continental Shelf.

This Court also has jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"), which grants jurisdiction over actions "*arising out of, or in connection with . . . any operation* conducted on the [OCS] which *involves exploration, development, or production* of the minerals, of the subsoil and seabed of the [OCS], or which involves rights to such minerals."  43 U.S.C. § 1349(b)(1) (emphases added).  OCSLA was enacted "to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources."  *EP Operating Ltd. v. Placid Oil Co.*, 26 F.3d 563, 566 (5th Cir. 1994).

To promote this broad aim, Congress extended federal jurisdiction "to the entire range of legal disputes that it knew would arise relating to resource development on the [OCS]." *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985). Accordingly, the phrase "arising out of, or in connection with" is "undeniably broad in scope." *EP Operating Ltd.*, 26 F.3d at 569.

Defendants satisfy the first prong of OCSLA's jurisdictional test, because they engage in an "operation conducted on the [OCS]" that entails the "exploration" and "production" of "minerals." 43 U.S.C. § 1349(b)(1); *see, e.g.*, NOR ¶ 36. Defendants and/or their affiliates operate a large share of the "more than 5,000 active oil and gas leases on nearly 27 million OCS acres" that the U.S. Department of the Interior administers under OCSLA. NOR ¶ 35. Oil produced from the OCS accounts for approximately *30% of all domestic production*. Dick Decl. Ex. 5, at 1–4. "Between 1954 and 2016 . . . production from offshore leases totaled more than 20 billion barrels of oil" and "the federal government collected an estimated $80 billion in signature bonuses and $150 billion in royalties—not adjusted for inflation—from offshore oil and gas leases." Priest Decl. ¶ 7(1).[6]

---

[6] According to data published by the Department of Interior for the period 1947 to 1995, sixteen of the twenty largest—including the five largest—OCS operators in the Gulf of Mexico, measured by oil volume, were either a Defendant in this action, or a predecessor or one of their subsidiaries. NOR Decl. Ex. 22. And in every subsequent year, at least three of the top five OCS operators in this area have been a Defendant (or a predecessor) or one of their subsidiaries. Dick Decl. Ex. 6; *see also*

Defendants also satisfy the second prong of OCSLA's jurisdictional test, because Plaintiff's claims "aris[e] out of *or in connection with*" Defendants' operations on the OCS.  43 U.S.C. § 1349(b)(1) (emphasis added).  Indeed, Plaintiff alleges that the cumulative impact of Defendants' *global* extraction and production activities over the past several decades—which necessarily include Defendants' significant production from the OCS in compliance with federal leases—contributed to global greenhouse gas emissions that caused Plaintiff's alleged injuries.  *See, e.g.*, Compl. ¶¶ 37–41.  Notwithstanding Plaintiff's ineffective disclaimer, the Complaint does not and cannot distinguish between alleged injuries caused by fossil fuels based on the location of their extraction or production; rather, Plaintiff contends that Defendants' *cumulative* fossil fuel production activities contribute to *undifferentiated* greenhouse gas emissions that caused its alleged injuries.  *Id.* ¶ 42.

Plaintiff's assertion that "but-for" causation is required for removal under OCSLA is mistaken.  *See* Mot. at 53.  Not only is this interpretation contrary to the text of the statute, which requires only a "connection," 43 U.S.C. § 1349(b), but the case law Plaintiff cites also does not support that requirement.  To the extent courts have discussed "but-for" causation, it has been to explain that but-for causation is

---

NOR ¶ 36.  The Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates. Defendants reject Plaintiff's erroneous attributions, but describe the conduct of certain predecessors, subsidiaries, and affiliates to show that the Plaintiff's Complaint, as pleaded, should remain in federal court.

*sufficient* for jurisdiction, in the course of *rejecting* higher causation standards proposed by the plaintiffs in those cases. *See In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) (rejecting argument that more than a "'but-for' connection" is required for jurisdiction); *Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996) (declining to require more than but-for causation, because of the "broad jurisdictional grant under § 1349").

Plaintiff cites no case rejecting OCSLA jurisdiction on the ground that but-for causation is *necessary* for jurisdiction. Congress's use of the phrase "in connection with," 43 U.S.C. § 1349(b)—separate and apart from the grant of jurisdiction over claims "arising out of" OCS operations—necessarily means there is no causal requirement at all. Indeed, courts have routinely held that OCSLA jurisdiction is proper in the absence of but-for causation—for example, where the plaintiff's claims are connected to OCSLA operations in the sense that they threaten to "impair" the "recovery" of minerals from the OCS. *See, e.g.*, *EP Operating Ltd.*, 26 F.3d at 570 (applying "impaired recovery" test); *United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 407 (5th Cir. 1990) (same).

OCSLA jurisdiction is proper here under that rationale as well. Congress intended OCSLA's removal provision to cover "any dispute that alters the progress of production activities on the OCS and thus threatens to impair the total recovery of the federally-owned minerals." *EP Operating Ltd.*, 26 F.3d at 570. Plaintiff seeks

potentially billions of dollars in damages, together with an order of abatement and an order enjoining Defendants' alleged trespass, which would necessarily require enjoining their production of oil and gas. *See* Compl. at 144–45. The relief Plaintiff seeks would directly or indirectly threaten the viability of future OCSLA production by making it prohibitively costly. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992) ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief."); *San Diego Unions*, 359 U.S. at 247 (same). This would substantially interfere with OCSLA's congressionally mandated goal of obtaining the largest "total recovery of the federally-owned minerals" underlying the OCS. *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988); *see* 43 U.S.C. § 1802(1)–(2).

### E. The Action Is Removable Because It Is Connected to Defendants' Activities at the Direction of Federal Officers.

This action is also removable because officers of the federal government directed Defendants to engage in activities connected to Plaintiff's claims. *See* 28 U.S.C. § 1442(a)(1). The federal officer removal statute authorizes removal where, as here, "(1) the defendant is a 'person' within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct 'acting under' the United States, its agencies, or its officers; (3) the plaintiff's claims against the defendant are 'for, or relating to' an act under color of federal office; and (4) the defendant raises a colorable federal defense to the plaintiff's claims." *Papp v. Fore-Kast Sales Co.*,

842 F.3d 805, 812 (3d Cir. 2016) (alterations omitted) (citation omitted).

"[T]he federal officer removal statute is to be 'broadly construed' in favor of a federal forum." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia*, 790 F.3d 457, 466–67 (3d Cir. 2015) ("*Def. Ass'n of Philadelphia*"). The court must "construe the facts in the removal notice in the light most favorable to the" existence of federal jurisdiction. *Id.* at 466. "[T]he statute must be liberally construed" and, in particular, "[t]he words 'acting under' are broad." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007); *Def. Ass'n of Philadelphia*, 790 F.3d at 468. "The classic case of such assistance . . . is when the private contractor acted under a federal officer or agency because the contractors helped the Government to produce an item that it needed." *Papp*, 842 F.3d at 812 (citations and alterations omitted). When "'the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete,' that contractor is 'acting under' the authority of a federal officer." *Id.*

The facts contained in Defendants' Notice of Removal show that this case falls within the ambit of the federal officer removal statute. Defendants have "acted under" federal officers for decades by producing and supplying oil and gas under the direction and control of the U.S. government. Plaintiff's claims "relate to" these activities because the claims—based on the alleged consequences of global climate change—necessarily encompass *all* production and sales, including activity under

the direction and control of federal officers.

### 1.   Defendants "Acted Under" Federal Officers.

Defendants have established—through substantial evidence including declarations from Professors Tyler Priest and Mark Wilson, professors of history in relevant fields—that a significant portion of their oil and gas production and sales over the last century was conducted under the direction, guidance, supervision, and control of the federal government.  As Professor Wilson explains:  "Over the last 120 years, the U.S. government has relied upon the oil and gas industry to control oil supplies and expand the production of petroleum products, in order to meet military needs and enhance national security."  Wilson Decl. ¶ 1; NOR at 15–16. The "U.S. government has controlled and directed oil companies in order to secure and expand fuel supplies for its military forces and those of its allies, both in wartime and in peacetime."  Wilson Decl. ¶ 2: *see also* NOR ¶ 50.  In response to the 1973 Arab Oil Embargo, for example, the federal government considered creating a *national oil company* to facilitate the production of oil and gas on the OCS. Ultimately, however, it instead chose to use private energy companies, including many Defendants—*acting as agents*—to achieve this federal objective.  *See, e.g.*, Priest Decl. ¶¶ 7(2), 53–55; NOR ¶¶ 56–59.  "When . . . 'the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete,' that contractor is 'acting under' the authority of a federal

officer." *Papp*, 842 F.3d at 812.

Plaintiff argues that Defendants' activities do not qualify for federal officer removal because they reflect "arms-length" business arrangements.  Mot. at 45.  That is not the law.  The Supreme Court has emphasized that "[t]he words 'acting under' are broad," and are satisfied where, "in the *absence of [] contract[s] with [] private firm[s]*, the Government itself would have had to perform" such tasks.  *Watson*, 551 U.S. at 147, 154 (emphasis added).  "The Supreme Court has said, for example, that a private company acting pursuant to a contract with the federal government has this [federal officer] relationship."  *Agyin v. Razmzan*, 2021 WL 243514, at *5 (2d Cir. Jan. 26, 2021).  The Third Circuit in *Papp* called "actions Boeing took while working under a federal contract to produce an item the government needed, to wit, a military aircraft, and that the government would otherwise have been forced to produce on its own," "an archetypal case" of conduct "'acting under' the direction of a federal officer or agency," and thus "Boeing easily satisfie[d] the 'acting under' requirement."  842 F.3d at 813.  And, as this Court  recently held, a "high threshold requirement of supervision and control . . . is inconsistent with the Third Circuit's directives in *Defender* and *Papp*.  The Third Circuit . . . has *never* held that a contractor cannot have a high level of autonomy or that it must be closely supervised or controlled by the federal agency in order to invoke Officer Removal jurisdiction."  *MHA, LLC v. Amerigroup Corp.*, 2021 WL 226110, at *6 (D.N.J. Jan. 21, 2021)

(emphasis added).

Defendants' relationship with the government does not consist of mere supply arrangements to provide the government with a fungible consumer good; rather, the relationship formed out of the U.S. government's need to mobilize an entire industry to accomplish fundamental public policy objectives—objectives that benefit the nation as a whole.  Indeed, Plaintiff concedes that "unusually close and detailed . . . contractual relationship[s]" with "close supervision by the federal government" are sufficient for removal.  Mot. at 45.  In each of the examples below, Defendants "acted under" federal officers to produce and supply oil and gas for the federal government under just such close relationships, in furtherance of federal policies.

### a. Defendants Produced Oil and Gas at Federal Direction in Furtherance of Important Federal Interests.

The federal government has used Defendants and their predecessors, under contracts with detailed specifications, to fulfill a government need—producing oil and gas from federal lands to further national energy security.  It has long been the policy of the United States that fossil "fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports."  42 U.S.C. § 15927(b)(1); *see also* 83 Fed. Reg. 23295, 23296 (Final List of Critical Minerals 2018) ("[F]ossil fuels" are "indispensable to a modern society for the purposes of national security, technology, infrastructure, and energy production.").

Defendants performed these critical tasks in several ways, including by developing resources on the OCS and onshore federal lands, by operating the Elk Hills reserve, and by managing the Strategic Petroleum Reserve.

*OCS Leases.*   Removal is appropriate because Defendants, through OCS leases, have performed an important function under the direction of federal officers that the government would otherwise have had to perform—production of government-controlled resources from the OCS.   Contrary to Plaintiff's suggestion, these are not mere "arms-length" business arrangements.   Mot. at 45.   As Professor Tyler Priest explains, these OCS leases are "*not merely commercial transactions* between the federal government and the oil companies.   They reflect the creation of a valuable national security asset for the United States over time."   Priest Decl. ¶ 7(1).   The development of the OCS was a "political and policy-driven project to incorporate the OCS into the nation's public lands and manage OCS resources in the long-term interest of U.S. energy security."   *Id.*; *see also* NOR ¶¶ 62–82.

"The federal OCS program procured the services of oil and gas firms to develop urgently needed resources on federal offshore lands that the federal government was unable to do on its own."   Priest Decl. ¶ 7(1).   The federal government "had no experience or expertise," and "[t]herefore [] had little choice but to enlist the service of the oil firms who did."   *Id.* ¶ 18.   But it was the *federal government*, not the oil companies, that "dictated the terms, locations, methods and

rates of hydrocarbon production on the OCS" in order to advance federal interests and accordingly, "[t]he policies and plans of the federal OCS program did not always align with those of the oil firms interested in drilling." *Id.* ¶ 7(2); *see also* NOR ¶ 72. "Federal officials viewed these firms as agents of a larger, more long-range energy strategy to increase domestic oil and gas reserves." Priest Decl. ¶ 7(2). The federal government enlisted Defendants, as its agents, to extract the federal government's oil and gas out of the ground and supply the domestic market to serve a federal government interest. Put differently, the federal government controls substantial amounts of oil and gas that are contained in the OCS. The government could either extract and sell (or use) the oil and gas itself or hire third parties to perform that task on its behalf. Since the federal government had "no experience or expertise," it chose the second option. This is the definition of "acting under": "[I]n the absence of [] contract[s] with [] private firm[s], the Government itself would have had to" extract and produce oil and gas from the OCS. *Watson*, 551 U.S. at 147, 154.

In 1953, Congress passed OCSLA for the express purpose of making oil and gas on the OCS "available for expeditious and orderly development" in keeping with "national needs." 43 U.S.C. § 1332(3). The initial regulations "went well beyond those that governed the average federally regulated entity at that time." Priest Decl. ¶ 19. As Professor Priest explains, "An OCS lease was a contractual obligation on the part of lessees to ensure that all operations *'conform to sound conservation*

*practice'* . . . and *effect the 'maximum economic recovery'* of the natural resources on the OCS." *Id.* (citing 19 Fed. Reg. § 250.11, 2656) (emphasis added); NOR ¶¶ 72–73. And the federal government retained the power to "direct how oil and gas resources would be extracted and sold from the OCS." Priest Decl. ¶ 20.

Professor Priest further explains that federal officials in the Department of Interior—who the Code of Federal Regulations called "supervisors"—exerted substantial control and oversight over Defendants' operations on the OCS from the earliest OCS exploration. *Id.* ¶ 19. Federal supervisors had complete authority to control and dictate the "rate of production from OCS wells," *id.* ¶ 26; NOR ¶ 73, and had authority to suspend operations in certain situations, Priest Decl. ¶ 20; NOR ¶ 78. And the supervisors also "had the final say over methods of measuring production and computing royalties," which was based on "the estimated reasonable value of the product as determined by the supervisor." Priest Decl. ¶ 20 (internal quotation marks omitted). As Professor Priest explains, these federal officials "did not engage in perfunctory, run-of-the-mill permitting and inspection." *Id.* ¶ 22. Rather, they "provided direction to lessees regarding when and where they drilled, and at what price, in order to protect the correlative rights of the federal government as the resource owner and trustee" of federal lands. *Id.* ¶ 28.

In addition, the federal government exerted substantial control by issuing highly specific and technical orders, known as "OCS Orders," which, among other

things: "specified how wells, platforms, and other fixed structures should be marked"; "dictated the minimum depth and methods for cementing well conduct casing in place"; "prescribed the minimum plugging and abandonment procedures for all wells"; and "required the installation of subsurface safety devices on all OCS wells." *Id.* ¶ 24. Professor Priest observes that through these OCS Orders, federal officials "exercised active control on the federal OCS over the drilling of wells, the production of hydrocarbons, and the provision of safety." *Id.* ¶ 25.

Federal officials have repeatedly recognized the importance of OCS development to support the nation's need for energy. In response to the 1973 OPEC oil embargo, President Nixon "called for a national effort . . . to develop the 'potential to meet our own energy needs without depending on any foreign energy sources' by 1980." *Id.* ¶ 50. Congress mandated "expedited exploration and development of the [OCS] in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments," including by "mak[ing] such resources available to meet the Nation's energy needs as rapidly as possible." 43 U.S.C. § 1802(1)–(2); *see also California ex rel. Brown v. Watt*, 668 F.2d 1290, 1297–98 (D.C. Cir. 1981).

Multiple proposals in Congress around this time sought to address the nation's oil and gas needs by creating a national oil company. *See* NOR ¶ 63; NOR Decl. Ex. 9; Priest Decl. ¶¶ 52–53; 121 Cong. Rec. 4490 (daily ed. Feb. 26, 1975); Dick

Decl. Ex. 7.  One proposal, for example, "would have formally established a 'Federal Oil and Gas Corporation.'"  Priest Decl. ¶ 53 (internal quotation marks omitted).  As Professor Priest explains:  This corporation, "'Fogco,' was to be 'owned by the federal government' and 'in case of any shortage of natural gas or oil and serious public hardship, could itself engage in production on Federal lands in sufficient quantities to mitigate such shortage and hardship.'"  *Id.*  These proposals were ultimately rejected in favor of an arrangement by which the government would contract with private energy companies, including Defendants, to perform these essential tasks on its behalf with expanded federal supervision and control.  *See* Priest Decl. ¶ 55.  The legislative history thus confirms that the federal government uses OCS lessees to meet a "basic governmental task." *County of San Mateo v. Chevron Corp.*, 960 F.3d 586, 599 (9th Cir. 2020).  Rather than forming a national oil company to implement Congress's mandate to exploit these national resources, the government opted to use private parties under the direction of federal officers to provide for the country's economic and national security.  The importance of the OCS to domestic energy security and economic prosperity has continued to the present, across every administration.  *See* Priest Decl. ¶ 79.  For example, in 2010 President Obama announced "the expansion of offshore oil and gas exploration" because "our dependence on foreign oil threatens our economy." *Id.* ¶ 78.

   ***BLM Leases.***  In addition to leases on the OCS, the Department of the

Interior's Bureau of Land Management ("BLM") onshore leases similarly direct and control Defendants' production activities. NOR ¶¶ 74–82. For example, the BLM leases provide that the United States "reserves the right to specify rates of development and production in the public interest." NOR ¶ 74. BLM may also unilaterally suspend onshore operations. 30 U.S.C. § 226(i); 43 C.F.R. § 3103.4-4.[7]

*Operation of the Elk Hills Reserve.* The analysis above applies equally to Chevron predecessor Standard Oil of California's operation of the federal government's National Petroleum Reserve No. 1 in Elk Hills, which it did for decades in the employ of the Navy. "Congressional intent was to retain the oil [at the Reserve] in the ground except when it was needed for national defense or to avoid damage to the field and the irretrievable loss of oil." NOR ¶ 84. In other words, Congress's policy objective was to take steps necessary to maintain and preserve the fields exclusively for federal strategic purposes, and the government used Standard Oil to accomplish these objectives. *Id.*

Plaintiff relies on other court decisions that concluded that the Unit Production Contract ("UPC") between Standard Oil and the Navy, *standing alone*, did not

---

[7] Onshore leases constitute a significant portion of U.S. oil and gas production. "Oil and gas produced from the Federal and Tribal mineral estate are significant parts of the nation's energy mix. For fiscal year (FY) 2018, sales of oil, gas, and natural gas liquids produced from the Federal and Tribal mineral estate accounted for approximately 8 percent of all oil, 9 percent of all natural gas, and 6 percent of all natural gas liquids produced in the United States." Dick Decl. Ex. 8.

provide sufficient evidence that Chevron or its predecessor "acted under" federal officers.  Mot. at 46–48.  Here, however, Defendants have provided new factual support demonstrating that the Navy separately hired Standard Oil to *operate* the field on its behalf for 31 years and that Standard Oil was "in the employ" of the Navy during this period.  NOR ¶ 95.  This evidentiary record establishes that the relationship between Defendants and the Navy was far more than the "arms-length business arrangement" claimed by Plaintiff.  Mot. at 47 (citations omitted).  Indeed, there is no dispute that, consistent with Congressional policy objectives, Standard Oil operated and maintained the Reserve for the Navy.  Nor can there be any dispute that those efforts paid off—indeed, the Reserve was ready and produced up to 65,000 barrels per day in 1945 "to address fuels shortages and World War II military needs."  NOR ¶ 94.  And when the country faced an energy shortage in 1974, the government once again directed Chevron to produce 400,000 barrels per day.  NOR ¶ 95.

Although the UPC gave the Navy the right to operate the field as between the two co-owners, it had to decide whether it wanted to produce oil on its own or hire a contractor for the job.  "***The Navy chose to operate the reserve through a contractor rather than with its own personnel***."  Dick Decl. Ex. 9, at 15 (emphasis added).  Standard Oil "was awarded the contract, and continued to operate NPR-1 [for the Navy] for the next 31 years."  *Id.*  This evidence was not before the courts of appeals that previously reviewed remand orders in climate change cases.

42

Declassified documents, which were also not before those courts, demonstrate that a "substantial increase in production at the earliest possible date was urgently requested by the Joint Chiefs of Staff to meet the critical need for petroleum on the West Coast to supply the armed forces in the Pacific theatre," and that Standard Oil was "chosen as operator because it was the only large company capable of furnishing the facilities for such a development program."  NOR Decl. Ex. 8, at 1.

Standard Oil's operation and production of Elk Hills for the Navy were subject to substantial supervision by Navy officers.  NOR ¶¶ 86–93.  The Operating Agreement between the Navy and Standard Oil provided that "OPERATOR [Standard Oil] is *in the employ of the Navy Department* and is *responsible to the Secretary thereof*."  *See* NOR Decl. Ex. 27, at 3 (emphases added).  Naval officers directed Standard Oil to conduct operations to further national policy.  For example, in November 1974, the Navy directed Standard Oil to determine whether it was possible to produce 400,000 barrels per day to meet the unfolding energy crisis, advising Standard Oil that "*you are in the employ of the Navy* and *have been tasked with performing a function which is within the exclusive control of the Secretary of the Navy*."  Dick Decl. Ex. 10 (emphases added).

Standard Oil's operation of Elk Hills at the Navy's direction is quintessential "acting under" activity.  It was "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."  *Watson*, 551 U.S. at 152.  Standard Oil operated Elk

Hills for decades "in the employ of," and under the "subjection, guidance, or control" of the Navy, a paradigmatic example of the "unusually close [relationship] involving detailed regulation, monitoring, or supervision." *Id.* at 151, 153.

***Strategic Petroleum Reserve.*** In further response to the 1970s oil embargoes, Congress created the Strategic Petroleum Reserve to reduce the impact of any disruptions in oil supply. NOR ¶ 101. Defendants "acted under" federal officers by supplying federally owned oil for and managing the Strategic Petroleum Reserve for the government. From 1999 to 2009, "the Strategic Petroleum Reserve received 162 million barrels of crude oil through the [royalty-in-kind ('RIK')] program" valued at over $6 billion. NOR ¶ 102; Dick Decl. Ex. 11, at 18, 39 tbl. 13. The government also contracted with Defendants to assist in the physical delivery of these RIK payments to the Strategic Petroleum Reserve. NOR ¶ 103; Dick Decl. Ex. 12, at 19.

The Strategic Petroleum Reserve subjects Defendants to the federal government's supervision and control, including in the event that the President calls for an emergency drawdown, under which the reserve oil can be used to address national crises. NOR ¶ 105; *see* Dick Decl. Ex. 13, at 16, 34. The United States exercised this emergency control to draw down the reserve in response to Hurricane Katrina in 2005 and disruptions to oil supply in Libya in 2011. NOR ¶ 105 & n.154; Dick Decl. Ex. 13. The hundreds of millions of barrels of oil flowing through these facilities were subject to federal control and supervision, and Defendants engaged in

"an effort to assist, or to help carry out," the federal government in ensuring energy security. *Watson*, 551 U.S. at 152; *Papp*, 842 F.3d at 812.

> **b.** **Defendants Have Acted Under Federal Officers to Produce and Supply Specialized Fuels for the Military.**

The United States Department of Defense ("DOD") is the single largest consumer of energy in the United States and one of the world's largest consumers of petroleum fuels. *See* Dick Decl. Ex. 14. As two former Chairmen of the Joint Chiefs of Staff explained, the "history of the Federal Government's control and direction of the production and sale of gasoline and diesel to ensure that the military is 'deployment-ready'" spans "more than a century," and during their tenure, petroleum products were "crucial to the success of the armed forces." Dick Decl. Ex. 15, at 2–3 (Amici Curiae Brief of General (Retired) Richard B. Myers and Admiral (Retired) Michael G. Mullen, in Support of Petitioners, *BP p.l.c. v. Mayor and City Council of Baltimore*, No. 19-1189 (U.S. Nov. 23, 2020)). "Because armed forces have used petroleum-based fuels since the 1910s, oil companies have been essential military contractors, throughout the last century." Wilson Decl. ¶ 2.

Many of the Defendants have acted under federal officers for decades, including by producing and supplying oil and gas during World War II at the direction of the Petroleum Administration for War ("PAW"), supplying petroleum to the federal government under directives issued pursuant to the Defense Production Act of 1950, Pub. L. No. 81-774, 64 Stat. 798 ("DPA"), and producing and supplying

large quantities of specialized jet fuel for the U.S. military.  *See* NOR ¶¶ 48–60.

Much of this evidence, including the government's control of the oil and gas industry

during World War II and the Korean War, the provisions of specialized fuels for the

government, and the declaration of Professor Wilson, was not presented to or

considered by the courts that issued previous decisions in climate change cases.

***Defendants Acted Under Federal Officers During World War II and the***

***Korean War***.  During World War II, the United States pursued full production of its

oil reserves and created agencies to *control* the petroleum industry, including

Defendants' predecessors and affiliates.   It built refineries and directed the

production of certain products, and it managed scarce resources for the war effort.

As Senator O'Mahoney, Chairman of the Special Committee Investigating

Petroleum Resources, put it in 1945, "No one who knows even the slightest bit about

what the petroleum industry contributed to the war can fail to understand that it was,

without the slightest doubt, one of the most effective *arms* of this Government . . .

in bringing about a victory."  Dick Decl. Ex. 16 (emphasis added).

Multiple courts have found that the federal government exerted extraordinary

control over Defendants during World War II and the Korean War to guarantee the

supply of oil and gas for wartime efforts, such as high-octane avgas.  "Because avgas

was critical to the war effort, the United States government exercised significant

control over the means of its production during World War II."  *United States v.*

*Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002); NOR ¶ 107.  Put simply, "[t]he government [] used [its] authority to control many aspects of the refining process and operations."  *Exxon Mobil Corp. v. United States*, 2020 WL 5573048, at *14 (S.D. Tex. Sept. 16, 2020) *appeal docketed*, No. 20-20590 (5th Cir. Nov. 13, 2020).[8]

These cases highlight the nature and extent of the control exerted by the federal government through agencies such as the PAW, which directed construction of new oil exploration and manufacturing facilities and allocation of raw materials, issued production orders, entered into contracts giving extraordinary control to federal officers, and "programmed operations to meet new demands, changed conditions, and emergencies."  *See* NOR ¶ 107; *Shell Oil Co. v. United States*, 751 F.3d 1282, 1286 (Fed. Cir. 2014) ("PAW told the refiners what to make, how much of it to make, and what quality."); *Exxon Mobil*, 2020 WL 5573048, at *11 (rejecting argument that private refiners "voluntarily cooperated"; instead finding they had "no choice" but to comply with the federal officers' direction).[9]

---

[8]  Defendants also acted under federal officers in constructing and operating the Inch Lines "under contracts" and "as agent" for the federal government, bringing hundreds of millions of barrels of crude oil and refined products for use and combustion on the cross-Atlantic fronts during the war.  *Schmitt v. War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949); *see* NOR ¶¶ 112–16.  Plaintiff asserts that this conduct predates 1965, Mot. at 42, but the Complaint encompasses the Defendants' alleged cumulative, global emissions. *See, e.g.*, Compl. ¶¶ 41–42.

[9]  It is irrelevant that the *Exxon Mobil* court elsewhere held that the federal government was not an "operator" of ExxonMobil's refineries under CERCLA.  CERCLA's "operator" standard demands a significantly tighter nexus to waste

The government dictated where and how to drill, rationed essential materials, and set statewide minimum levels for production.  Dick Decl. Ex. 17, at 28, 171, 177–79, 184 & n.18.  As Professor Wilson explains:  "PAW instructed the oil industry about exactly which products to produce, how to produce them, and where to deliver them."  Wilson Decl. ¶ 11.  Professor Wilson establishes that "[s]ome directives restricted the use of certain petroleum products for high-priority war programs; others dictated the blends of products; while others focused on specific pieces of the industry, such as the use of individual pipelines."  *Id.*  PAW's directives to Defendants were mandatory and were enforceable by law.  PAW's message to the oil and gas industry was clear: the government would "get the results" it desired, and if "we can't get them by cooperation, then we will have to get them some other way."  NOR Decl. Ex. 59, at 8.  PAW also maintained "disciplinary measures" for noncompliance, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance."  NOR Decl. Ex. 55.  In sum, the federal government deployed an array of coercive actions, threats, and sanctions to ensure

---

disposal activity than the federal officer removal statute.  *Compare United States v. Bestfoods*, 524 U.S. 51, 66–67 (1998) (an "operator" must "manage, direct, or conduct operations *specifically related* to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations" (emphasis added)), *with Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020) (en banc) ("[A]ny civil action that is *connected or associated with* an act under color of federal office may be removed." (emphasis added)).  Further, Plaintiff's claims here relate to the product produced at the facilities, not to how the contractor disposed of waste at the facility in question.

Defendants assented to PAW's directives.  Controlling production of petroleum products by setting production levels, dictating where and how to explore for petroleum, micromanaging operations, and rationing materials in order to help conduct a war are not the stuff of mere "regulation."  They are instead the kind of special relationship described in *Watson* and *Papp*.

Defendants also acted under the federal government by operating and managing government-owned and/or government-funded petroleum production facilities.  During World War II, the government built "dozens of large government-owned industrial plants" that were "*managed by private companies under government direction*."  Wilson Decl. ¶ 14 (emphasis added).  "The U.S. government enlisted oil companies to operate government-owned industrial equipment . . . [in order] to comply with government orders."  *Id.* ¶ 15.  These "oil companies were not merely top World War II prime contractors, but also served as government-designated operators of government-owned industrial facilities" or government-owned equipment within industrial facilities.  *Id.* ¶ 19.  Among the largest facilities was a refinery site in Richmond, California, operated by Socal (a Chevron predecessor), which was "the second-largest of all the facilities focused on aviation gasoline production, providing 10 percent of total global output of aviation fuel" by 1945.  *Id.*  Several other Defendants or their predecessors operated similar production equipment and facilities for the government.  *Id.* ¶ 20.

Defendants further acted under federal officers as contractors to build plants and manufacture war products for the Allied effort.  For example, "[o]n January 22, 1942, Shell entered into a contract with the United States on behalf of the Army Ordnance Department for the purchase of 20 million to 25 million gallons of nitration grade toluene over a two year period.  The contract provided that Shell would construct a toluene plant at Shell['s] Wilmington, California refinery and that the Government would advance 30% of the contract price or $2,040,000 for construction of the plant. . . .  Shell completed a toluene plant in 1943 and produced toluene for the remainder of the war" "to manufacture TNT" and later "as a blending agent" to make "avgas."  Dick Decl. Ex. 18; *see also* Wilson Decl. ¶ 23.

At the advent of the Korean War in 1950, President Truman established the Petroleum Administration for Defense ("PAD") under authority of the DPA.  PAD issued production orders to Defendants and other oil and gas companies, including to ensure adequate quantities of avgas for military use.  *See* NOR ¶¶ 117–18; *see also Exxon Mobil*, 2020 WL 5573048, at *15 (detailing government's use of DPA "to force" petroleum industry to "increase their production of wartime . . . petroleum products").  As Professor Wilson explains, the DPA "gave the U.S. government broad powers to direct industry for national security purposes," and "PAD directed oil companies to expand production during the Korean War, for example, by calling on the industry to drill 80,000 wells inside the United States, and more than 10,000

more wells abroad, in 1952." Wilson Decl. ¶ 28; NOR ¶¶ 117–18.

*Defendants Have Continued to Produce and Supply Large Quantities of Specialized Fuel Under Military Direction.* To this day, Defendants continue to produce and supply large quantities of highly specialized fuels that are required to conform to exact DOD specifications to meet the unique operational needs of the U.S. military. Professor Wilson explains that "[b]y 2010, the U.S. military remained the world's biggest single purchaser and consumer of petroleum products" and, "[a]s it had for decades, the military continued to rely on oil companies to supply it under contract with specialty fuels, such as JP-5 jet aviation fuel and other jet fuels, F-76 marine diesel, and Navy Special Fuel." Wilson Decl. ¶ 40. "[I]n the absence of . . . [these] contract[s] with [the Defendants], the Government itself would have had to perform" these essential tasks to meet the critical DOD fuel demands. *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 942 (7th Cir. 2020) (quoting *Watson*, 551 U.S. at 154).

For example, during the Cold War, Shell Oil Company developed and produced specialized jet fuel to meet the unique performance requirements of the U-2 spy plane and later the OXCART and SR-71 Blackbird programs. NOR ¶ 119. For the U-2, Shell Oil Company produced fuel known as JP-7, which required special processes and a high boiling point to ensure the fuel could perform at very high altitudes and speeds. "The Government stated that the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the

technological challenge. . . . A new fuel and a chemical lubricant had to be developed to meet the temperature requirements."  NOR Decl. Ex. 39, at 24.  For OXCART, Shell Oil Company produced millions of gallons of specialized fuel under contracts with specific testing and inspection requirements.  NOR Decl. Exs. 41–49.

Similarly, BP entities contracted with the Defense Logistics Agency ("DLA") to provide approximately 1.5 billion gallons of specialized military fuels for the DOD's use in *the past four years alone*.  Dick Decl. Ex. 19, at 5.  Since 2016, BP entities entered into approximately 25 contracts to supply various military-specific fuels, such as JP-5, JP-8, and F-76, together with fuels containing specialized additives, including fuel system icing inhibitor ("FSII"), corrosion inhibitor/lubricity improver ("CI/LI") and, for F-76 fuels, lubricity improver ("LIA").  *Id.*  Such additives are essential to support the high performance of the military engines they fueled.  FSII is required to prevent freezing caused by the fuels' natural water content when military jets operate at ultra-high altitudes, potentially leading to engine flameout, while CI/LI and LIA are used to avoid engine seizures and to ensure fuel handling system integrity when military fuels are stored for long periods, as on aircraft carriers.  NOR Decl. Ex. 66; Dick Decl. Ex. 20; NOR ¶¶ 120–29.  DOD specifications also required BP entities to conform the fuels to other specific chemical and physical requirements, such as enumerated ranges for conductivity, heat of combustion, and thermal stability, all of which are essential and unique to

performance of the military function. Dick Decl. Exs. 21–29.

As another example, from at least 2010-2013, Shell Oil Company or its affiliates entered into billion-dollar contracts with DLA to supply specialized JP-5 and JP-8 military jet fuel, tens of millions of gallons of which were destined for use at Joint Base McGuire-Dix-Lakehurst in New Jersey.  *See* Dick Decl. Exs. 30–33; ECF 1-61, NOR Decl. Ex. 60 at 8–14, 39–43; Dick Decl. Ex. 34–36.[10]  The DOD's detailed specifications for the makeup of the military jet fuels require that they "shall be refined hydrocarbon distillate fuel oils" made from "crude oils" with special additives.  *See* NOR Decl. Ex. 50, at 5, 7, 10; Dick Decl. Ex. 37.  Those requirements and "the compulsion to provide the product to the government's specifications," demonstrate the necessary "acted under" special relationship between Defendants and the government.  *Baker*, 962 F.3d at 943 (quoting *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998)); *see* NOR ¶¶ 120–129.  These unique jet fuels are designed for military use and thus fall into the category of specialized military products that support federal officer jurisdiction.  *See Watson*, 551 U.S. at

---

[10]  Given that Plaintiff's claims encompass *all* of Defendants' production and sales activities and its alleged injuries arise from *global* climate change, Plaintiff necessarily complains about the federal government's emissions from jet fuel supplied by Defendants on U.S. military bases, and thus federal enclave jurisdiction supports removal.  *See Manning v. Gold Belt Falcon, LLC*, 681 F. Supp. 2d 574, 576 (D.N.J. 2010) ("Fort Dix falls under the definition of a federal enclave[.]"); *Jones v. John Crane-Houdaille, Inc.*, 2012 WL 1197391, at *1 (D. Md. Apr. 6, 2012) ("A suit based on events occurring in a federal enclave . . . implicates federal question jurisdiction under § 1331."); NOR ¶¶ 178–82.

154 ("providing the Government with a product that it used to help conduct a war" supports removal) (citing *Winters*, 149 F.3d 387); *Baker*, 962 F.3d at 943.

Each of the above examples demonstrates that Defendants have produced oil and gas at the direction of the federal government.  Any one of those examples would be sufficient to support removal under the statute, and each demonstrates the strong federal interest in oil production, which Plaintiff now seeks to disrupt.

## 2.  Plaintiff's Claims Are "For or Relating To" Defendants' Acts Under Federal Officers.

Plaintiff's claims, which seek to impose liability for the "extraction, production, and sale" of oil and gas, necessarily relate to Defendants' acts under federal officers.  The "hurdle erected by [the connection] requirement is quite low." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008).  When Congress inserted the words "or relating to" into the Removal Clarification Act of 2011, it "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Latiolais*, 951 F.3d at 292.  In fact, Plaintiff concedes that, to satisfy this prong, there need only be "a 'connection' or 'association' between the act in question and the federal office."  Mot. at 37 (citing *Def. Ass'n of Philadelphia*, 790 F.3d at 471).  As this Court recently explained, Defendants need not establish "a causal nexus between the wrongdoing alleged in the complaint and . . . acti[ons] at the direction of a federal authority.  . . . [A]fter the 2011 statutory amendments . . . acts need not be at [the]

behest of [a] federal agency to justify Officer Removal jurisdiction." *MHA*, 2021 WL 226110, at *7 (citing *Papp*, 842 F.3d at 813).

Plaintiff argues that "none of the wrongful acts described in the Complaint were taken in 'connection' or 'association' with the federal offices identified by Defendants." Mot. at 37. But Plaintiff's broad allegations encompass *all* of the production activities undertaken by Defendants, and rely on Defendants' *production* and *sales* activities to seek massive damages resulting from these activities. *E.g.*, Compl. ¶¶ 2–3, 7, 14, 18–22, 58–59. Thus, the production and sales activities Defendants conducted at the direction of federal officers necessarily relate to or are connected with Plaintiff's claims.

The federal government's policy choices to produce significant amounts of oil and gas to fulfill national interests, and its direct supervision of Defendants' activities to advance those goals, go to the core of Plaintiff's claims, which fundamentally rest upon the alleged impacts caused by the *cumulative production* of petroleum products—including those products produced under the direction and supervision of the federal government. Compl. ¶ 31. Plaintiff responds that its claims are limited to Defendants' alleged "disinformation campaign." Mot. at 39.[11]

---

[11]  Plaintiff relies heavily on opinions from other courts finding a lack of a causal connection, Mot. at 39, but this Court is not bound by those decisions. Nor are they persuasive because, as demonstrated above, Defendants have provided substantial additional evidence that they acted under government direction and control.

That argument fails because a federal court must "credit [the defendant's] theory of the case" in assessing the applicability of the federal officer removal statute. *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 432 (1999); *accord Def. Ass'n of Philadelphia*, 790 F.3d at 471, 474 ("[W]e must accept the [defendant's] theory of the case at this juncture.").

Thus, the allegations of the notice of removal are controlling for jurisdictional purposes, and they establish that Plaintiff's claims are connected to Defendants' federally controlled activities. NOR ¶¶ 42–133. Plaintiff's contrary position should be recognized for what it is: an attempt to evade the jurisdiction of the federal courts. Plaintiff's claims rise and fall on a chain of causation linking *all* of Defendants' production and sale of oil to global climate change and the alleged resulting harms for which Plaintiff seeks relief. *See supra* Section IV.A. Plaintiff's misinformation allegations, even if credited, only underscore the connection—Plaintiff alleges *that misinformation maintained or increased production and consumption of oil and gas*, but some of that allegedly injurious production occurred at the direction of the federal government in furtherance of federal objectives. This satisfies the "low" nexus requirement for federal officer removal. *See Papp*, 842 F.3d at 813 (there need only be "a connection or association between the act in question and the federal office"); *Def. Ass'n of Philadelphia*, 790 F.3d at 474 (holding same).

Plaintiff's attempt to minimize Defendants' production activities conducted

at the direction of the U.S. government, calling them "an unknown but at most inconsequential percentage of Defendants' total production and sale of fossil fuels," Mot. at 39–40, is not only unfounded, it is also inconsistent with Plaintiff's actual allegations in its Complaint.  Even a "small, yet *significant*, portion of [Defendants'] relevant conduct" would be sufficient to support federal officer removal.  *Baker*, 962 F.3d at 945.  In any event, Defendants' activities under federal officers are far from inconsequential.   As explained above, production from the OCS alone—where Defendants are some of the largest producers—constitutes approximately *30% of all U.S. oil and gas production*.  NOR ¶ 67; Dick Decl. Ex. 5; *see also* NOR ¶¶ 74–82 (describing onshore leasing and production activities at the direction of federal officers).  During World War II, "[a]lmost seven billion barrels of [oil] had to be brought from the ground between December 1941 and August 1945. . . . That is *one-fifth of all the oil that had been produced in this country since the birth of the industry in 1859*."  Dick Decl. Ex. 17, at 1.  And the DOD has been, and continues to be, one of the largest consumers of oil in the world.  Defendants have continued supplying fuels required by the military, including BP entities' contracts to provide approximately 1.5 billion gallons of specialized military fuels in just the past four years alone.

Although Plaintiff attempts to disclaim injuries arising "on federal property" or from "Defendants' provision of fossil fuel products to the federal government,"

Compl. ¶ 222 n.202, "courts have found that neither a plaintiff's disclaimer nor its characterization of his claims is determinative." *Reaser v. Allis Chambers Corp.*, 2008 WL 8911521, at *6 (C.D. Cal. June 23, 2008). All a defendant must show is that the elements of the federal officer removal statute are satisfied. *Ballenger v. Agco Corp.*, 2007 WL 1813821, at *1 n.2, *4 (N.D. Cal. June 22, 2007) ("[T]hat Plaintiff's complaint expressly disavows any federal claims is not determinative. Rather, removal is proper under the federal officer removal statute [if the statutory elements are met]." (citations omitted)). Defendants here satisfy all four elements.

### 3.   Defendants Raise "Colorable Federal Defenses."

Finally, because Defendants acted under federal officers to implement the government's policies and decisions to promote the production of oil and gas, they have several "colorable federal defenses," *which Plaintiff does not dispute*. *See* Mot. at 35–49. The defenses include the government contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500, 512–13 (1988); *Gertz v. Boeing Co.*, 654 F.3d 852, 860–66 (9th Cir. 2011); preemption, *see Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1249 (9th Cir. 2017); and federal immunity, *see Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166–68 (2016). Plaintiff's claims are also barred by the Interstate and Foreign Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and Due Process Clauses, *id.* amends. V & XIV, § 1, and the foreign affairs doctrine, *see Pink*, 315 U.S. at 230–31. These and other

58

federal defenses are more than colorable, and a defendant invoking § 1442(a)(1) "need not win his case before he can have it removed." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *Papp*, 842 F.3 at 815.

### F.   This Court Has Jurisdiction Under CAFA

Alternatively, this Court has original jurisdiction over this case under CAFA, as Plaintiff brings this action on behalf of a class of Hoboken "consumers" under New Jersey's Consumer Fraud Act ("CFA"), N.J. Stat. §§ 56:8-1, *et seq.*, *see* Compl. ¶¶ 173–193, 350–66, and further on behalf of a class of Hoboken "residents," *see, e.g.*, *id.* ¶¶ 231, 260–61, 263, 281–82 (describing injuries to Hoboken *residents* that would be avoided by abatement of the alleged nuisance and/or trespass).

Plaintiff erroneously claims that CAFA does not apply because it is not seeking relief "for anyone other than itself."  Mot. at 56.  Plaintiff seeks "entry of an Order compelling Defendants to abate the nuisance alleged herein and to pay the costs of abatement" and "entry of an Order preliminarily and permanently enjoining Defendants from engaging in future acts of trespass."  Compl. at 144–45, Prayer for Relief.   Plaintiff cannot—and does not—claim that the relief it seeks would exclusively, or even primarily, benefit Plaintiff as opposed to Hoboken residents, businesses, and consumers.  In fact, Plaintiff asserts that it "brings this action . . . to protect . . . the property of the residents and businesses of [Hoboken]."  Compl. ¶ 17. The relief sought is based in part on "loss suffered by the City *and its residents*," *id.*

¶ 366, unlike *City of Charleston v. West Virginia-American Water Co.*, 2016 WL 3460439, at \*4 (S.D. W. Va. June 21, 2016), where the plaintiff sought relief *only* for itself, and only referenced injuries incurred only by residents insofar as they "relate[d] to the government entities' tax revenue" and the area's "reputation."[12]

Similarly, Plaintiff's assertion that "[u]nder Defendants' theory *every* claim brought by a municipality in state court would automatically confer federal jurisdiction, so long as more than a hundred people lived there" is unfounded. *See* Mot. at 59. Plaintiff chose to bring this suit in the nature of a class action, seeking relief on behalf of residents and consumers. *See id.* at 7, 9, 43, 58. Plaintiff cannot avail itself of the benefits of a class action-like statute while abjuring the jurisdictional implications Plaintiff dislikes.

## V.   CONCLUSION

For the foregoing reasons, and those set forth in Defendants' Notice of Removal, the Court should deny Plaintiff's Motion to Remand. Defendants respectfully submit that it would be most efficient for this Court to await guidance from the Supreme Court before ruling on Plaintiff's Motion.

---

[12] Plaintiff also incorrectly asserts that Defendants have not identified any "State statute or rule of judicial procedure [similar to Federal Rule of Civil Procedure 23] authorizing an action to be brought by 1 or more representative persons as a class action." Mot. at 57–58. But the New Jersey Supreme Court has deemed suits brought under New Jersey's CFA as being "in the nature of a class action." *See* NOR ¶ 190; *Kugler v. Romain*, 58 N.J. 522, 538–39 (1971).

Respectfully submitted,

Dated: January 29, 2021
Florham Park, New Jersey

By: */s/ Paul J. Fishman*
Paul J. Fishman

ARNOLD & PORTER KAYE
SCHOLER LLP
Paul J. Fishman
  paul.fishman@arnoldporter.com
One Gateway Center
Newark, NJ  07102-5310
Telephone: (973) 776-1901
Facsimile: (973) 776-1919

Nancy Milburn, *pro hac vice*
  nancy.milburn@arnoldporter.com
Diana Reiter, *pro hac vice*
  diana.reiter@arnoldporter.com
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

Matthew T. Heartney, *pro hac vice*
  matthew.heartney@arnoldporter.com
John D. Lombardo, *pro hac vice*
  john.lombardo@arnoldporter.com
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone: (213) 243-4000
Facsimile: (213) 243-4199

Jonathan W. Hughes, *pro hac vice*
  jonathan.hughes@arnoldporter.com
Three Embarcadero Center, 10th Floor

By: */s/ Herbert J. Stern*
    Herbert J. Stern

STERN, KILCULLEN & RUFOLO,
LLC
Herbert J. Stern
  hstern@sgklaw.com
Joel M. Silverstein
  jsilverstein@sgklaw.com
325 Columbia Turnpike, Suite 110
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

GIBSON, DUNN & CRUTCHER LLP
Theodore J. Boutrous, Jr., *pro hac vice*
  tboutrous@gibsondunn.com
William E. Thomson, *pro hac vice*
  wthomson@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

Andrea E. Neuman, *pro hac vice*
  aneuman@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

Thomas G. Hungar, *pro hac vice*
  thungar@gibsondunn.com
1050 Connecticut Avenue, N.W.,
Washington, DC 20036
Telephone: 202.955.8500

61

San Francisco, CA 94111-4024
Telephone: (415) 471-3156
Facsimile: (415) 471-3400

*Attorneys for Defendants*
*BP plc and BP America Inc.*


By: */s/ Kevin H. Marino*
Kevin H. Marino

MARINO, TORTORELLA & BOYLE,
P.C.
Kevin H. Marino
  kmarino@khmarino.com
John D. Tortorella
  jtortorella@khmarino.com
437 Southern Boulevard
Chatham, NJ 07928
Tel: (973) 824-9300
Fax: (973) 824-8425

PAUL, WEISS, RIFKIND,
WHARTON
& GARRISON LLP
Theodore V. Wells, Jr., *pro hac vice*
  twells@paulweiss.com
Daniel J. Toal, *pro hac vice*
  dtoal@paulweiss.com
Yahonnes Cleary, *pro hac vice*
  ycleary@paulweiss.com
Caitlin E. Grusaukas, *pro hac vice*
  cgrusaukas@paulweiss.com
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
Fax: (212) 757-3990

*Attorneys for Defendants Exxon Mobil*
*Corp. and ExxonMobil Oil Corp.*

Facsimile: 202.467.0539

Joshua D. Dick, *pro hac vice*
  jdick@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.374.8451

SUSMAN GODFREY L.L.P
Erica W. Harris, *pro hac vice*
  eharris@susmangodfrey.com
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

*Attorneys for Defendants*
*Chevron Corp and Chevron U.S.A. Inc.*


By: */s/ Anthony J. Zarillo, Jr.*
Anthony J. Zarillo, Jr.

RIKER DANZIG SCHERER
HYLAND & PERRETTI LLP
Anthony J. Zarillo, Jr.
  azarillo@riker.com
Jeffrey M. Beyer
  jbeyer@riker.com
One Speedwell Avenue
Morristown, NJ 07962-1981
Telephone: 973.538.0800
Facsimile: 973.451.3708

MCGUIREWOODS LLP
Andrew G. McBride, *pro hac vice*
  amcbride@mcguirewoods.com
2001 K Street N.W.
Suite 400

By: *Anthony P. Callaghan*
Anthony P. Callaghan

GIBBONS P.C.
Anthony P. Callaghan, Esq.
Thomas R. Valen, Esq.
Sylvia-Rebecca Gutiérrez, Esq.
One Gateway Center
Newark, NJ  07102
Tel:  (973) 596-4500
Fax:  (973) 596-0545
acallaghan@gibbonslaw.com
tvalen@gibbonslaw.com
sgutierrez@gibbonslaw.com

LATHAM & WATKINS LLP
Steven M. Bauer, *pro hac vice*
  Steven.Bauer@lw.com
Margaret A. Tough, *pro hac vice*
  Margaret.Tough@lw.com
Gabriella Kapp, *pro hac vice*
  Gaby.Kapp@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Tel: (415) 391-0600
Fax: (415) 395-8095

*Attorneys for Defendants Phillips 66 and Phillips 66 Company*

By: */s/ Jeffrey S. Chiesa*
Jeffrey S. Chiesa

CHIESA SHAHINIAN & GIANTOMASI PC
Jeffrey S. Chiesa
  jchiesa@csglaw.com

Washington, DC 20006-1040
Telephone: 202.857.2487
Facsimile: 202.828.2987

Brian D. Schmalzbach, *pro hac vice*
  bschmalzbach@mcguirewoods.com
800 East Canal Street
Richmond, VA 23219
Telephone: 804.775.4746
Facsimile: 804.698.2304

Amanda S. Hawkins, *pro hac vice*
  ashawkins@mcguirewoods.com
501 Fayetteville Street
Raleigh, NC 2760
Telephone: 919.755.6600
Facsimile: 919.755.6699

*Attorneys for Defendant American Petroleum Institute*

By: */s/ Loly G. Tor*
Loly G. Tor

K&L GATES LLP
Loly G. Tor
  loly.tor@klgates.com
One Newark Center, 10th Fl.
Newark, NJ 07102
Phone: (973) 848-4026

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
David C. Frederick, *pro hac vice*
  dfrederick@kelloghansen.com
Brendan J. Crimmins, *pro hac vice*
  bcrimmins@kelloghansen.com
Grace W. Knofczynski, *pro hac vice*
  gknofczynski@kelloghansen.com

Dennis M. Toft
  dtoft@csglaw.com
Michael K. Plumb
  mplumb@csglaw.com
One Boland Drive
West Orange, New Jersey 07052
Telephone: (973) 325-1500
Facsimile: (973) 325-1501

BARTLIT BECK LLP
Jameson R. Jones, *pro hac vice*
  jameson.jones@bartlitbeck.com
Daniel R. Brody, *pro hac vice*
  dan.brody@bartlitbeck.com
Sean C. Grimsley, *pro hac vice*
  sean.grimsley@bartlitbeck.com
1801 Wewatta Street
Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

LATHAM & WATKINS LLP
Steven M. Bauer, *pro hac vice*
  Steven.Bauer@lw.com
Margaret A. Tough, *pro hac vice*
  Margaret.Tough@lw.com
Gabriella Kapp, *pro hac vice*
  Gaby.Kapp@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Tel: (415) 391-0600
Fax: (415) 395-8095

*Attorneys for Defendants*
*ConocoPhillips and ConocoPhillips*
*Company*

Daniel S. Severson, *pro hac vice*
  dseverson@kellogghansen.com
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900

*Attorneys for Defendants Royal Dutch*
*Shell plc and Shell Oil Company*